1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| 9 | RICHARD KENNEDY and MARGARET HAZARD, individually and on behalf of all others similarly situated,

       Plaintiffs,

  v.

EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION; SHELL PLC; SHELL USA, INC.; EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US; SHELL TRADING (US) COMPANY; CHEVRON CORPORATION; CHEVRON U.S.A. INC.; BP PLC; BP AMERICA, INC.; BP PRODUCTS OF NORTH AMERICA; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; and AMERICAN PETROLEUM INSTITUTE,

       Defendants. | Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED** |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    NATURE OF THIS ACTION ....................................................................1

II.   PARTIES ..............................................................................................4

      A.    Plaintiffs ...................................................................................4

      B.    Defendants ................................................................................5

            1.    The Exxon/Mobil Defendants (Exxon Mobil Corporation
                  and ExxonMobil Oil Corporation)...........................................6

            2.    The Shell Defendants (Shell PLC, Shell USA, Inc., Equilon
                  Enterprises LLC d/b/a Shell Oil Products US, and Shell
                  Trading (US) Company). ........................................................8

            3.    The Chevron Defendants (Chevron Corporation and
                  Chevron U.S.A. Inc.). ..........................................................10

            4.    The BP Defendants (BP PLC, BP America, Inc., and BP
                  Products of North America)....................................................12

            5.    The Conoco/Phillips Defendants (ConocoPhillips and
                  ConocoPhillips Company). .....................................................14

            6.    The American Petroleum Institute. ........................................15

III.  JURISDICTION AND VENUE ..............................................................17

IV.   FACTUAL ALLEGATIONS .................................................................23

      A.    Unabated And Ever-Increasing Fossil Fuel Sales Driven By The
            Defendants' Deceptive And Unlawful Conduct And Their
            Insatiable Appetite For Profits Are Driving Climate Change...............23

      B.    Big Tobacco Redux.....................................................................24

      C.    They Knew All Along...................................................................24

      D.    They Made A Conscious And Deliberate Choice To Lie In Order
            To Protect Their Profits ..............................................................35

      E.    They Funded Fraudulent Scientific Research .................................48

      F.    They Conspired With, Financed, And Worked Hand-In-Hand With
            Industry Trade Associations, Front Groups, And Other
            Organizations To Lie About It......................................................51

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

G.  Defendants Targeted Universities, The Press, And Critics....................................70

H.  Funding and Shaping Academic Research Programs ............................................71

I.  Conditioning Grants on Cooperation from Researchers........................................73

J.  Using Academic Programs to Bolster Access to Policymakers............................74

K.  Tracking Critics And Pressuring News Outlets ....................................................75

L.  They Obstructed And Attempted To Undermine A Congressional Investigation...................................................................................................77

M.  Meanwhile, They Schemed About How To Protect Themselves And Profit From Climate Change ........................................................................77

N.  The Lying Continues—The Greenwashing ..........................................................79

O.  Causation And Damages ......................................................................................89

    1.  Atmospheric CO2 levels sufficient to cause the severe weather events driving the Plaintiffs' increased home-owners premiums were not inevitable. .....................................................89

    2.  Defendants obstructed and delayed the transition to clean energy sources they knew could be achieved by deceiving consumers. .................................................................................................92

    3.  The massive fossil fuel sales driven by the Defendants' deceptive and unlawful conduct have now resulted in the very same extreme weather events defendants foresaw they would and, in turn, have precipitated a home-owners insurance crisis...................................................................................96

V.  CLASS ACTION ALLEGATIONS ..............................................................................100

FIRST CAUSE OF ACTION VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §1962(C))...................................................................................................................102

A.  The RICO Enterprise ........................................................................................102

B.  The Pattern Of Racketeering Activity................................................................104

SECOND CAUSE OF ACTION VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §1962(A))...................................................................................................................106



THIRD CAUSE OF ACTION VIOLATION OF THE RACKETEER
    INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C.
    §1962(B))..................................................................................................106

FOURTH CAUSE OF ACTION VIOLATION OF THE RACKETEER
    INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C.
    §1962(D))..................................................................................................107

FIFTH CAUSE OF ACTION FRAUDULENT MISREPRESENTATION (THE
    WASHINGTON SUB-CLASS ONLY) ....................................................108

SIXTH CAUSE OF ACTION CIVIL CONSPIRACY (THE WASHINGTON
    SUB-CLASS ONLY)................................................................................109

SEVENTH CAUSE OF ACTION UNJUST ENRICHMENT (THE
    WASHINGTON SUB-CLASS ONLY) ....................................................109

EIGHTH CAUSE OF ACTION VIOLATION OF THE WASHINGTON
    CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. §
    19.86.010, *ET SEQ.*) (THE WASHINGTON SUB-CLASS ONLY)..............109

NINTH CAUSE OF ACTION NUISANCE (THE WASHINGTON SUB-CLASS
    ONLY)......................................................................................................110

REQUEST FOR RELIEF ........................................................................................112

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# I.    NATURE OF THIS ACTION

1.    From 2018 through 2022, the annual number of major disaster declarations for climate-related events was almost double the annual average over the 50-year period from 1960 to 2010. In 2023, a significant number of natural catastrophes again impacted the United States, at an estimated cost of $114 billion, of which approximately $80 billion was insured. And in just the first three quarters of 2024, natural catastrophes caused the United States to suffer an estimated $145 billion in economic losses, of which nearly $80 billion was insured.[1]

2.    These immense and never-before-seen covered losses have sparked a multi-billion dollar increase in the premiums ordinary homeowners are being forced to pay. As the New York Times has observed, the Climate Crisis has become an Insurance Crisis.[2] As natural disasters become more costly, homeowners foot the bill.[3]

3.    In the state of Washington alone, homeowners rates have increased by a total of 51% over the past six years.   But climate change has driven insurance premium increases throughout the country because insurance generally operates by pooling risks.[4] Thus, when climate change increases the frequency and intensity of disasters, insurance companies will spread the costs across the customer pool in the form of higher rates.[5] "So even if you haven't been directly harmed by extreme weather, you're paying for some of the costs of those climate-worsened disasters."[6]

4.    This case is about holding the fossil fuel Defendants accountable for the increased homeowners' insurance premiums that their coordinated and deliberate scheme to hide the truth about climate change and the effects of burning fossil fuels has brought about and for their conduct contributing to climate change; a cost the highly profitable trillion dollar industry can easily afford,

---

[1] U.S. Department of the Treasury Report: *Homeowners Insurance Costs Rising, Availability Declining as Climate-Related Events Take Their Toll,* January 16, 2025.

[2] *See* https://www.nytimes.com/2024/12/19/climate/how-the-climate-crisis-became-an-insurance-crisis.html.

[3] *See* https://www.nytimes.com/2025/08/14/realestate/home-rebuild-rising-cost-natural-disaster.html.

[4] https://yaleclimateconnections.org/2025/01/nobodys-insurance-rates-are-safe-from-climate-change/.

[5] *Id.*

[6] *Id*.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    and one that it should not be permitted to simply pass along to the everyday people who are

2    presently bearing the burden of these increased premiums.

3         5.    Defendants have known since at least the 1960s, based on their own internal

4    scientific research, that carbon dioxide and other greenhouse gas pollution caused by the

5    unchecked sales of its highly profitable petroleum products would inevitably lead to "catastrophic"

6    weather-related consequences with "considerable significance to civilization" and that only a

7    narrow window of time existed in which to act before severe consequences would result.

8         6.    Defendants took this internal calculus seriously. They were well aware of that

9    climate change associated with the sale of fossil fuel products would result in extreme weather

10   events and rising sea levels, and they invested heavily to protect their own assets, infrastructure,

11   and operations from them and invested to continue and expand their conduct that was contributing

12   to climate change.

13        7.    Defendants were also well aware of the threat that the public's accurate

14   understanding of the risks associated with their fossil fuel products posed to their highly profitable

15   business model. As the Defendants themselves knew as early as 1980, clean non-fossil fuel energy

16   sources, if pursued, could penetrate fully half of the energy market by 2030.

17        8.    So rather than inform the public, or to undertake meaningful remedial steps,

18   Defendants chose instead to protect their profits by engaging in a massive, deliberate, decades-

19   long misinformation campaign intended to sow doubt in the minds of the media, business leaders,

20   and deceive the public and consumers about the conclusions they themselves had reached about

21   the substantial consequences that the sale of their products would have.

22        9.    Taking their lead from the big-tobacco playbook, Defendants embarked on a

23   coordinated, comprehensive, and disinformation campaign beginning at least as early as the 1970s

24   and continuing to this day. This campaign has included knowingly false public denials; funding

25   bogus "scientific research"; financing and working hand in hand with industry trade associations,

26   front groups, and other organizations to lie about the risks associated with their products; targeting

27   universities, the press, and critics; and obstructing a congressional investigation.

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

10. To falsely reassure consumers that purchasing fossil products is actually good for the planet, Defendants advertise them as "cleaner," "emissions-reducing," and the like, while failing to disclose their harmful effects on the climate. This, too, is a strategy taken from the tobacco industry's playbook, which deceptively promoted "low tar" and "light" cigarettes as healthier smoking options, when the companies knew that any use of cigarettes was harmful. Defendants here likewise falsely present themselves as corporate leaders in the fight against climate change, claiming to invest substantially in low-emission technologies and zero-emission energy sources, while their businesses continue to focus overwhelmingly on fossil fuel production and sales.

11. As United States Senator Sheldon Whithouse has aptly observed,

> "The tobacco fraud operation became the fossil fuel fraud operation: same entities, same people, same tactics. For years, the fossil fuel industry used that operation, and expanded and multiplied that operation, to sow false doubt about climate science and to fraudulently suggest we'd all be worse off if we solved the fossil fuel emissions problem."[7] "[A] lot of people and a lot of front groups, who had been 'expert' in how tobacco smoke wasn't bad for you, suddenly became 'expert' in how fossil fuel emissions wouldn't wreck the Earth's climate."[8] "The parallels between what the tobacco industry did and what the fossil fuel industry is doing now are striking. In fact, we can go back and re-read those judicial findings about tobacco, substitute the word 'fossil fuel,' and exactly describe what the fossil fuel industry is up to."[9]

12. Defendants' deceptive conduct and sophisticated and aggressive promotion of fossil fuel products without warning of their dangers worked as Defendants intended it to. It sustained and unduly inflated demand for fossil fuels, forestalled the move to low- and no-carbon alternatives, and generated trillions of dollars in profits for Defendants.

13. But the Defendants' profits have come at tremendous costs for others.

14. One of the many consequences of the Defendants' conduct has been a substantial increase in the cost that ordinary people must pay for home insurance in Washington and many parts of the United States.

---

[7] https://www.whitehouse.senate.gov/news/speeches/time-to-wake-up-301-a-dangerous-precipice/.

[8] *Id.*

[9] https://www.whitehouse.senate.gov/news/release/whitehouse-compares-climate-denial-to-civil-racketeering-perpetrated-by-tobacco-industry/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

15. The failures to disclose and deceptive promotion increased, inflated and maximized the market for and sales of Defendants' fossil fuels by forestalling the transition to clean energy sources, and has—in turn— resulted in atmospheric $CO_2$ levels sufficient to cause the very "catastrophic" climate consequences the Defendants themselves foresaw they would since at least the 1960s.

16. And there is no debate that these escalating extreme weather-related events have caused insurance companies to increase homeowner's insurance premiums, a multi-billion-dollar cost that is directly attributable to the Defendants' unlawful and deceptive conduct.

17. Plaintiffs and the putative class do not seek to limit, cap, or enjoin the production and sale of fossil fuels by Defendants, or anyone else. Instead, they seek only to recover damages that are attributable to the Defendants' unlawful and deceptive conduct and to enjoin the Defendants from continuing those unlawful and deceptive practices. Defendants' deceptive conduct is the gravamen and sole basis for the claims here. This lawsuit seeks to hold Defendants accountable for the lies they have told and the damage they have caused.

18. Plaintiffs bring this case as a proposed class action on behalf of all persons who purchased homeowner insurance at any time after 2017. Plaintiffs assert claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), and various state law claims.

## II.    PARTIES

### A.    Plaintiffs

19. Plaintiff Richard Kennedy is a citizen of the United States and the State of Washington, residing in Normandy Park, Washington. Plaintiff Kennedy has paid homeowner's insurance premiums since 2017 and since 2017 his insurance premiums have gone from $1,012.10 to $2,149.18, an increase of approximately 113%. Plaintiff Kennedy also regularly purchased gas for his vehicles at Shell stations in Burien, Washington. Plaintiff was unaware of Defendants' misleading and deceptive acts concerning the true impact their practices had on climate change and the related increase in his insurance premiums based on this wrongdoing. At no time during the class period did Defendants disclose the true impact of their practices and direct correlation to increased insurance premiums.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    20.    Plaintiff Margaret Hazard is a citizen of the United States and the State of

2  Washington, residing in Carson, Washington. Plaintiff Hazard has paid homeowner's insurance

3  premiums since 2017 and since 2017 her insurance premiums have doubled. Because of the

4  increased insurance premiums, Plaintiff Hazard recently had to change her homeowners insurance

5  to a different policy with less coverage which is concerning because she lives in area that is very

6  dry and prone to forest fires. Plaintiff Hazard has purchased gas from Shell and Chevron stations

7  near her home in Washington. Plaintiff was unaware of Defendants' misleading and deceptive acts

8  concerning the true impact their practices had on climate change and the related increase in her

9  insurance premiums based on this wrongdoing. At no time during the class period did Defendants

10 disclose the true impact of their practices and direct correlation to increased insurance premiums.

11 **B.    Defendants**

12    21.    The Defendants in this case can be fairly described as among the most successful

13 companies in the world. This handful of highly profitable companies is jointly responsible for just

14 under one-third of all of the total worldwide greenhouse gases emitted from 1965 to 2022, a period

15 during which approximately 70-75% of fossil fuel emissions in the entire history of human activity

16 have occurred. The Defendants' conduct is a direct cause of the climate change-related premium

17 hikes that the plaintiffs and putative class are now being forced to pay.

18    22.    As explained more fully below, the Defendants have purposefully distributed,

19 marketed, advertised, promoted, and supplied their fossil fuel products in the state of Washington

20 and elsewhere, with knowledge that the intended use of those products for combustion has caused

21 and will continue to cause severe climate change-related harms. Defendants engaged in a

22 conscious and deliberate scheme designed to conceal the harms it knew their products would cause,

23 mislead consumers and the public, and leave them in the dark about the serious adverse

24 consequences that would result, leaving the costs of those harms to be borne by others and reaping

25 enormous profits in the process.

26

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1. **The Exxon/Mobil Defendants (Exxon Mobil Corporation and ExxonMobil Oil Corporation).**

23.     Defendant Exxon Mobil Corporation is a New Jersey corporation headquartered in Spring, Texas.

24.     Exxon Mobil Corporation is vertically integrated and is active in every area of the oil and gas industry.

25.     Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Exxon Corporation; ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining & Supply Corporation; Exxon Company, U.S.A.; Standard Oil Company of New Jersey; and Mobil Corporation.

26.     Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "ExxonMobil."

27.     ExxonMobil's operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

28.     Exxon Mobile Corporation controls and has controlled decisions about the quantity and rate of fossil fuel production and sales of ExxonMobil products, including whether and to what extent ExxonMobil markets, produces, and/or distributes fossil fuel products.

29.     Exxon Mobile Corporation controls and has controlled decisions related to marketing, advertising, GHG emissions, and climate change from its fossil fuel products, including communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans for ExxonMobil.

30.     Exxon Mobil Corporation's Board of Directors holds the highest level of direct responsibility for climate change policy for ExxonMobil. Exxon Mobil Corporation's Chairman of the Board and Chief Executive Officer, its President, and the other members of its Management

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

1  Committee have been actively engaged in discussions relating to GHG emissions and the risks of

2  climate change on an ongoing basis. Exxon Mobil Corporation requires its subsidiaries, when

3  seeking funding for capital investments, to provide estimates of project costs related to GHG

4  emissions.

5      31.  ExxonMobil Oil Corporation is a New York corporation headquartered in Spring,

6  Texas.

7      32.  ExxonMobil Oil Corporation is a wholly owned subsidiary of Exxon Mobil

8  Corporation, acts on Exxon Mobil Corporation's behalf, and is subject to Exxon Mobil

9  Corporation's control.

10     33.  ExxonMobil Oil Corporation was formerly known as, did or does business as,

11  and/or is the successor in liability to Standard Oil Company of New York and Mobil Oil

12  Corporation.

13     34.  ExxonMobil, along with Defendants, BP, Shell, Chevron, and their predecessor

14  corporations, constituted a group in the 1970s known as the "Seven Sisters"[10] which controlled

15  around 85% of the world's petroleum reserves.[11]

16     35.  ExxonMobil is one of the largest "Big Oil" companies in the world.[12]

17     36.  ExxonMobil is the largest non-government-owned company in the energy

18  industry.[13]

19

20

21  [10] "Seven Sisters" was a common term for the seven transnational oil companies of the "Consortium for Iran"
oligopoly or Enterprise, which dominated the global petroleum industry from the mid-1940s to the mid-1970s.

22  Alluding to the seven mythological Pleiades sisters fathered by the titan Atlas, the business usage was popularized in
the 1950s by businessman Enrico Mattei, then-head of the Italian state oil company Eni. The industry group consisted

23  of Anglo-Iranian (started as Anglo-Persian) Oil Company (now BP), Gulf Oil (later part of Chevron), Royal Dutch
Shell, Standard Oil Company of California (SoCal, now Chevron), Standard Oil Company of New Jersey (Esso, later

24  Exxon, now part of ExxonMobil), Standard Oil Company of New York (Socony, later Mobil, also now part of
ExxonMobil), and Texaco (later merged into Chevron).

25  [11] Ian Mann, Shaky industry that runs the world, THE TIMES (Jan. 24, 2010), https://www.timeslive.co.za/
ideas/2010-01-24-shaky-industry-that-runs-the-world/.

    [12] Id.

26  [13] ExxonMobil, 2018 Financial & Operating Review, EXXONMOBIL (2019), https://corporate.exxonmobil

27  .com/-/media/global/files/annual-report/2018-financial-and-operating-review.pdf; Taylor, Matthew & Jonathan
Watts, Revealed: the 20 firms behind a third of all carbon emissions, THE GUARDIAN (Oct. 9, 2019) https://www.

28  theguardian.com/environment/2019/oct/09/revealed-20-firms-third-carbon-emissions (citing Richard Heede, Carbon
Majors: Update of Top Twenty companies 1965-2017, CLIMATE ACCOUNTABILITY INSTITUTE (Oct. 9, 2019)).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

37.     ExxonMobil has consistently ranked as the world's second-largest oil company by revenue.[14]

38.     ExxonMobil's total assets at the end of 2022 were valued at $369.1 billion.[15]

39.     ExxonMobil, including its joint ventures, is responsible for 3.59% of all Global GHG emissions from 1965 to 2022.[16]

40.     ExxonMobil manages, directs, and controls its and its subsidiaries' policies and practices related to climate change and fossil fuel production.

41.     ExxonMobil's operation includes the marketing, advertising, and sales of its petroleum-based products throughout the United States.

**2.     The Shell Defendants (Shell PLC, Shell USA, Inc., Equilon Enterprises LLC d/b/a Shell Oil Products US, and Shell Trading (US) Company).**

42.     Shell PLC f/n/a Royal Dutch Shell PLC is a public limited company registered in England and Wales, with its international headquarters in The Hague, Netherlands. Shell's headquarters for its U.S. operations is in Houston, Texas.

43.     Shell PLC is vertically integrated and is active in every area of the oil and gas industry.

44.     Shell PLC, Shell USA, Inc., Equilon Enterprises LLC d/b/a Shell Oil Products US, and Shell Trading (US) Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Shell."

45.     Shell's operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

---

[14] Fortune, Global 500, FORTUNE 500, https://fortune.com/fortune500/2022/.

[15] 42 ExxonMobil, 2022 Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10K), EXXONMOBIL (Feb. 27, 2019) https://www.sec.gov/Archives/edgar/data/34088/000003408823000020/xom20221231.htm.

[16] Richard Heede, Carbon Majors: Update of Top Twenty companies 1965-2017, CLIMATE ACCOUNTABILITY INSTITUTE (Updated Aug. 2023).

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    46.    Shell PLC controls and has controlled decisions about the quantity and rate of fossil

2 fuel production and sales of Shell, including whether and to what extent Shell markets, produces,

3 and/or distributes fossil fuel products.

4    47.    Shell PLC controls and has controlled decisions related to marketing, advertising,

5 GHG emissions, and climate change from its fossil fuel products, including communications

6 strategies concerning climate change and the link between fossil fuel use and climate change-

7 related impacts on the environment and humans for Shell.

8    48.    Shell PLC's Board of Directors holds the highest level of direct responsibility for

9 climate change policy for Shell Oil. At least as early as 1988, Shell PLC, through its predecessors

10 and subsidiaries, was researching company-wide $CO_2$ emissions and concluded that climatic

11 changes could compel Shell Oil, as controlled by Shell PLC, to examine the possibilities of

12 expanding and contracting its business accordingly.

13    49.    Shell USA, Inc. (formerly Shell Oil Company) is a wholly owned subsidiary of

14 Shell PLC that acts on Shell PLC's behalf and is subject to Shell PLC's control. Shell USA, Inc.

15 is incorporated in Delaware, with its principal office in Houston, Texas. Shell USA, Inc. was

16 formerly known as, did or does business as, and/or is the successor in liability to Shell Oil

17 Company; Shell Oil; Deer Park Refining LP; Shell Oil Products US; Shell Chemical LP; Shell

18 Trading (US) Company; Shell Energy Resources Company; Shell Energy Services Company,

19 L.L.C.; The Pennzoil Company; and Pennzoil-Quaker State Company.

20    50.    Equilon Enterprises LLC d/b/a Shell Oil Products US is a wholly owned subsidiary

21 of Shell PLC, that acts on Shell PLC's behalf and is subject to Shell PLC's control. It is a Delaware

22 limited liability corporation with its principal office in Houston, Texas.

23    51.    Shell Trading (US) Company is a wholly owned subsidiary of Shell PLC that acts

24 on Shell PLC's behalf and is subject to Shell PLC's control. It is a Delaware corporation with its

25 principal office in Houston, Texas.

26    52.    Shell is also one of the largest of the "Big Oil" companies in the world.

27

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

53.     Shell has operations in over 70 countries.[17]

54.     Shell owns "Pennzoil," "Quaker State," and "Jiffy Lube." Shell claims to be the number one global lubricant supplier, delivering market-leading lubricants to consumers in over 100 countries.[18]

55.     At the end of 2018, Shell reported $339.2 billion in assets.[19]

56.     Shell, including its joint ventures, is responsible for 12.96% of all global industrial GHG emissions from 1965 to 2022.[20]

57.     Shell manages, directs, and controls its policies and practices related to climate change and fossil fuel production.

58.     Shell's operation includes the marketing, advertising, and sales of its petroleum-based products throughout the United States.

**3.     The Chevron Defendants (Chevron Corporation and Chevron U.S.A. Inc.).**

59.     Chevron Corporation is incorporated in Delaware, with its principal place of business in San Ramon, California.

60.     Chevron Corporation is vertically integrated and is active in every area of the oil and gas industry.

61.     Chevron Corporation and Chevron USA, Inc., and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Chevron."

62.     Chevron's operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

---

[17] Shell Global, Who We Are, SHELL PLC, https://www.shell.com/about-us/who-we-are.html.

[18] Shell United States, Shell Engine Oils and Lubricants, SHELL UNITED STATES, https://www.shell.com/motorist/oils-lubricants.

[19] Royal Dutch Shell PLC, Form 20-F Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, SHELL PLC (Mar. 13, 2019), https://www.shell.com/about-us/annual-publications/annual-reportsdownloadcentre/_jcr_content/par/tabbedcontent_f645/tab_603d/textimage_18e7.stream/1594128317894/3358e41179b57db16dae76d29cf27e0e1b45eaff/annual-report-rds-20f-2018.pdf.

[20] Heede, *supra*.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

63.    Chevron Corporation controls and has controlled decisions about the quantity and rate of fossil fuel production and sales of Chevron, including whether and to what extent Chevron markets, produces, and/or distributes fossil fuel products.

64.    Chevron Corporation controls and has controlled decisions related to marketing, advertising, GHG emissions, and climate change from its fossil fuel products, including communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans for Chevron.

65.    Chevron Corporation's Board of Directors holds the highest level of direct responsibility for climate change policy for Chevron.

66.    Defendant Chevron U.S.A. Inc. is a wholly owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control. Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal office in San Ramon, California. Chevron U.S.A. Inc. was formerly known as, did or does business as, and/or is the successor in liability to Chevron Energy Solutions Company, Chevron Products Company, Chevron U.S.A. Production Company, Chevron U.S.A. Products Company, ChevronTexaco Exploration & Production Company, ChevronTexaco Products Company, Gulf Oil Corp., and Warren Petroleum Company.

67.    Defendants Chevron Corporation and Chevron U.S.A. Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Chevron."

68.    Chevron is one of the largest "Big Oil" companies in the world.

69.    Chevron is active in more than 180 countries. As of 2017, it ranked nineteenth in the Fortune 500 list of the top U.S. closely held and public corporations and sixteenth on the Fortune Global 500 list of the top 500 corporations worldwide.[21]

---

[21] Fortune, *Chevron | 2022 Fortune 500*, FORTUNE, https://fortune.com/company/chevron/fortune500/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

70.    Chevron sells the "Delo," "Ursa," "Havoline," "IsoClean," and "Techron" heavy-duty diesel engine oils, coolants/antifreeze, transmission fluids, gear oils, greases, and hydraulic oils.

71.    According to its 2017 corporate disclosures, Chevron had $253.8 billion in total assets.[22]

72.    Chevron, including its joint ventures, is responsible for 6.53% of all global industrial GHG emissions from 1965 to 2022.[23]

73.    Chevron manages, directs, and controls its and its subsidiaries' policies and practices related to climate change and fossil fuel production.

74.    Chevron's operation includes the marketing, advertising, and sales of its petroleum-based consumer products throughout the United States.

**4.    The BP Defendants (BP PLC, BP America, Inc., and BP Products of North America).**

75.    BP PLC is a public limited company registered in England and Wales, with its international headquarters in London, England. The headquarters for BPC's U.S. operations is in Houston, Texas.

76.    BP PLC is vertically integrated and is active in every area of the oil and gas industry.

77.    BP PLC was formerly known as, did or does business as, and/or is the successor in liability to British Petroleum Company, British Petroleum Company PLC, BP Amoco PLC, Amoco Corporation, and Atlantic Richfield Company.

78.    BP PLC, BP America, Inc., and BP Products of North America and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "BP."

79.    BP's operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil

---

[22] Chevron, 2017 Annual Report, CHEVRON (2018), https://www.chevron.com/-/media/chevron/annualreport/2017/2017-Annual-Report.pdf.

[23] Heede, *supra*.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  into petroleum products and marketing those products; and manufacturing and marketing

2  commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

3      80.    BP PLC controls and has controlled decisions about the quantity and rate of fossil

4  fuel production and sales of BP, including whether and to what extent BP markets, produces,

5  and/or distributes fossil fuel products.

6      81.    BP PLC controls and has controlled decisions related to marketing, advertising,

7  GHG emissions, and climate change from its fossil fuel products, including communications

8  strategies concerning climate change and the link between fossil fuel use and climate change-

9  related impacts on the environment and humans for BP.

10      82.    BP PLC makes and has made decisions on the production and use of fossil fuel

11  reserves for the entire BP Group based on factors including climate change.

12      83.    BP PLC's senior leadership directly oversees and has overseen a "carbon steering

13  group," which manages climate change-related matters and consists of two committees—both

14  overseen directly by the board—focused on climate change-related investments.

15      84.    BP's Board of Directors holds the highest level of direct responsibility for climate

16  change policy for BP.

17      85.    BP is one of the largest "Big Oil" companies in the world.

18      86.    BP's assets total in excess of 249 billion.[24]

19      87.    BP, including its joint ventures, is responsible for 4.96% of all global industrial

20  GHG emissions from 1965 to 2022.[25]

21      88.    BP manages, directs, and controls its and its subsidiaries' policies and practices

22  related to climate change and fossil fuel production.

23      89.    BP's operation includes the marketing, advertising, and sales of its petroleum-based

24  consumer products throughout the United States.

25

26

27  [24] https://www.wsj.com/market-data/quotes/BP/financials/annual/balance-sheet.

28  [25] Heede, *supra*.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

**5.    The Conoco/Phillips Defendants (ConocoPhillips and ConocoPhillips Company).**

90.    ConocoPhillips is incorporated in Delaware, with its principal place of business in Houston, Texas.

91.    ConocoPhillips is vertically integrated and is active in every area of the oil and gas industry.

92.    ConocoPhillips and ConocoPhillips Company and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "ConocoPhillips."

93.    ConocoPhillips' operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

94.    ConocoPhillips controls and has controlled decisions about the quantity and rate of fossil fuel production and sales of ConocoPhillips, including whether and to what extent ConocoPhillips markets, produces, and/or distributes fossil fuel products.

95.    ConocoPhillips controls and has controlled decisions related to marketing, advertising, GHG emissions, and climate change from its fossil fuel products, including communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans for ConocoPhillips.

96.    ConocoPhillips has developed and implemented a corporate Climate Change Action Plan to govern climate change decision-making across all entities in ConocoPhillips.

97.    ConocoPhillips Board of Directors holds the highest level of direct responsibility for climate change policy for ConocoPhillips.

98.    ConocoPhillips Company is a wholly owned subsidiary of ConocoPhillips that acts on ConocoPhillips' behalf and is subject to ConocoPhillips' control. ConocoPhillips Company is incorporated in Delaware and has its principal office in Bartlesville, Oklahoma.

99.    ConocoPhillips is one of the largest "Big Oil" companies in the world.



100.    ConocoPhillips' assets total in excess of 122 billion.[26]

101.    ConocoPhillips, including its joint ventures, is responsible for 1.06% of all global industrial GHG emissions from 1965 to 2022.[27]

102.    ConocoPhillips manages, directs, and controls its and its subsidiaries' policies and practices related to climate change and fossil fuel production.

103.    ConocoPhillips' operation includes the marketing, advertising, and sales of its petroleum-based consumer products throughout the United States.

**6.    The American Petroleum Institute.**

104.    The American Petroleum Institute (API) is a national trade association that was formed in 1919 to advocate for the petroleum industry's interests. API has over 600 members and is the largest oil and trade association in the United States.

105.    API seeks to "influence public policy in support of a strong, viable U.S. oil and natural gas industry." API's mission has always been to foster "a strong, viable U.S. oil and natural gas industry," by encouraging production and consumption of fossil fuels for the financial benefit of its members.[28]

106.    As API's past president Frank Ikard put it: "API also works hard to promote the use of petroleum products … . [W]e cannot, of course, engage directly in selling gasoline to customers. But if we can't sell the steak, we can sell the sizzle." Ikard continued, "[w]e can contribute to gasoline sales, for example, by telling as many motorists as possible about the wonderful places to go in this country and about some of the historic trails that connect them. This we are doing by means of a national campaign of localized newspaper ads.[29]

107.    API has targeted advertising campaigns at United States consumers, including advertising on local television networks, on national television programs, and on social media.

---

[26] https://www.macrotrends.net/stocks/charts/COP/conocophillips/total-assets#google_vignette.

[27] Heede, *supra*.

[28] American Petroleum Institute, *About*, https://www.api.org./about.

[29] Address by Frank N. Ikard, President, American Petroleum Institute, at the Annual Meeting of the Interstate Oil Compact Commission, Broadwater Beach Hotel, Biloxi, Mississippi, Dec. 11, 1964 (Bernard Majewski Papers, Box 59, American Heritage Center, University of Wyoming).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

108.   API continues to act as an advertising and marketing arm for its member companies' fossil fuel products.

109.   API coordinates members of the petroleum industry, gathers information of interest to the industry, and disseminates that information to its members.

110.   All of the Big Oil companies that are Defendants in this case and/or their predecessors-in-interest or parent companies are or have been key API members and have held key API leadership roles. For example:

111.   Exxon's CEO served on API's Executive Committee, including as President and Chairman, for 21 of the 29 years between 1991 and 2020. Multiple high-level executives from Exxon, such as Presidents, Vice Presidents, CEOs, COOs, and Chairmen, served on API's Board in each year between 1994 and 2002.

112.   Shell's President served as API Treasurer in 1997 and sat on the Board's Executive Committee from at least 2005 to 2006. Multiple high-level Shell executives served on API's Board of Directors between 1994 and 2002. Sunoco's President served as API Board Chairman between 1965 and 1967.

113.   Chevron's CEO served as API Chairman in 1994, 1995, 1997, 1998, 2003, and 2012. In 2002, Chevron's CEO served as API Treasurer. Chairman and CEO of Chevron's predecessor, Texaco, served as API Board Chairman in 2001, and as Treasurer in 1999. Multiple high-level executives from Chevron served on API's Board of Directors in each year between 1994 and 2002.

114.   BP's CEO served as API's Chairman in 1988, 1989, and 1998. Multiple high-level executives from BP served on API's Board of Directors between 1994 and 2002. The Chairman and CEO of BP's predecessor, ARCO, served as API Treasurer in 1998 and Chairman in 1999.

115.   ConocoPhillips' Chairman and CEO was API Chairman from 2016 to 2018. Phillips 66's Chairman and CEO served as API Board President from 2020 to 2022. Multiple high-level ConocoPhillips executives served on API's Board of Directors between 1994 and 2002.

116.   Through membership, participation in key executive positions, and/or economic support for API, the Big Oil Defendants have collectively participated in the operation and control

1  of the association's policies and business practices, created, and carried out a fraudulent climate

2  change denial advertising and communications misinformation campaign in an effort to preserve

3  their fossil fuel-related profits. The Big Oil Defendants directly oversaw, took part in, and

4  controlled API's deceptive climate change misinformation campaign.

5     117.    Since the 1960s, API and its membership have known of the causes and harms of

6  climate change. But rather than inform the public, API and its membership instead chose to

7  participate in and lead a number of coalitions, front groups, and organizations that disseminated

8  false information about the climate impacts of fossil fuel products to consumers. These front

9  groups, funded and governed by the Fossil Fuel Industry, including the Defendants in this case,

10  included the Global Climate Coalition, Partnership for a Better Energy Future, Coalition for

11  American Jobs, Alliance for Energy and Economic Growth, and Alliance for Energy and

12  Environmental Protection, were established to spread misinformation and advocate for climate

13  change from a supposedly neutral source.

14     118.    API and the Big Oil Defendants' climate misinformation campaign continues to

15  date.

16     119.    As discussed more fully below, each of the Defendants was the agent, servant,

17  partner, aider and abettor, co-conspirator, and/or joint venturer of each of the remaining

18  Defendants herein and was at all times material hereto operating and acting within the purpose and

19  scope of said agency, service, employment, partnership, conspiracy, and joint venture and rendered

20  substantial assistance and encouragement to the other Defendants, knowing that their conduct was

21  wrongful.

22              **III.    JURISDICTION AND VENUE**

23     120.    This Court has subject matter jurisdiction over this action pursuant to the Class

24  Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because at least one Class

25  Member is of diverse state citizenship from Defendants, there are more than 100 Class Members,

26  and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs. This

27  Court also has jurisdiction pursuant to 28 U.S.C § 1331 as this case arises from violations of 18

28  U.S.C. 1961, *et seq.*

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

121.    The Western District of Washington has personal jurisdiction over Defendants.

122.    Each Defendant purposefully availed itself of the Washington market, and thus of the benefits of the laws of the State, during all times relevant to this Complaint, so as to render Washington courts' exercise of jurisdiction over each Defendant consistent with traditional notions of fair play and substantial justice.

123.    Each Defendant has had sufficient minimum contacts with the State and has purposefully directed activities toward this State and/or purposefully availed itself of the privileges and obligations of conducting business in this State, and/or has consented either explicitly or implicitly to the jurisdiction of this Court.

124.    Defendants engage in persistent courses of conduct in Washington; derive substantial revenue from manufactured goods, products, or services used or consumed there; and/or have interests in, use, or possess real property there, perform work there; contract to supply goods, manufactured products, or services there; and caused and continue to cause injury there.

125.    All of the Defendants are either registered to do business in Washington or have wholly-owned subsidiaries registered to do business in Washington.

126.    Each Defendant is transacting or has transacted substantial business in Washington; is contracting or has contracted to supply services or things in Washington; has or does derive substantial revenue in Washington or engages in a persistent course of conduct in Washington; had or has interests in, used or uses, or possessed or possesses real property in Washington; and/or caused tortious injury in Washington and has intentionally engaged in conduct aimed at Washington, which has caused harm they knew was likely to be incurred in Washington.

127.    Hundreds of Defendant-branded gas stations serve Washington consumers in the state. The Exxon/Mobil Defendants have at least 93 such locations in 56 Washington cities; the Shell Defendants have at least 456 such locations in 148 Washington cities; the Chevron Defendants have at least 425 such locations in 179 Washington cities; the BP Defendants have at

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    least 154 ARCO-branded such locations in 69 Washington cities; and the Conoco Defendants have

2    at least 67 such locations in 35 Washington cities.[30]

3         128.    Through their various agreements with dealers, franchises, or otherwise,

4    Defendants direct and control the branding, marketing, sales, promotions, image development,

5    signage, and advertising of their branded fossil fuels at their respectively branded gas stations in

6    Washington, including point-of-sale advertising and marketing. Defendants dictate which grades

7    and formulations of their gasoline may be sold at their respective branded stations. Defendants

8    also maintain websites to direct Washington residents to their nearby retail service stations.

9         129.    With respect to their subsidiaries, each non-resident Fossil Fuel Defendant parent

10   controls and has controlled decisions about the quantity and extent of its fossil fuel production and

11   sales; determines whether and to what extent to market, produce, and/or distribute its fossil fuel

12   products; and controls and has controlled decisions related to its marketing and advertising,

13   specifically communications strategies concerning climate change and the link between fossil fuel

14   use and impacts on the environment. Each non-resident Fossil Fuel Defendant parent has the power

15   to direct and control its non-resident subsidiaries named here. Thus, each subsidiary is the agent

16   of its parent. As agents, the subsidiaries of each non-resident Fossil Fuel Defendant conducted

17   activities in Washington at the direction and for the benefit of its parent company. Specifically,

18   the subsidiaries furthered each parent company's campaign of deception and denial through

19   misrepresentations, omissions, and affirmative promotion of the company's fossil fuel products as

20   safe with knowledge of the climate change-related harms that would result from the intended use

21   of those products, all of which resulted in climate change-related injuries in the State and increased

22   sales to the parent company. Therefore, the subsidiaries' jurisdictional activities are properly

23   attributed to each parent company and serve as a basis to assert jurisdiction over each of the non-

24   resident Fossil Fuel Defendant parent companies.

25        130.    Defendants have purposefully directed and continue to purposefully direct their

26   tortious conduct toward Washington by distributing, marketing, advertising, promoting, and

27

28   _____
     [30] https://www.scrapehero.com/location-reports/top-gas-stations-in-washington-usa/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  supplying fossil fuels in Washington, with knowledge that fossil fuels have caused and will

2  continue to cause climate crisis-related injuries in Washington.

3          131.    Defendants committed substantial acts to further the conspiracy in Washington by

4  making affirmative misrepresentations to Washington consumers, as well as misleading them by

5  omission, about the existence, causes, and effects of global warming, the role their fossil fuel sales

6  plays in climate change, and the risks associated with the sale of their fossil fuel products. Indeed,

7  Defendants affirmatively promoted the Fossil Fuel Defendants' fossil fuel products as safe, with

8  knowledge of the disastrous impacts that would result from the intended use of those products.

9          132.    Over the past several decades, Defendants, directly and through their surrogates,

10  have spent millions of dollars on radio, television, outdoor advertisements, and social media sites

11  in the Washington market related to their fossil fuels. As just one example, a December 12, 2003

12  Op-Ed in the Seattle Post-Intelligencer, authored by former API and Global Climate Coalition

13  executive William O'Keefe, claimed the "science of climate change" was "far from settled,"

14  relying on a "review" by Willie Soon, who was later exposed as receiving millions of dollars in

15  funding from the oil and gas industry, including at least some of the Defendants here. In the OpEd,

16  O'Keefe asserts, falsely, that "Neither I nor anyone else knows whether climate over the course of

17  this century will be a scientific curiosity or a serious ecological threat," when it was well known

18  for years, throughout the fossil fuel industry, that climate change posed a "serious ecological

19  threat." Since the 1970s and continuing today, Defendants have also advertised in print

20  publications circulated widely to Washington consumers, including, but not limited to: The

21  Atlantic, The Economist, Fortune Magazine, The New York Times, People, Sports Illustrated,

22  Time Magazine, The Washington Post, Newsweek, and The Wall Street Journal.

23          133.    The Western States Petroleum Association (WSPA) is one of the oldest oil and gas

24  trade associations in the United States. Exxon, Shell, Chevron, and BP are members, among others.

25  InfluenceMap describes the organization as "actively engaged on climate policy with strongly

26  negative positions, particularly on state-level policy in California, Washington, and Oregon."

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    WSPA has lobbied against bills designed to reduce emissions, including by working to establish a

2    network of "citizen activist" groups in western states.[31]

3         134.    Two key documents obtained by the House Oversight Committee reveal BP's

4    comprehensive campaign in Washington, in collaboration with WSPA, to oppose state and local

5    policies that would have cut climate-warming emissions. After a Washington County proposed an

6    ordinance that would require one of BP's refineries to reduce its carbon emissions and make it

7    more difficult to obtain permits to expand or upgrade refineries, BP launched a statewide campaign

8    to oppose it. In an internal memorandum, BP outlined a planned "$300,000 advocacy campaign to

9    build opposition to the proposal in its current form and persuade local officials to amend, postpone,

10   or give up on the plan." The document noted that WSPA would "also run a coordinated $200,000

11   grassroots voter activation campaign on behalf of its membership." In the memorandum, BP

12   explained that, "given the opposition to our industry in this area of the United States[,] … we are

13   also developing a comprehensive Washington State strategy" for "managing business and

14   reputational risk from our West Coast operations" in the long-term.[32]

15        135.    A document from a few months after the memorandum shows how BP's statewide

16   strategy evolved. In the document, BP identified a handful of key actions and investments to exert

17   its influence in the region. BP planned to enhance "external education, community engagement,

18   political influence and advocacy [that] can change the narrative, stem the flow of bad policy and

19   create opportunities for business growth." The team asked for a "significant increase in C&EA

20   funding" as well as $2.5 million to construct a salmon hatchery that, officials believed, "would

21   change the dynamic of how the public and elected officials view the refinery." The team requested

22   between $2.5 and $4.5 million for "hard persuasion" tactics, such as television advertising, and

23   $300,000 for "soft persuasion" to be invested in the community and grow support that "will be

24   helpful with elected officials." BP believed that its Washington strategy was necessary because it

25

26

---

27   [31] 2014, Congressional Joint Staff Report: *Denial, Disinformation, and Doublespeak: Big Oil's Evolving Efforts to Avoid Accountability for Climate Change.*

28   [32] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  feared that its reputation would "only get worse unless we change the public's perception of us

2  and the elected official's lack of respect for our business."[33]

3      136.    The causes of action arise from and/or relate to Defendants' transaction of business

4  within Washington, commission of tortious acts within this State, and/or ownership, use, or

5  possession of any real estate situated in this State. Defendants, in coordination with trade

6  organizations, including Defendant API, conspired to conceal and misrepresent the known dangers

7  of burning fossil fuels, to knowingly withhold material information regarding the consequences of

8  using fossil fuel products, to spread knowingly false and misleading information to the public

9  regarding the weight of climate science research, and to promote consumer demand for fossil fuel

10  products, which they knew were harmful.

11      137.    Through their own actions and through their membership and/or participation in

12  climate denialist front groups, each Defendant was and is a member of that conspiracy. Defendants

13  committed substantial acts to further the conspiracy in Washington by making misrepresentations

14  and misleading omissions to Washington consumers about the existence, causes, and effects of

15  global warming; by affirmatively promoting the Defendants' fossil fuel products as safe, with

16  knowledge of the disastrous impacts that would result from the intended use of those products; and

17  by failing to warn Washington consumers about the disastrous impacts of fossil fuel use.

18      138.    Defendants conduct and its effects, including extreme and unprecedented weather

19  events, directly impacts the people of Washington[34] and a substantial effect of this conspiracy has

20  manifested itself in Washington in the form of increased insurance premiums resulting directly

21  from the extreme heat, severe droughts, water shortages, catastrophic wildfires, massive storms,

22  and flooding that Defendants knew and actually foresaw would result from their unlawful and

23  deceptive conduct.

24      139.    Venue is appropriate in this District pursuant to 28 U.S.C. §1391(b).

[33] *Id.*

[34] Snover, A.K., C.L. Raymond, H.A. Roop, H. Morgan, 2019. No Time to Waste. The Intergovernmental Panel on Climate Change's Special Report on Global Warming of 1.5°C and Implications for Washington State. Briefing paper prepared by the Climate Impacts Group, University of Washington, Seattle.

## IV.    FACTUAL ALLEGATIONS

**A.    Unabated And Ever-Increasing Fossil Fuel Sales Driven By The Defendants' Deceptive And Unlawful Conduct And Their Insatiable Appetite For Profits Are Driving Climate Change**

140.    Defendants' promotion and sale of fossil fuels has exploded since World War II, driving a concurrent and dramatic rise in greenhouse gas emissions (GHG), including $CO_2$. In fact, the vast bulk of all anthropogenic[35] GHG emissions in history have occurred from the 1950s to the present, a period known as the "Great Acceleration."[36] Approximately three-quarters of all industrial $CO_2$ emissions in history have occurred since the 1960s.[37] And more than half have occurred since the early 1990s.[38]

141.    Fossil fuel emissions—especially $CO_2$—are far and away the dominant driver of climate change.[39]

142.    As GHG pollution accumulates in the atmosphere, some of which does not dissipate for potentially thousands of years (namely $CO_2$), climate changes and consequent adverse environmental changes compound, and their frequencies and magnitudes increase—a phenomenon about which Defendants were keenly aware for decades. As those adverse environmental changes compound and their frequencies and magnitudes increase, so too do the physical, environmental, economic, and social injuries that result from them.

143.    Defendants' accumulating, increasing, and ongoing fossil fuel sales – sales facilitated and maximized by the climate deception campaign described herein – have resulted in catastrophic consequences, including, but not limited to, extreme weather-related events, including deadly wildfires, floods, and storms, which, in turn, have caused a significant increase in the

---

[35] The term "anthropogenic" is defined by the Merriam Webster Dictionary as "of, or relating to, or resulting from the influence of human beings on nature." Merriam Webster Dictionary, Anthropogenic, https://perma.cc/LV59-6Y62.

[36] Will Steffen et al., The Trajectory of the Anthropocene: The Great Acceleration, 2 The Anthropocene Rev. 81, 81 (2015).

[37] R. J. Andres et al., A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion, 9 Biogeosciences 1845, 1851 (2012); Glob. Carbon Budget, The Latest GCB Data, https://globalcarbonbudgetdata.org/latest-data.html.

[38] *Id.*

[39] *See* Intergovernmental Panel on Climate Change ("IPCC"), Summary for Policymakers, in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment; Peter C. Frumhoff et al., The climate responsibilities of industrial carbon producers, Climatic Change 132:157-171 (2015) (hereinafter Frumhoff 2015) Report 4–9 (2021), https://perma.cc/WQS2-2VRK.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

insurance premiums homeowners are being forced to pay. Defendants GHG emissions total just under one-third of all of the collective GHG emissions in history. Their unlawfully boosted fossil fuel sales are much more than a substantial contributing factor to the damages the Plaintiffs seek here.

**B.     Big Tobacco Redux**

144.    As set forth below, the tactics Defendants' employed to maximize and protect massive fossil fuel sales and profits in the face of growing public awareness of the dangerous consequences those sales posed – including outright denial, claiming uncertainty when there was in fact a scientific consensus, and secretly funding, then publicly promoting fringe scientific theories as evidence of a true scientific debate – mirrored the tactics that cigarette companies used to persuade consumers that smoking did not cause cancer:

> The tobacco fraud operation became the fossil fuel fraud operation: same entities, same people, same tactics. For years, the fossil fuel industry used that operation, and expanded and multiplied that operation, to sow false doubt about climate science and to fraudulently suggest we'd all be worse off if we solved the fossil fuel emissions problem.[40]

**C.     They Knew All Along**

145.    Defendants began studying the climate-related impacts of their fossil fuel sales for decades, developing a sophisticated and early understanding of the causal relationship between the two that was not available to the public.

146.    Since at least the 1950s, Defendants knew that their products caused climate change, and that the unabated sale of their fossil fuels would have severe environmental and social consequences.

147.    Defendants also knew, by at least the early 1980s, that urgent action was necessary and that there was "no leeway" for delay.

148.    Defendants were also very much aware of the risk the public's accurate knowledge of climate change science posed to their business model.

---

[40] https://www.whitehouse.senate.gov/news/speeches/time-to-wake-up-301-a-dangerous-precipice/.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    149.    In 1954, the American Petroleum Institute (API), the industry's main trade

2    association, learned from geochemist Harrison Brown and his colleagues at the California Institute

3    of Technology that fossil fuels had caused atmospheric carbon dioxide levels to increase by about

4    5% since 1840.[41]

5    150.    API continued to fund measurements of carbon dioxide levels thereafter, but did

6    not share the results publicly.[42]

7    151.    In 1959, physicist Edward Teller warned API members, including Defendants, that

8    "a temperature rise corresponding to a 10[%] increase in carbon dioxide will be sufficient to melt

9    the icecap and submerge … [a]ll the coastal cities … this chemical contamination is more serious

10   than most people tend to believe."[43]

11   152.    In 1965, President Lyndon Johnson's Science Advisory Committee (SAC) reported

12   that burning fossil fuels was adding carbon dioxide to the Earth's atmosphere and could lead to

13   uncontrollable and significant changes in the Earth's climate, and rapid sea-level rise.[44]

14   153.    The contents of the SAC report were not widely distributed to the public, but API

15   promptly discussed this report with its members, including Defendants, stating: "[t]he substance

16   of the report is that there is still time to save the world's peoples from the catastrophic consequence

17   of pollution, but time is running out."[45] API's President emphasized the report's finding that "the

18   pollution from internal combustion engines is so serious, and is growing so fast, that an alternative

19   nonpolluting means of powering automobiles, buses, and trucks is likely to become a national

20   necessity."[46]

21

22

23

24   [41] Benjamin Franta, Early Oil Industry Knowledge of $CO_2$ and Global Warming, 8 Nature Climate Change 1024, 1024–25 (2018).

25   [42] Id.

     [43] Edward Teller, Energy Patterns of the Future, in Energy and Man: A Symposium 53–72 (1960).

26   [44] President's Science Advisory Committee, Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel 9, 119–24 (Nov. 1965), https://hdl.handle.net/2027/uc1.b4315678.

27   [45] See Franta, Early Oil Industry Knowledge of $CO_2$ and Global Warming at 1024–25.

28   [46] Id.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    154.    API subsequently commissioned research on carbon dioxide pollution from the

2    Stanford Research Institute.[47]

3    155.    In 1968, the SRI scientists informed API that "[p]ast and present studies of $CO_2$ are

4    detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere." They warned

5    there was "no doubt" that the "potential damage to our environment could be severe."[48]

6    156.    In a supplemental report the next year (1969), the Stanford Research Institute

7    projected that, if present fossil fuel consumption trends continued, the concentration of carbon

8    dioxide in the atmosphere would reach 370 parts per million ("ppm") by 2000. The report explicitly

9    connected the rise in $CO_2$ levels to the combustion of fossil fuels, finding it "unlikely that the

10   observed rise in atmospheric $CO_2$ has been due to changes in the biosphere." The scientists'

11   projection was accurate. In 2000, the concentration of carbon dioxide in the atmosphere was

12   369.64 ppm.[49]

13   157.    API shared this research with Defendants. In 1972, API members received a status

14   report on all environmental research projects funded by API. The report summarized the 1968 SRI

15   report describing the impact of fossil fuel products, including Defendants', on the environment,

16   including global warming and attendant consequences.[50]

17   158.    Exxon also researched climate science. In the 1970s and 1980s, Exxon scientists

18   confirmed that burning fossil fuels was the dominant source of carbon dioxide pollution and

19   accurately predicted future concentrations of carbon dioxide and the associated rise in temperature.

20   They briefed management at the highest levels of their findings.

21   159.    In 1977, James Black, an Exxon scientist, briefed Exxon management that "current

22   scientific opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil

23

24   _____

[47] Elmer Robinson & R.C. Robbins, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, Stanford
25   Rsch. Inst. (Feb. 1968), https://www.smokeandfumes.org/documents/document16.

26   [48] Elmer Robinson & R.C. Robbins, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants
     Supplement, Stanford Rsch. Inst. (June 1969).

27   [49] NASA Goddard Institute for Space Studies, Global Mean $CO_2$ Mixing Ratios (ppm): Observations,
     https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt.

28   [50] American Petroleum Institute, Environmental Research, A Status Report, Committee for Air and Water
     Conservation (Jan. 1972).

**HAGENS BERMAN**

1  fuel consumption," and doubling atmospheric carbon dioxide would, according to the best climate

2  model available, "produce a mean temperature increase of about 2°C to 3°C" by 2050.[51]

3      160.    Black's predictions were correct. In 2023, independent researchers confirmed that

4  the observed change in temperature closely tracked his 1977 prediction.[52]

5      161.    Black highlighted the need to make "hard decisions regarding changes in energy

6  strategies" in the next 5-10 years (i.e., before 1987) to avoid these harms.[53]

7      162.    A confidential Exxon internal document from 1979 (The Proprietary October 19,

8  1979 Memo) stated plainly that the "most widely held theory of climate change was that it was

9  "due to fossil fuel combustion" and that that the present trend of fossil-fuel consumption "will

10  cause dramatic environmental effects before the year 2050"[54]:



**PROPRIETARY INFORMATION**
**Exxon** For Authorized Company Use Only — Petroleum Department —
**Engineering**

79PE 554        October 16, 1979

E X X O N   R E S E A R C H   A N D   E N G I N E E R I N G   C O M P A N Y

CONTROLLING THE $CO_2$ CONCENTRATION IN THE ATMOSPHERE

The $CO_2$ concentration in the atmosphere has increased since the beginning of the world industrialization. It is now 15% greater than it was in 1850 and the rate of $CO_2$ release from anthropogenic sources appears to be doubling every 15 years. The most widely held theory is that:

- The increase is due to fossil fuel combustion
- Increasing $CO_2$ concentration will cause a warming of the earth's surface
- The present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050.

11

12

13

14

15

16

17

18

19

20      163.    Throughout the 1970s, it was also becoming increasingly clear that widespread

21  acceptance of climate change as being driven by fossil fuels could have serious implications for

22  the Defendants' business model.

23

24  [51] Letter from J.F. Black, Exxon Research and Engineering Co., to F.G. Turpin, Exxon Research and Engineering Co., The Greenhouse Effect, ClimateFiles (June 6, 1978), http://www.climatefiles.com/exxonmobil/1978-exxon-memo-on-greenhouse-effect-for-exxoncorporation-management-committee.

25  [52] G. Supran et al., Assessing ExxonMobil's global warming projections. Science 379, eabk0063(2023). DOI: 10.1126/science.abk0063. https://www.science.org/doi/10.1126/science.abk0063.

26  [53] Id.

27  [54] R.L. Mastracchio & L.E. Hill, Proprietary Memorandum to R. L. Hirsch: Controlling Atmospheric $CO_2$ (Oct. 16, 1979), http://www.climatefiles.com/exxonmobil/1979-exxon-memo-on-potential-impact-of-fossil-fuel-combustion.

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

164.    In 1977, Exxon scientist Henry Shaw circulated a memo to colleagues pointing out that the climatic effects of rising $CO_2$ "may be the primary limiting factor on energy production from fossil fuels over the next few centuries."[55]

165.    In a 1979 memorandum, Shaw wrote: "It behooves us to start a very aggressive defensive program in the indicated areas of atmospheric science and climate because there is a good probability that legislation affecting our business will be passed."[56]

166.    A 1979 letter from Exxon's director of research, Edward David, to senior vice president George T. Piercy states that Exxon's ongoing research "could well influence Exxon's view about the long-term attractiveness of coal and synthetics relative to nuclear and solar energy."[57]

167.    The Proprietary October 19, 1979 Memo highlighted that "dramatic changes in patterns of energy use would be required" to avoid environmental damage. Significantly, the memo said that in order to limit $CO_2$ emissions to avoid these harms, fossil fuel emissions would have to peak in the 1990s and alternative energies would need to be rapidly deployed. Eighty percent of fossil fuel resources would remain undeveloped; thus "coal and possibly other fossil fuel resources could not be utilized to an appreciable extent." Certain fossil fuels, such as shale oil, could not be substantially exploited at all.[58]

168.    In 1979, API and its members, including Defendants, convened a Task Force to monitor and share cutting-edge climate research among the oil industry. The group was initially called the $CO_2$ and Climate Task Force, but in 1980 changed its name to the Climate and Energy Task Force (hereinafter referred to as "API $CO_2$ Task Force"). Membership included senior scientists and engineers from nearly every major U.S. and multinational oil-and-gas company,

---

[55] Henry Shaw, Interoffice Correspondence to John W. Harrison: Environmental Effects of Carbon Dioxide (Oct. 31, 1977), http://www.climatefiles.com/exxonmobil/1977-exxon-memo-about-doe-environmental-advisory-committee-subgroup-studying-CO2-effects.

[56] Henry Shaw, Interoffice Correspondence to H.N. Weinberg: Research in Atmospheric Science (Nov. 19, 1979), http://www.climatefiles.com/exxonmobil/1979-exxon-memo-on-atmospheric-science-research-to-influence-legislation.

[57] Edward David, Proprietary Memorandum to George Piercy (Nov. 9, 1979), https://insideclimate news.org/documents/letters-senior-vps-1980.

[58] Letter from W.L. Ferrall, Exxon Research and Engineering Co., to Dr. R.L. Hirsch, Controlling Atmospheric $CO_2$, Climate Investigations Ctr. (Oct. 16, 1979), https://www.industrydocuments.ucsf.edu/docs/mqwl0228.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    including Exxon and Mobil (ExxonMobil), among others. The Task Force was charged with

2    monitoring government and academic research, evaluating the implications of emerging science

3    for the petroleum and gas industries.[59]

4        169.    In 1979, API prepared a background paper on $CO_2$ and climate for the API $CO_2$

5    Task Force, stating that $CO_2$ concentrations were rising steadily in the atmosphere, and predicting

6    when the first clear effects of global warming might be detected. The API reported to its members

7    that although global warming would occur, it would likely go undetected until approximately the

8    year 2000, because the API believed its effects were being temporarily masked by a natural cooling

9    trend.[60]

10        170.    In 1980, the API $CO_2$ Task Force met with Dr. John Laurmann, "a recognized

11    expert in the field of $CO_2$ and climate." The meeting included a "complete technical discussion"

12    of global warming caused by fossil fuels, including "the scientific basis and technical evidence of

13    $CO_2$ buildup, impact on society, methods of modeling and their consequences, uncertainties, policy

14    implications, and conclusions that can be drawn from present knowledge." Representatives from

15    Exxon and API were present, and the minutes of the meeting were distributed to the entire API

16    $CO_2$ Task Force. Laurmann informed the Task Force of the "scientific consensus on the potential

17    for large future climatic response to increased $CO_2$ levels" and that there was "strong empirical

18    evidence that [the carbon dioxide] rise [was] caused by anthropogenic release of $CO_2$, mainly from

19    fossil fuel burning." Unless fossil fuel production and use were controlled, Lauermann explained,

20    atmospheric $CO_2$ would be twice preindustrial levels by 2038, with "likely impacts" including

21    "catastrophic effects" along the following trajectory:

22

23

24

25

---

26    [59] Neela Banerjee, Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too, Inside Climate
News (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxonmobil-oil-industry-peers-knew-about-
27    climate-change-dangers-1970s-american-petroleuminstitute-api-shell-chevron-texaco.

    [60] Memorandum from R.J. Campion to J.T. Burgess, The API's Background Paper on $CO_2$ Effects, Climate
28    Investigations Ctr. (Sep. 6, 1979), https://www.industrydocuments.ucsf.edu/docs/lqwl0228.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

```
· LIKELY IMPACTS:

   1°C RISE (2005): BARELY NOTICEABLE
   2.5°C RISE (2038): MAJOR ECONOMIC CONSEQUENCES, STRONG
                      REGIONAL DEPENDENCE

   5°C RISE (2067): GLOBALLY CATASTROPHIC EFFECTS
```

171.    Laurmann also explained that, while some uncertainty remains, if achieving high market penetration for new energy sources would require a long time, there was "no leeway" for delay. The Task Force planned to research the "market penetration requirements of introducing a new energy source into worldwide use."[61]

172.    During the 1980s, the API, including the API $CO_2$ Task Force, provided a forum for fossil-fuel companies to share their research efforts and corroborate their findings related to anthropogenic greenhouse-gas emissions.[62] "The group's members included senior scientists and engineers from nearly every major U.S. and multinational oil and gas company[.]"[63] By virtue of their membership and participation in API and/or as a result of their own analysis, all of the Defendants and/or their predecessors in interest either received the SRI reports or were on notice of their conclusions by no later than the early 1980s.

173.    A 1980 memorandum from the Exxon Research and Engineering Company states that "[t]here is little doubt that these observations indicate a growth in atmospheric $CO_2$. It is also believed that the growth of atmospheric $CO_2$ has been occurring since the middle of the past century, i.e., coincident with the start of the Industrial Revolution."[64]

174.    Also in 1980, Imperial Oil Limited ( an ExxonMobil subsidiary) reported to managers and environmental staff at multiple affiliated Esso and Exxon companies that there was

---

[61] Letter from Jimmie J. Nelson, American Petroleum Institute, to AQ-9 Task Force, The $CO_2$ Problem; Addressing Research Agenda Development, Climate Investigations Ctr. (Mar. 18, 1980), https://www.industry documents.ucsf.edu/docs/gffl0228.

[62] Neela Banerjee, Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too, Inside Climate News (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxon mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco     [https://perma.cc/QB22-KP6G].

[63] Id.

[64] Henry Shaw, General 7A Memorandum to T.K. Kett: $CO_2$ Greenhouse Effect (Dec. 18, 1980) (emphasis added),     http://www.climatefiles.com/exxonmobil/1980-exxon-memo-on-the-$CO_2$-greenhouse-effect-and-current-programs-studying-the-issue.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  "no doubt" that fossil fuels were aggravating the build-up of $CO_2$ in the atmosphere.[65] Imperial
2  noted that "Technology exists to remove $CO_2$ from stack gases but removal of only 50% of the
3  $CO_2$ would double the cost of power generation."

4      175.    Also in 1980, Exxon manager Henry Shaw briefed management on the "$CO_2$
5  Greenhouse Effect." Shaw's briefing stated that burning fossil fuels was increasing carbon dioxide
6  levels and this would "most likely" result in global warming of approximately 3°C around the year
7  2060; that calculations predicting a lower temperature increase were "not held in high regard by
8  the scientific community"; that oceans could absorb some heat that could delay (but not prevent)
9  the temperature increase "by a few decades," and that natural climate fluctuations would hide
10 global warming from carbon emissions until around the year 2000; and that the future impacts
11 would be "dramatic."[66]

12      176.    Shaw also reported on Exxon's research into "the market penetration of non-fossil
13 fuel technologies," and reported that, all other things being equal, alternative energy "would need
14 about 50 years to penetrate and achieve roughly half of the total [energy] market."[67]

15      177.    In 1981, Exxon staff sent an internal "Scoping Study on $CO_2$" to management
16 stating that "[e]nergy conservation or shifting to renewable energy sources[] represent the only
17 options that might make sense" in the future.[68]

18      178.    In 1981, Roger Cohen, an Exxon researcher, circulated a memorandum in which he
19 disagreed that climate change would be "well short of catastrophic":[69]

20
21
22

[65] Imperial Oil Ltd, Review of Environmental Protection Activities for 1978-1979 (Aug. 6, 1980), http://www.documentcloud.org/documents/2827784-1980-Imperial-Oil-Review-of-Environmental.html#document/p2.

[66] Memorandum from Henry Shaw to T.K. Kett, Exxon Research and Engineering Company's Technological Forecast: $CO_2$ Greenhouse Effect (Dec. 18, 1980), https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-SummarizingCurrent-Models-And.html.

[67] G. Supran et al., Assessing ExxonMobil's global warming projections. Science 379, eabk0063(2023). DOI:10.1126/science.abk0063. https://www.science.org/doi/10.1126/science.abk0063.

[68] Letter from G.H. Long, Exxon Research and Engineering Co., to P.J. Lucchesi et al., Atmospheric $CO_2$ Scoping Study, Climate Investigations Ctr. (Feb. 5, 1981), https://www.industrydocuments.ucsf.edu/docs/yxfl0228.

[69] Roger Cohen, Interoffice Correspondence to W. Glass (Aug. 18, 1981) http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

INTER-OFFICE CORRESPONDENCE

DATE August 18, 1981

TO          W. Glass                    REFERENCE

FROM        R. W. Cohen                 SUBJECT

I have looked over the draft of the EED reply to the
request from O'Loughlin.  The only real problem I have is with
the second clause of the last sentence in the first paragraph:
"but changes of a magnitude well short of catastrophic..."
I think that this statement may be too reassuring.  Whereas
I can agree with the statement that our best guess is that
observable effects in the year 2030 are likely to be "well
short of catastrophic", it is distinctly possible that the
CPD scenario will later produce effects which will indeed be
catastrophic (at least for a substantial fraction of the
earth's population).  This is because the global ecosystem
in 2030 might still be in a transient, headed for much more
significant effects after time lags perhaps of the order of
decades.  If this indeed turns out to be case, it is very
likely that we will unambiguously recognize the threat by
the year 2000 because of advances in climate modeling and
the beginning of real experimental confirmation of the $CO_2$
effect.  The effects of such a recognition on subsequent
fossil fuel combustion are unpredictable, but one can say
that predictions based only on our knowledge of availability
and economics become hazardous.

I would feel more comfortable if the first para-
graph concluded with a statement to the effect that future
developments in global data gathering and analysis, along
with advances in climate modeling, may provide strong
evidence for a delayed $CO_2$ effect of a truly substantial
magnitude, a possibility which increases the uncertainty
surrounding the post-2000 CPD scenario.

179.  A 1982 internal Exxon document (the "Cohen/Levine Memo") explicitly declared that the science was "unanimous" and that climate change would "bring about significant changes in the earth's climate":

[O]ver the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric $CO_2$. The consensus is that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 + 1.5)$ °C... There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere.[70]

180.  In 1982, Exxon's Environmental Affairs Manager distributed a confidential primer on climate change to a "wide circulation [of] Exxon management … intended to familiarize Exxon personnel with the subject."[71]

[70] Roger Cohen & Duane Levine, Memorandum to A.M. Natkin (Aug. 25, 1982) (emphasis added), http://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-CO2-greenhouse-effect-research.

[71] M.B. Glaser, Memorandum to Distribution List: CO₂ "Greenhouse" Effect (Nov. 12, 1982), http://www.climatefiles.com/exxonmobil/1982-memo-to-exxon-management-about-CO2-greenhouse-effect/ (hereinafter Glaser Memo 1982).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    global warming becomes detectable it could be too late to take effective countermeasures to reduce

2    the effects or even to stabilize the situation." The report emphasized that "the potential implications

3    for the world are … so large that policy options [to reduce emissions] need to be considered much

4    earlier." Thus, rather than research "what the world may be facing exactly," research should be

5    directed to ways to reduce emissions and alternate energy options.[76]

6        186.    Shell also acknowledged that: "it is possible that perception of a serious

7    environmental threat [such as climate change] could swing opinion away from fossil fuel

8    combustion and lead to a revival of interest in conservation, renewable sources and particularly

9    nuclear energy."[77] In assessing the "[i]mplications for Shell Companies … Group Planning felt

10    there was a possibility that an increasing awareness of the greenhouse effect might change people's

11    attitudes towards non-fossil energy sources, especially nuclear."[78]

12        187.    Ken Croasdale, a senior ice researcher for Exxon's subsidiary Imperial Oil, stated

13    to an audience of engineers in 1991 that greenhouse gases are rising "due to the burning of fossil

14    fuels. Nobody disputes this fact."[79]

15        188.    In a confidential 1989 scenario planning report, Shell noted that evidence "that

16    mankind and his actions could affect the climate … is strong and accumulating fast." In that report,

17    Shell evaluated a scenario it called "Sustainable World," which would address climate change by

18    reducing $CO_2$ emissions to 1989 levels by 2010. Contrasting the "Sustainable World" scenario

19    with another scenario titled "Global Mercantilism," Shell reported that under a "Sustainable

20    World" scenario, global temperatures would likely increase between 0.5 and 1.5 degrees Celsius

21    from $CO_2$ concentration increases that had already occurred by 1989, but the scenario "could

22    mitigate the problem." In contrast, under the "Global Mercantilism" scenario, which forecasted a

23

24

---

25    [76] Shell Internationale Petroleum, Greenhouse Effect Working Group, The Greenhouse Effect (May 1988),
26    https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239; https://s3.document
cloud.org/documents/4411090/Document3.pdf.

27    [77] Id.

      [78] Id.

28    [79] Ronald C. Kramer, Carbon Criminals, Climate Crimes (1st ed. 2020).

continual increase in $CO_2$ emissions, $CO_2$ concentrations and temperatures would rise considerably higher.[80]

189.    In another scenario, published in a 1998 internal report, Shell paints a disturbingly prescient scene:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the US. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry, or the government. After all, two successive IPCC reports since 1995 have reinforced the human connection to climate change … Following the storms, a coalition of environmental NGOs brings a class action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[81]

## D.    They Made A Conscious And Deliberate Choice To Lie In Order To Protect Their Profits

190.    As discussed above, Defendants realized long ago that accurate consumer and public understanding of the dangers of fossil fuels would pose a paramount threat to Fossil Fuel Defendants' business model, their assets, and their enourmous profits.

191.    The late 1980s marked a turning point: climate change began to be more widely recognized and publicly discussed, and Defendants efforts to silence the facts began to crack.

192.    In 1988, NASA scientist James Hansen testified at a congressional hearing "with 99% confidence" that global warming was already occurring.[82] The testimony was widely publicized, including coverage on the front page of The New York Times.

193.    The same year, the United Nations formed the Intergovernmental Panel on Climate Change (IPCC) and members of U.S. Congress introduced "The National Energy Policy Act of

---

[80] Shell Internationale Petroleum, Greenhouse Effect Working Group, The Greenhouse Effect (May 1988) pp. 1, 27, available at https://www.documentcloud.org/documents/4411090-Document3/.

[81] Royal Dutch Shell Group, Group Scenarios 1998–2020 (1998) pp. 115, 118, available at http://www.document cloud.org/documents/4430277-27-1-Compiled.html.

[82] Amy Lieberman & Susanne Rust, Big Oil braced for global warming while it fought regulations, Los Angeles Times (Dec. 31, 2015) (hereinafter Lieberman & Rust 2015).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  1988," which intended to "establish a national energy policy that will quickly reduce the generation

2  of carbon dioxide and [other] trace gases as quickly as is feasible in order to slow the pace and

3  degree of atmospheric warming … to protect the global environment."[83]

4  194.  In 1992, the United Nations held its Earth Summit in Rio de Janeiro and adopted

5  the United Nations Framework Convention on Climate Change (UNFCCC), which is an

6  international treaty with the aim of stabilizing the concentration of greenhouse gases to avoid the

7  most catastrophic impacts of climate change. By 1997, the UNFCCC had adopted the Kyoto

8  Protocol, which put the obligation to reduce greenhouse-gas emissions on developed countries on

9  the basis that they are historically responsible for the rising levels of greenhouse gases in the

10  atmosphere.

11  195.  The IPCC issued its first report in 1990 and a supplement in 1992. The IPCC

12  concluded that "emissions from human activities are substantially increasing the atmospheric

13  concentrations of greenhouse gases." Burning fossil fuels was responsible for 70-90% of those

14  emissions. The increase in greenhouse gasses will warm the Earth's surface, leading to serious

15  environmental damage. The IPCC found sufficient evidence of these risks to justify immediate

16  "use of cleaner, more efficient energy sources with lower or no emissions of greenhouse gases."[84]

17  196.  Defendants were well aware of the risk the public's clear knowledge of the effect

18  of climate change posed to their business.[85] For example, a slide presentation prepared by a

19  Princeton researcher funded through BP's CMI titled "The Challenge of Climate Change" reveals

20  BP's understanding of the threats to BP's core business posed by a shift from fossil fuel

21  consumption to lower carbon alternatives: "the climate problem has the potential to disrupt BP's

22  core business" because "effective climate policies can emerge that discourage fossil fuel

23  consumption … and that subsidize or otherwise promote efficiency and low carbon energy."

24

25

26  [83] Frumhoff 2015, *supra.*

27  [84] IPCC, Climate Change: The IPCC Scientific Assessment xi (1990), https://www.ipcc.ch/report/climate-change-the-ipcc-1990-and-1992-assessments.

28  [85] 2014, Congressional Joint Staff Report: *Denial, Disinformation, and Doublespeak: Big Oil's Evolving Efforts to Avoid Accountability for Climate Change.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

197.    In response to the public's growing knowledge, and the associated risk to their business model, Defendants made a conscious and deliberate choice to protect their profits by engaging in a deliberate decades-long misinformation campaign intended to sow doubt about the conclusions they themselves had reached about the substantial consequences that the sale of their products would have.

198.    In a secretly recorded video from 2021, an Exxon executive stated:

> Did we aggressively fight against some of the science? Yes.
>
> Did we join some of these shadow groups to work against some of the early efforts? Yes, that's true. There's nothing illegal about that.
>
> We were looking out for our investments. We were looking out for our shareholders.[86]

199.    In 1988, Joseph Carlson, an Exxon public affairs manager, stated in an internal memo that Exxon "is providing leadership through API in developing the petroleum industry position" on climate change.[87] The "Exxon Position" would, in pertinent part, be to:

> EMPHASIZE THE UNCERTAINTY IN SCIENTIFIC CONCLUSIONS REGARDING THE POTEN-TIAL ENHANCED GREENHOUSE EFFECT.
>
> RESIST THE OVERSTATEMENT AND SENSATIONALIZATION OF POTENTIAL GREENHOUSE EFFECT WHICH COULD LEAD TO NONECONOMIC DEVELOPMENT OF NONFOSSIL FUEL RESOURCES.

200.    In 2019, Professor Martin Hoffert, a physicist and Exxon consultant in the 1980s, testified to Congress about Exxon's "climate science denial program campaign," stating:

> [O]ur research [at Exxon] was consistent with findings of the United Nations Intergovernmental Panel on Climate Change on human impacts of fossil fuel burning, which is that they are increasingly having a perceptible influence on Earth's climate… . If anything, adverse climate change from elevated $CO_2$ is proceeding faster than the average of the prior IPCC mild projections and fully consistent with what we knew back in the early 1980's at Exxon… . I was greatly distressed by the climate science denial program campaign that Exxon's front office launched around the time I stopped

---

[86] Jeff Brady, Exxon Lobbyist Caught on Video Talking About Undermining Biden's Climate Push, NPR (July 1, 2021, 11:37 AM ET), https://perma.cc/MAZ7-TLG4.

[87] Memorandum from Joseph M. Carlson, The Greenhouse Effect (Aug. 3, 1988), https://assets.documentcloud.org/documents/3024180/1998-Exxon-Memo-on-the-GreenhouseEffect.pdf.



1
2
3
4

working as a consultant—but not collaborator—for Exxon. The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this.[88]

201.    Defendants formed the International Petroleum Industry Environmental

5    Conservation Association to coordinate the industry's response to the public's growing awareness

6    of climate change. Within the Association, Defendants participated in a "Working Group on

7    Global Climate Change." In 1990, the Working Group sent a strategy memo to Defendants and

8    hundreds of other oil companies. The memo explained that, to forestall a global shift away from

9    burning fossil fuels for energy, the industry should emphasize uncertainties in climate science, call

10    for further research, and promote industry-friendly policies that would leave the fossil-fuel

11    business intact.[89]

12    202.    In 1991, the Information Council for the Environment, whose members included

13    Defendants, launched a national climate change science denial campaign with full-page newspaper

14    ads, radio commercials, a public relations tour schedule, "mailers," and research tools to measure

15    campaign success. The campaign's top strategy was to:

16

17    # 1. Reposition global warming as theory (not fact).

18    203.    Its target audiences included younger, lower-income women who "are likely to be

19    'green' consumers, to believe the earth is warming, and to think the problem is serious … . These

20    women are good targets for magazine advertisements."[90]

21
22
23
24

---

[88] Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change, Hearing Before the Subcomm. on Civil Rights and Civil Liberties of the Comm. on Oversight and Reform, 116th Cong. 7–8 (Oct. 23, 2019) (statement of Martin Hoffert, Former Exxon Consultant, Professor Emeritus, Physics, New York University), https://oversight.house.gov/hearing/subcommittee-on-civil-rights-climate-change/.

[89] Benjamin A. Franta, Big Carbon's Strategic Response to Global Warming, 1950-2020 140 (2022), https://purl.stanford.edu/hq437ph9153.

[90] Union of Concerned Scientists, Deception Dossier #5: Coal's "Information Council on the Environment" Sham (1991), https://www.ucsusa.org/sites/default/files/attach/2015/07/TheClimate-Deception-Dossiers.pdf.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

204. The campaign planned to "use a spokesman from the scientific community" based on consumer research that found "technical and expert sources have the highest credibility among a broad range of members of the public."[91]

205. In 1994, an internal Shell report similarly described its public relations plan to emphasize:[92]

> Scientific uncertainty and the evolution of energy systems indicate that policies to curb greenhouse gas emissions beyond 'no regrets' measures could be premature, divert resources from more pressing needs and further distort markets.

206. In 1998, API formed the Global Climate Science Communications Team, including representatives from Exxon, API, and Chevron. There were no scientists on the Science Communications Team. The Science Communications Team enlisted several Defendant-funded front groups to participate, as well as a front group created by cigarette-maker Phillip Morris, "The Advancement of Sound Science Coalition," and its executive director, Steve Milloy, to assist. Philip Morris had created and funded "The Advancement of Sound Science Coalition" to act as a seemingly more credible and independent voice to claim that second-hand smoke did not cause cancer or heart disease. API and Defendants paid The Advancement of Sound Science Coalition and Steve Milloy to spread doubt about climate science in the same way that it spread doubt about smoking and cancer.[93]

207. The Global Climate Science Communications Team "developed an action plan to inform the American public that science does not support the precipitous actions Kyoto would dictate [i.e., reducing use of fossil fuels]." According to the plan:

[91] *Id.*

[92] Shell Internationale Petroleum, Greenhouse Effect Working Group, The Greenhouse Effect (May 1988), https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239.

[93] Union of Concerned Scientists, Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science (July 16, 2007), https://www.ucsusa.org/resources/smoke-mirrors-hot-air.

## Victory Will Be Achieved When

- Average citizens "understand" (recognize) uncertainties in climate science; recognition of uncertainties becomes part of the "conventional wisdom"

- Media "understands" (recognizes) uncertainties in climate science.

- Media coverage reflects balance on climate science and recognition of the validity of viewpoints that challenge the current "conventional wisdom"

- Industry senior leadership understands uncertainties in climate science, making them stronger ambassadors to those who shape climate policy

- Those promoting the Kyoto treaty on the basis of extant science appear to be out of touch with reality.

208.    The Global Climate Science Communications Team would: "1. Develop and implement a national media relations program to inform the media about uncertainties in climate science to generate national, regional, and local media coverage on the scientific uncertainties," to be accomplished by the following (among other actions): "offer scientists to appear on radio talk shows across the country … Identify, recruit, and train a team of five independent scientists to participate in media outreach … Produce [and] distribute a steady stream" of climate science information and editorials "authored by scientists" to media outlets nationwide. The Science Communications Team would also "Organize, promote and conduct through grassroots organizations a series of campus/community workshops/debates on climate science."[94]

209.    The Communications Team also planned to create a "one-stop resource on climate science" for industry partners, as well as policymakers, the media, and "all others concerned." In particular, the resource center would provide the "logistical and moral support" to enable industry partners to advocate for protecting fossil fuel markets based on alleged uncertainties in climate science.[95]

---

[94] Email from Joe Walker to Global Climate Science Team, Draft Global Climate Science Communications Plan (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/apiglobal-climate-science-communications-plan.pdf.

[95] Email from Joe Walker to Global Climate Science Team, Draft Global Climate Science Communications Plan (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/apiglobal-climate-science-communications-plan.pdf.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

210.     Soon after, API distributed a memo to its members stating: "Climate is at the center of industry's business interests. Policies limiting carbon emissions reduce petroleum product use. That is why it is API's highest priority issue and defined as strategic."[96]

211.     In furtherance of the campaign, for over a decade, Mobil (ExxonMobil) regularly published advertisements in the New York Times and other national newspapers. These advertisements were meant to look like editorials, not paid advertisements. In line with Defendants' strategy, many such "advertorials" claimed the science of climate change was uncertain or lacking evidence.

212.     For example, a 1993 Mobil advertorial published in the New York Times "Apocalypse No" (set forth in full on the following page of this complaint) asserted that "what's wrong with so much of the global warming rhetoric" is "[t]he lack of solid scientific data," and quoted a purportedly neutral scientific expert who insisted that "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."[97] It also quoted another purportedly neutral scientist who asserted that "the net impact [of a modest warming] may yet be beneficial."[98]

---

[96] Union of Concerned Scientists, Deception Dossier #5: Coal's "Information Council on the Environment" Sham at 47-49 (1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier5_ICE.pdf.

[97] Mobil, Apocalypse No, N.Y. Times, A19 (Feb. 25, 1993), https://perma.cc/MGA5-W43N.

[98] Id.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

# Apocalypse no

For the first half of 1992, America was inundated by the media with dire predictions of global warming catastrophes, all of which seemed to be aimed at heating up the rhetoric from the Earth Summit in Rio de Janeiro last June.

Unfortunately, the media hype proclaiming that the sky was falling did not properly portray the consensus of the scientific community. After the Earth Summit, there was a noticeable lack of evidence of the sky actually falling and subsequent colder than normal temperatures across the country cooled the warming hysteria as well.

Everybody, of course, remembers the Earth Summit and the tons of paper used up in reporting on it—paper now buried in landfills around the world. But few people ever heard of a major document issued at the same time and called the "Heidelberg Appeal." The reason? It just didn't make "news."

Perhaps that is because the Appeal urged Summit attendees to avoid making important environmental decisions based on "pseudo-scientific arguments or false and non-relevant data."

The Heidelberg Appeal was issued initially by some 264 scientists from around the world, including 52 Nobel Prize winners. Today, the Appeal carries the signatures of more than 2,300 scientists—65 of them Nobel Prize winners—from 79 countries. If nothing else, its message is illustrative of what's wrong with so much of the global warming rhetoric. The lack of solid scientific data.

Scientists can agree on certain facts pertaining to global warming. First, the greenhouse effect is a natural phenomenon; it accounts for the moderate temperature that makes our planet habitable. Second, the concentration of greenhouse gases (mainly carbon dioxide) has increased and there has been a slight increase in global temperatures over the past century. Finally, if present trends continue, carbon dioxide levels will double over the next 50 to 100 years.

Controversy arises when trying to link past changes in temperatures to increased concentrations of greenhouse gases. And it arises again when climate prediction models are used to conclude Earth's temperature will climb drastically in the next century and—based on such models—to propose policy decisions that could drastically affect the economy.

According to Arizona State University climatologist Dr. Robert C. Balling in his book, *The Heated Debate* (San Francisco: Pacific Research Institute for Public Policy, 1992), until knowledge of the interplay between oceans and the atmosphere improves, "model predictions must be treated with considerable caution." Moreover, models don't simulate the complexity of clouds, nor do they deal adequately with sea ice, snow or changes in intensity of the sun's energy.

And they don't stand up to reality testing. Comparing actual temperatures over the last 100 years against model calculations, the models predicted temperature increases higher than those that actually occurred. Moreover, most of the earth's temperature increase over the last century occurred before 1940. Yet, the real build-up in man-made $CO_2$ didn't occur until after 1940. Temperatures actually fell between 1940 and 1970.

Sifting through such data, Dr. Balling has concluded, "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."

Other scientists have an even more interesting viewpoint. Notes atmospheric physicist S. Fred Singer, president of the Washington, D.C.-based Science & Environmental Policy Project, "the net impact [of a modest warming] may well be beneficial."

All of which would seem to suggest that the jury's still out on whether drastic steps to curb $CO_2$ emissions are needed. It would seem that the phenomenon—and its impact on the economy—are important enough to warrant considerably more research before proposing actions we may later regret.

Perhaps the sky isn't falling, after all.

## Mobil

213.    The first of the purportedly neutral scientific experts mentioned in the Apocalypse

no advertorial, Robert C. Balling, acknowledged five years after the advertorial ran that he had

CLASS ACTION COMPLAINT - 42
011350-11/3355774 V1

1    received $408,000 in research funding from the fossil fuel industry over the past decade, including

2    from Exxon.[99]

3         214.    The second, S. Fred Singer, was not a climatologist and had previously been funded

4    by tobacco companies to spread doubt about the scientific claim that exposure to second-hand

5    smoke causes cancer.[100]

6         215.    The advertorial misleadingly portrays the "Heidelberg Appeal" as evidence that

7    there was insufficient scientific data for action on climate change. In fact, the Heidelberg Appeal

8    did not discuss climate change or the validity of scientific reasoning or evidence showing that

9    climate change is happening, is human-caused, and will cause severe environmental damage.[101]

10        216.    Many other Exxon/Mobil advertorials falsely or misleadingly characterized the

11   state of climate science research to the readership of The New York Times' op-ed page. A sample

12   of these untruthful statements includes:

- "We don't know enough about the factors that affect global warming and the degree to
  which—if any—that man-made emissions (namely, carbon dioxide) contribute to
  increases in Earth's temperature."[102]

- "[G]reenhouse-gas emissions, which have a warming effect, are offset by another
  combustion product—particulates—which leads to cooling."[103]

- "Even after two decades of progress, climatologists are still uncertain how—or even
  if—the buildup of man-made greenhouse gases is linked to global warming. It could
  be at least a decade before climate models will be able to link greenhouse warming
  unambiguously to human actions. Important answers on the science lie ahead."[104]

- "[I]t is impossible for scientists to attribute the recent small surface temperature
  increases to human causes."[105]

- "Within a decade, science is likely to provide more answers on what factors affect
  global warming, thereby improving our decision-making. We just don't have this
  information today. Answers to questions about climate change will require more

---

[99] DeSmog, Robert C. Balling, Jr., https://perma.cc/T6YY-SFFY.

[100] Naomi Oreskes & Erik M. Conway, Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warming, 150–54 (Bloomsbury Press, 1st ed. 2011).

[101] Heidelberg Appeal. DeSmog. https://www.desmog.com/heidelberg-appeal/.

[102] Mobil, Climate Change: A Prudent Approach, N.Y. Times (Nov. 13, 1997), https://perma.cc/8D9V-H88D.

[103] Mobil, Less Heat, More Light on Climate Change, N.Y. Times (July 18, 1996), https://perma.cc/BQJ3-4G2S.

[104] Mobil, Climate Change: Where We Come Out, N.Y. Times (Nov. 20, 1997), https://perma.cc/YX2Q-EZ87.

[105] ExxonMobil, Unsettled Science (Mar. 23, 2000), reproduced in https://perma.cc/YNM7-QT9J.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

reliable measurements of temperature at many places on Earth, better understanding of clouds and ocean currents along with greater computer power."[106]

217.    In 1996, Exxon released a publication called "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." In the publication's preface, Exxon CEO Lee Raymond inaccurately stated that "taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand the climate system." The publication described the greenhouse effect as "definitely a good thing," while ignoring the severe consequences that would result from the influence of the increased $CO_2$ concentration on the Earth's climate. Instead, it falsely characterized the greenhouse effect as simply "what makes the earth's atmosphere livable."

218.    Directly contradicting Exxon's own internal knowledge and peer-reviewed science, the publication misleadingly ascribed the rise in temperature since the late nineteenth century to "natural fluctuations that occur over long periods of time" rather than to the anthropogenic emissions that Exxon itself and other scientists had confirmed were responsible.

219.    The publication also falsely challenged the computer models that projected the future impacts of fossil fuel product consumption, including those developed by Exxon's own employees, as having been "proved to be inaccurate."

220.    The publication contradicted the numerous reports prepared by and circulated among Exxon's staff, and by API, stating that "the indications are that a warmer world would be far more benign than many imagine … moderate warming would reduce mortality rates in the US, so a slightly warmer climate would be more healthful."

221.    The publication falsely claimed that advocates for reducing fossil fuel use were simply "drawing on bad science, faulty logic, or unrealistic assumptions"— omitting the fact that Exxon's own scientists agreed with the claims of those advocates.[107]

222.    Also in 1996, API published the book Reinventing Energy: Making the Right Choices which claimed "there is no persuasive basis for forcing Americans to dramatically change

[106] Mobil, Science: What We Know and Don't Know (1997), reproduced in https://perma.cc/YNM7-QT9J.

[107] Exxon Corp., Global Warming: Who's Right? (1996), https://perma.cc/77FT-9AKV.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   their lifestyles to use less oil." "[N]o scientific evidence exists that human activities are

2   significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of

3   storms." "Facts don't support the arguments for restraining oil use."[108/109] API claimed that

4   scientists do not understand how carbon flows in and out of the atmosphere or whether fossil fuels

5   are responsible for increasing concentrations of atmospheric $CO_2$. It then explained that even if

6   some warming does occur, such warming "would present few if any problems." For example,

7   farmers could be "smart enough to change their crop plans" and low-lying areas would "likely

8   adapt" to sea-level rise.[110]

9          223.    Defendants shared these talking points with other members of the fossil fuel

10  industry. In a 1997 speech to the World Petroleum Congress, Exxon's CEO claimed:

> We also have to keep in mind that most of the greenhouse effect comes from natural sources … Leaping to radically cut this tiny sliver of the greenhouse pie on the premise that it will affect climate defies common sense and lacks foundation in our current understanding of the climate system.
>
> Let's agree there's a lot we really don't know about how climate will change in the 21st century and beyond … It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now.[111]

17         224.    In a 1998 publication from Imperial Oil (ExxonMobil), "A Cleaner Canada,"

18  Imperial's CEO publicly claimed:

> There is absolutely no agreement among climatologists on whether or not the planet is getting warmer, or, if it is, on whether the warming is the result of man-made factors or natural variations in the climate… . I feel very safe in saying that the view that burning fossil fuels will result in global climate change remains an unproved hypothesis.[112]

---

[108] Sally Brain Gentille et al., Reinventing Energy: Making the Right Choices, American Petroleum Institute (1996), http://www.climatefiles.com/trade-group/american-petroleuminstitute/1996-reinventing-energy.

[109] American Petroleum Institute, Reinventing Energy: Making the Right Choices 79 (1996), http://www.climate files.com/trade-group/american-petroleum-institute/1996-reinventingenergy.

[110] *Id.* at 86–87.

[111] Lee R. Raymond, Chairman and Chief Executive Officer, Exxon Corp., Address at the World Petroleum Congress (Oct. 13, 1997), https://www.climatefiles.com/exxonmobil/1997-exxonlee-raymond-speech-at-world-petroleum-congress/.

[112] Robert Peterson, A Cleaner Canada in Imperial Oil Review (1998), https://www.climatefiles.com/exxonmobil/imperial-oil/1998-imperial-oil-article-a-cleanercanada-by-robert-peterson/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

225.    In 2000, an ExxonMobil advertisement in the Washington Post misleadingly implied that climate models (such as those it relied on internally) were unreliable: "Today's global models simply don't work at a regional level." It went on to claim that the National Assessment Synthesis Report (on climate change) "is written as a political document, not an objective summary of the underlying science."[113]

226.    Also in 2000, an ExxonMobil advertorial in the New York Times misleadingly declared that the consequences of climate change could be beneficial: "Just as changeable as your local weather forecast, views on the climate change debate range from seeing the issue as serious or trivial, and from seeing the possible future impacts as harmful or beneficial."[114]

227.    In 2004, an ExxonMobil newspaper advertisement continued to blatantly and falsely exaggerate the uncertainty of climate science: "Scientific uncertainties continue to limit our ability to make objective, quantitative determinations regarding the human role in recent climate change or the degree and consequence of future change."[115]

228.    A 2017 peer-reviewed quantitative analysis of Exxon's climate communications between 1989 and 2004 found that, while 83% of the company's peer-reviewed papers and 80% of its internal documents acknowledged the reality and human origins of climate change, 81% of its advertorials communicated doubt about those conclusions.[116] Exxon, the analysis concluded, "misled the public."[117]

229.    Shell likewise "shaped a series of influential industry-backed publications that downplayed or omitted key risks; emphasized scientific uncertainties; and pushed for more fossil fuels … ."[118] In 1992, for instance, Shell had released a publication for wide external distribution purporting to describe the "Basic Scientific Facts" of the "Potential Augmented Greenhouse

---

[113] ExxonMobil, Political cart before a scientific horse, Washington Post (2000).

[114] ExxonMobil, Do No Harm, Washington Post (Mar. 16, 2000).

[115] ExxonMobil, Weather and climate, New York Times (Jan. 22, 2004).

[116] Geoffrey Supran & Naomi Oreskes, Assessing ExxonMobil's Climate Change Communications (1977–2014), 12 Envtl. Rsch. Letter 12 (2017), https://perma.cc/3W29-Z9NY.

[117] *Id*.

[118] Matthew Green, Lost Decade: How Shell Downplayed Early Warnings Over Climate Change, Desmog (Mar. 31, 2023), https://perma.cc/VBU3-YYPT.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    Effect."[119] This document downplayed the scientific consensus (that Shell internally

2    acknowledged) by referring to the "relatively few established scientific fundamentals" regarding

3    the causes of climate change.[120] It also misleadingly suggested that a "particular cause" of climate

4    change was "difficult" to identify, even though Shell had identified the use of its products as a

5    significant contributor to the greenhouse effect in the previous decade.[121]

6         230.    A 1994 Shell report entitled "The Enhanced Greenhouse Effect: A Review of the

7    Scientific Aspects" similarly emphasized scientific uncertainty, falsely stating, for example, that

8    "the postulated link between any observed temperature rise and human activities has to be seen in

9    relation to natural variability, which is still largely unpredictable."[122]

10         231.    In 1996, more than 30 years after API's president told petroleum industry leaders

11    that carbon emissions from fossil fuels could "cause marked changes in climate" by the year 2000

12    if not abated,[123] API published the book Reinventing Energy: Making the Right Choices to refute

13    this very conclusion. Contradicting the scientific consensus of which its members had been aware

14    for decades, the book claims: "Currently, **no** conclusive—or even strongly suggestive—scientific

15    evidence exists that human activities are significantly affecting sea levels, rainfall, surface

16    temperatures, or the intensity and frequency of storms."[124]

17         232.    The book also falsely suggested that even if some warming does occur, such

18    warming "would present few if any problems" because, for example, farmers could be "smart

19    enough to change their crop plans" and low-lying areas would "likely adapt" to sea level rise.[125]

---

[119] Jan Kuyper, Potential Augmented Greenhouse Effect, & Depletion of the Ozone Layer, Shell Grp. 3 (Sept. 1992), https://perma.cc/SM9A-FDAD.

[120] *Id*. at 5.

[121] *Id.*

[122] P. Langcake, Shell Internationale Petroleum, The Enhanced Greenhouse Effect: A Review of the Scientific Aspects, 9 (Dec. 1994), https://perma.cc/FM7F-U8ZP.

[123] Flannery, Greenhouse Science, Connections: Corporate Research, Exxon Research and Engineering Company (Fall 1989), available at https://www.climatefiles.com/exxonmobil/1989-exxon-mobil-article-technologys-place-marketing-mix/.

[124] American Petroleum Institute, Reinventing Energy: Making the Right Choices (1996) p. 79 (emphasis in original), available at https://www.climatefiles.com/trade-group/american petroleum-institute/1996-reinventing-energy/.

[125] *Id.* at 85-87.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

233.    The book falsely stated further that "[t]he state of the environment does not justify the call for the radical lifestyle changes Americans would have to make to substantially reduce the use of oil and other fossil fuels" and that the "benefits of alternatives aren't worth the cost of forcing their use." "Some jobs definitely will be created in making, distributing and selling alternatives. But they will come at the expense of lost jobs in the traditional automobile and petroleum industries," the authors continued. "[A]lternatives will likely be more expensive than conventional fuel/vehicle technology. Consumers, obviously, will bear these increased expenses, which means they will have less to spend on other products. This in turn will … cost jobs."[126]

234.    As confirmed by the book's final section, its purpose was to ensure its members could continue to produce and sell fossil fuels in massive quantities that it knew would devastate the planet: "[S]evere reductions in greenhouse gas emissions by the United States, or even all developed countries, would impose large costs on those countries but yield little in the way of benefits—even under drastic climate change scenarios."[127]

**E.    They Funded Fraudulent Scientific Research**

235.    As mentioned *supra*, one of strategies Defendants employed by Defendants in furtherance of their scheme to discredit scientific consensus on climate change was to bankroll unqualified or unscrupulous scientists to advance fringe conclusions about climate change. These scientists obtained part or all of their research budget from Fossil Fuel Defendants directly or through Fossil Fuel Defendant-funded organizations like Defendant API.[128]

236.    For example, during the early- to mid-1990s, Exxon directed some of this funding to Dr. Fred Seitz, Dr. Fred Singer, and/or Seitz and Singer's Science and Environmental Policy Project ("SEPP") in order to launch repeated attacks on mainstream climate science and IPCC conclusions, even as Exxon scientists participated in the IPCC.[129] Seitz and Singer were not climate scientists. Rather, they and SEPP had previously been paid by the tobacco industry to

---

[126] *Id.* at 59, 68, 69.

[127] *Id.* at p. 89.

[128] E.g., Willie Soon & Sallie Baliunas, Proxy Climatic and Environmental Changes of the Past 1000 Years, 23 Climate Rsch. 89, 105 (Jan. 31, 2003), https://perma.cc/9V32-EY8H.

[129] Union of Concerned Scientists (2007), *supra*.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  create doubt in the public mind about the hazards of smoking.[130] Singer also acted as a paid

2  consultant for Sun (Sunoco) and Shell.[131]

3      237.    These Industry-funded scientists frequently failed to disclose their fossil fuel

4  industry underwriters.[132] At least one, Dr. Wei-Hock Soon, contractually agreed to allow donors

5  to review his research before publication, and his housing institution agreed not to disclose the

6  funding arrangement without prior permission from his fossil fuel donors.[133] Between 2001 and

7  2012, various fossil fuel interests, including Exxon and API, paid Soon over $1.2 million.[134] "Dr.

8  Soon, in correspondence with his corporate funders, described many of his scientific papers as

9  'deliverables' that he completed in exchange for their money."[135] His Defendant-funded research

10  includes articles in scientific journals accusing the IPCC of overstating the negative environmental

11  effects of carbon dioxide emissions and arguing that the sun is responsible for recent climate

12  trends. Dr. Soon was the lead author of a 2003 article that argued that the climate had not changed

13  significantly. The article was widely promoted by other denial groups funded by Exxon, including

14  via "Tech Central Station," a website supported by Exxon.[136]

15      238.    Following Soon's 2003 publication, three editors of the scientific journal wherein

16  it was published resigned, criticizing the journal's review process as insufficiently rigorous and

17  claiming Soon and Baliunas' cited evidence did not support their conclusions. Thirteen of the

18  scientists cited in Soon and Baliunas' paper published a rebuttal explaining that Soon and Baliunas

19  had seriously misinterpreted their research.[137]

---

[130] The Center for Media and Democracy, S. Fred Singer, Source Watch, https://perma.cc/X35L-DYUY; The Center for Media and Democracy, Frederick Seitz, https://perma.cc/TV67-ABUH

[131] *Id.*

[132] E.g., Smithsonian Statement: Dr. Wei-Hock (Willie) Soon, Smithsonian (Feb. 26, 2015), https://perma.cc/A4KY-W3NM.

[133] Union of Concerned Scientists, The Climate Deception Dossier #1: Dr. Wei-Hock Soon's Smithsonian Contracts, 6 (2015), https://perma.cc/JL2V-XYGL.

[134] Justin Gillis & John Schwartz, Deeper Ties to Corporate Cash for Doubtful Climate Researcher, N.Y. Times (Feb. 21, 2015), https://perma.cc/897V-7B22.

[135] *Id.*

[136] Union of Concerned Scientists (2007), *supra*.

[137] *Id.* at 15.

HAGENS BERMAN

239.    Yet Defendant-funded front groups promoted Soon's work as neutral expert opinion on the uncertainty of climate science. One such promotion was published in the Seattle Post-Intelligencer by William O'Keefe. Significantly, William O'Keefe's employment rotated between API, the Global Climate Coalition, the Marshall Institute, and the Competitive Enterprise Institute – all groups that Defendants helped to form and/or fund. O'Keefe has also been a registered lobbyist for Exxon and API.[138]

240.    Dr. Soon published other bogus "research" in 2009, attributing global warming to solar activity, for which Exxon paid him $76,106.[139] This 2009 grant was made several years after Exxon had publicly committed not to fund climate change deniers.[140]

241.    William Happer is also on the payroll of Defendants.[141] Happer served for a year on the Trump administration's national security council and has been asked to serve as an expert witness on climate change, despite never having published a peer-reviewed article on the topic. In contrast to his lack of peer-reviewed climate-change articles, Happer has published numerous articles in non-peer-reviewed publications arguing that climate change is due to natural forces and that additional $CO_2$ will be beneficial for humankind. In 2013, as one example, Happer stated in an opinion piece in the *Wall Street Journal*, a national newspaper with substantial circulation in Washington,

> [T]he conventional wisdom about carbon dioxide is that it is a dangerous pollutant. That's simply not the case. Contrary to what some would have us believe, increased carbon dioxide in the atmosphere will benefit the increasing population on the planet by increasing agricultural productivity.[142]

---

[138] Union of Concerned Scientists, Climate Deception Dossier #1: Dr. Wei-Hock Soon's Smithsonian Contracts, (July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf [https://perma.cc/JL2V-XYGL] & https://s3.amazonaws.com/ucs-documents/globalwarming/Climate-Deception-Dossier-1_Willie-Soon.pdf; O'Keefe, W., 2003, Global warming an uncertainty, Seattle Post-Intelligencer, December 12; William O'Keefe. DeSmog. https://www.desmog.com/william-o-keefe/.

[139] Willie Soon FOIA Grants Chart (Jan. 28, 2011), https://perma.cc/LJA5-BEQM.

[140] ExxonMobil, 2007 Corporate Citizenship Report, 39 (2007), https://perma.cc/G4DK-TZGS.

[141] Happer and Frank Clemente were exposed by an undercover operation as agreeing to produce research in exchange for payments to his organization, the $CO_2$ Coalition. *See* Suzanne Goldenberg, *Greenpeace exposes sceptics hired to cast doubt on climate science*, The Guardian (Dec. 8, 2015), https://www.theguardian.com/environment/2015/dec/08/greenpeace-exposes-sceptics-cast-doubt-climate-science [https://perma.cc/N4SQ-WXFD].

[142] William Happer & Harrison Schmitt, *In Defense of Carbon Dioxide*, Wall Street Journal Opinion (May 8, 2013) ("[I]t's a wonder that humanitarians aren't clamoring for more atmospheric carbon dioxide. Instead, some are denouncing it.").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

242.    In November 2019, as another example, Happer told the *Washington Examiner*, in an article published on its website with national reach, including to Washington, that climate change was invented by paranoid scientists.[143] Defendants and their proxies intended Happer to produce exactly the sort of articles that he did—the arrangement and its outcome are not a coincidence.

243.    Philip Cooney, an attorney at API from 1996 to 2001, testified at a 2007 Congressional hearing that it was "typical" for API to fund think tanks and advocacy groups that minimized fossil fuels' role in causing climate change.[144]

244.    These examples are part of a pattern of using manufactured or questionable science to further business goals.[145]

**F.    They Conspired With, Financed, And Worked Hand-In-Hand With Industry Trade Associations, Front Groups, And Other Organizations To Lie About It**

245.    In April of 2014, Congress issued its Joint Staff Report: *Denial, Disinformation, and Doublespeak: Big Oil's Evolving Efforts to Avoid Accountability for Climate Change* (the Congressional Joint Staff Report), concluding as follows:

> The investigation and this report have set out new evidence about the extent of the fossil fuel industry's evolving efforts to avoid accountability for climate change. As previously understood, fossil fuel companies first approached climate change by branding it a "hoax" and denying outright that the burning of fossil fuels contributed to a warming planet. But as the science about climate change became too overwhelming to continue to deny its existence, Big Oil needed to pivot. Accordingly, as new documents set out in this report demonstrate, the fossil fuel industry engaged in an elaborate campaign of deception and doublespeak—supported by its armada of trade associations—marked by public claims to support climate action and significant private steps to avoid it as well as disinformation about the climate safety of natural gas and its role as a bridge fuel to a fossil-free future. For more than half a century, Big Oil has misled the American public about its role in the climate crisis, doing everything in its power to keep the United States and the world dependent on its polluting products. It is long past time to

---

[143] Josh Siegel, *Former Trump official says climate change is "imaginary threat" invented by "insular and paranoid" scientists*, Washington Examiner (Nov. 5, 2019).

[144] Transcript of Deposition of Philip Cooney, U.S. House of Reps., Exec. Session Comm. On Oversight and Gov't, 32:3-5 (Mar. 12, 2007), https://perma.cc/M8YK-CWD4.

[145] *See, e.g.*, Union of Concerned Scientists, *The Disinformation Playbook, How Business Interests Deceive, Misinform, and Buy Influence at the Expense of Public Health & Safety* (May 18, 2018), https://ucsusa.org/resources/disinformation-playbook [https://perma.cc/HGW7-2Z5B].

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

hold Big Oil accountable for its deception campaign and to take action to undo the harms it has perpetrated. [146]

246.  Among other things, the Congressional Joint Staff Report found that Fossil fuel companies used trade associations, think tanks, and other nonprofits to spread misleading narratives to the public, without having to put their names directly on advertisements, lobbying, or PR campaigns.[147]

247.  As the Congressional Joint Staff Report put it, an "armada of trade associations, organizations, and coalitions works with and for fossil fuel companies to perpetuate deceptive and misleading industry narratives … to obstruct climate progress"[148] A sample of these seemingly "independent" groups and their misleading or false statements is highlighted herein.

248.  API, as indicated *supra*, is the nation's leading oil and gas trade organization. Its membership includes 600 oil and gas companies, including major corporations in upstream, midstream, and downstream operations such as Exxon, Shell, Chevron, and BP. API serves as a "hub for industry coordination against climate progress."[149]

249.  Through initiatives like API Energy Excellence and the Climate Committee, API portrays itself as engaging in environmental and safety progress by encouraging the development of new technologies and transparent reporting. However, API's Climate Action Framework, purportedly aimed at accelerating low-carbon technologies and innovation, mitigating emissions, and advocating for government carbon pricing policies, has been criticized for a "lack of specifics." And its focus on carbon pricing was belied by an Exxon lobbyist "caught on camera … saying that a carbon tax will never happen and that support for the measure was a public relations ploy intended to stall more serious measures."[150]

250.  In 2018, Exxon CEO Darren Woods assumed the role of chairman of API's board of directors. He emailed other board members, including representatives from Shell, Chevron, BP,

---

[146] 2014, Congressional Joint Staff Report: *Denial, Disinformation, and Doublespeak: Big Oil's Evolving Efforts to Avoid Accountability for Climate Change.*

[147] *Id*. at 36-44 (internal citations omitted).

[148] *Id*. at 36-37.

[149] *Id*.

[150] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    Marathon, Conoco, and Phillips66, stating that API's upcoming Executive Committee meeting

2    would include a "strategic alignment" segment to focus on "WHAT gaps we have vs. WHY we

3    have them (i.e., no finger pointing/blame games)." He described that the meeting's objective was

4    to "put together an assessment of API's strengths, opportunities and ideas for potential

5    improvements," including "above and beyond advocacy priorities," based on "an ExxonMobil

6    view." This email illustrates that fossil fuel companies directly determine API's strategy to

7    undermine and oppose climate legislation and regulations.[151]

8        251.    The United States Chamber of Commerce (the Chamber) "has long played an

9    organizing and convening role for the fossil fuel industry, opposing climate action and preserving

10   business as usual." In 2007, for example, the Chamber ran television advertisements against

11   climate legislation, claiming that it would prevent people from heating their homes and driving to

12   work.[152]

13       252.    The Chamber has repeatedly been labeled one of the most powerful political

14   opponents to climate progress in the United States. Last year, independent researchers at

15   InfluenceMap released renewed evidence of the Chamber's persistent lobbying against climate

16   policies. According to InfluenceMap, the Chamber has "continued opposition to meaningful

17   legislation and regulation introduced by the federal government" while simultaneously issuing

18   "positive PR […] to create the impression of reform for climate-conscious investors and corporate

19   members." As Politico explained, the InfluenceMap analysis demonstrated that the Chamber's

20   "positions on climate policies mostly reflect the views of its fossil fuel members." Notably, the

21   Chamber has refused to disclose, even to its members, the extent of its funding from fossil fuel

22   interests.[153]

23       253.    The Chamber opposes EPA's recent proposed rules for vehicle greenhouse gas

24   emissions standards for light-, medium-, and heavy-duty vehicles. The Chamber opposed the

25   Securities and Exchange Commission's (SEC) proposed climate disclosure rules. In courtrooms,

26   _____

27   [151] *Id.*

     [152] *Id.* at 38-39.

28   [153] *Id.*

**HAGENS BERMAN**

1  as a litigant and as an amicus curiae, the Chamber has a long history of opposing climate rules and
2  laws, and supporting deregulatory theories propounded by polluting industries, which fetter
3  people's ability to protect themselves from pollution and climate harms.[154]

4      254.   The Oil and Gas Climate Initiative (OGCI) is a CEO-led effort that claims to assist
5  the oil and gas industry in curtailing its greenhouse gas emissions. Comprised of 12 of the world's
6  largest energy companies, OGCI members include Exxon, Shell, Chevron, and BP, and
7  collectively account for approximately one-third of the global oil and gas supply.[155]

8      255.   While OGCI attempts to "promote a climate-friendly image," its stated goal to
9  reach net zero emissions omits Scope 3 emissions, i.e., the emissions produced by the burning of
10 fossil fuels for energy, which "make up the vast majority of an oil company's total carbon
11 footprint."[156]

12     256.   Exxon and Chevron were initially hesitant about joining OGCI at its outset but
13 ultimately became members in 2018. Documents demonstrate that Exxon hesitated because of
14 concerns that the group was "very disorganized, its overarching propose [sic] / objective was
15 generally unclear and that the governance was basically undefined." Exxon revisited the matter in
16 2015 after Shell and BP had joined but still believed that the initiative was "more about 'window
17 dressing' in preparation for COP21 [the 2015 UN Climate Change Conference] than trying to
18 achieve lasting results."[157]

19     257.   Once Exxon did join the group, it provided "critical edits" for OGCI
20 announcements, statements, and its annual report, with which Chevron was "generally aligned."
21 Some of these edits included removing references to the Paris Agreement and language that
22 "potentially commits members to enhanced climate-related governance, strategy, risk
23 management, and performance metrics and targets." These memoranda demonstrate the

[154] *Id.*
[155] *Id.* at 39-41.
[156] *Id.*
[157] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    collaboration among fossil fuel companies to control the messaging of organizations of which they

2    are members to avoid additional commitments regarding climate.[158]

3        258.    The Natural Gas Supply Association (NGSA) is the sole domestic trade association

4    focusing on producer-marketer issues within the natural gas industry. NGSA's membership

5    includes nine of the largest natural gas suppliers in the country, including Exxon, Shell, Chevron,

6    and BP.[159]

7        259.    Publicly, NGSA expresses support for achieving economy-wide net-zero

8    greenhouse gas emissions by 2050, in alignment with the Paris Agreement goals. But NGSA

9    opposes certain "inappropriate" regulations that hinder its members' ability to provide "affordable

10   and reliable" natural gas—an objective that often conflicts with reducing greenhouse gas

11   emissions. In June 2021, NGSA emailed its "Business Leadership Committee" asking for feedback

12   from its members in crafting a response to Department of Energy Secretary Jennifer Granholm,

13   who was quoted as saying that natural gas should only be considered clean in a Clean Energy

14   Standard if combined with CCS (CCS is the process of capturing $CO_2$ emissions at the source and

15   injecting them into deep underground geologic formations for safe, secure, and permanent

16   storage). BP internally expressed concern that the "Administration [was] moving towards

17   squeezing out gas" and asked, "what we need to be doing with Administration (besides pushing

18   for strong Methane regulation) to preserve the role for gas in power generation."[160]

19       260.    The Western States Petroleum Association (WSPA) is one of the oldest oil and gas

20   trade associations in the United States. Exxon, Shell, Chevron, and BP are members, among others.

21   InfluenceMap describes the organization as "actively engaged on climate policy with strongly

22   negative positions, particularly on state-level policy in California, Washington, and Oregon."

23   WSPA has lobbied against bills designed to reduce emissions, including by working to establish a

24   network of "citizen activist" groups in western states.[161]

25

---

26   [158] *Id.*

[159] *Id.* at 41.

27   [160] *Id.*

28   [161] *Id.* at 42-43.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

261.    Two key documents obtained by the House Oversight Committee reveal BP's comprehensive campaign in Washington, in collaboration with WSPA, to oppose state and local policies that would have cut climate-warming emissions. After a Washington County proposed an ordinance that would require one of BP's refineries to reduce its carbon emissions and make it more difficult to obtain permits to expand or upgrade refineries, BP launched a statewide campaign to oppose it. In an internal memorandum, BP outlined a planned "$300,000 advocacy campaign to build opposition to the proposal in its current form and persuade local officials to amend, postpone, or give up on the plan." The document noted that WSPA would "also run a coordinated $200,000 grassroots voter activation campaign on behalf of its membership." In the memorandum, BP explained that, "given the opposition to our industry in this area of the United States[,] … we are also developing a comprehensive Washington State strategy" for "managing business and reputational risk from our West Coast operations" in the long-term.[162]

262.    A document from a few months after the memorandum shows how BP's statewide strategy evolved. In the document, BP identified a handful of key actions and investments to exert its influence in the region. BP planned to enhance "external education, community engagement, political influence and advocacy [that] can change the narrative, stem the flow of bad policy and create opportunities for business growth." The team asked for a "significant increase in C&EA funding" as well as $2.5 million to construct a salmon hatchery that, officials believed, "would change the dynamic of how the public and elected officials view the refinery." The team requested between $2.5 and $4.5 million for "hard persuasion" tactics, such as television advertising, and $300,000 for "soft persuasion" to be invested in the community and grow support that "will be helpful with elected officials." BP believed that its Washington strategy was necessary because it feared that its reputation would "only get worse unless we change the public's perception of us and the elected official's lack of respect for our business."[163]

263.    The National Petroleum Council (NPC) serves as a domestic advisory committee representing oil and gas industry views to the Secretary of Energy. Housed within the Department

---

[162] *Id.*

[163] *Id.*

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    of Energy's Office of Fossil Energy and Carbon Management, NPC consists of approximately 200

2    individuals appointed by the Secretary. According to the agency, these members serve without

3    compensation as representatives of industry or associated interests collectively, not as delegates of

4    specific companies or affiliations.[164]

5        264.    NPC members currently or have in the past included David Lawler, Chairman and

6    President of BP America Inc.; Michael Wirth, Chairman of the Board and CEO of Chevron

7    Corporation; Darren Woods, Chairman, President, and CEO of ExxonMobil Corporation; and

8    Gretchen Watkins, President of Shell USA Inc.[165]

9        265.    Despite the agency's assertion that members act independently, it is clear that the

10   direct involvement of top fossil fuel executives has allowed them to influence NPC's work in a

11   way that benefits their companies' interests.[166]

12       266.    For example, Exxon produced NPC's Topic Paper #1, Role of Natural Gas in a Low

13   Carbon Economy. In one of the later versions of this document, edits sent around by Southwestern

14   Energy, a fossil fuel company, removed all references to natural gas's "potential greater use to

15   displace higher carbon intensive fossil fuels," such as coal and oil, despite industry claims that

16   natural gas is a bridge fuel between these more carbon intensive fossil fuels and a clean energy

17   future.[167]

18       267.    NPC's most recent report, released in 2019, focused on the expansion of carbon

19   capture deployment domestically. Meeting minutes show that the report was led by BP America

20   and included ExxonMobil, Total, and Occidental Oil and Gas Corporation, among others, as part

21   of the Coordinating Subcommittee (CSC) for the study. The meeting minutes show that McKinsey

22   & Company would provide support to the study, including interviews with companies on the NPC

23   study. CSC "agreed to work language to reduce reputation risk" for the fossil fuel companies

24   involved.[168]

---

25   [164] *Id*. at 43-44.

26   [165] *Id*.

     [166] *Id*.

27   [167] *Id*.

28   [168] *Id*.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

268.    NPC's report sought to describe a "roadmap" to scaling up carbon capture deployment in the energy and industrial sectors as a fossil fuel-friendly climate "solution." The report did not mention that industry investment was inadequate to employ carbon capture technology at a scale necessary to meet ambitious climate targets. However, the cost should not have been any surprise to the companies. As far back as 2007, then-CEO of ExxonMobil and Chairman of NPC Lee Raymond acknowledged that carbon capture is "a huge, huge undertaking … and the cost is going to be very, very significant." Companies did not invest sufficiently in the technology, leading the IEA to characterize the fossil fuel industry's reliance on carbon capture to reduce emissions as "an illusion." These companies, including the Defendants, not only failed to invest in carbon capture technologies at scale but, at the same time, used the mere existence of the technologies to justify new oil and gas projects.[169]

269.    The International Petroleum Industry Environmental Conservation Association ("IPIECA") is another organization used by Defendants to coordinate the fossil fuel industry's response to the world's growing awareness of climate change. In 1987, the IPIECA formed a "Working Group on Global Climate Change" chaired by Duane LeVine, Exxon's manager for science and strategy development. The Working Group also included Brian Flannery from Exxon, Leonard Bernstein from Mobil, Terry Yosie from API, and representatives from BP, Shell, and Texaco (Chevron). In 1990, the Working Group sent a strategy memo created by LeVine to hundreds of oil companies around the world, including Defendants. This memo explained that, to forestall a global shift away from burning fossil fuels for energy, the industry should emphasize uncertainties in climate science and the need for further research.[170]

270.    In 1991, the Information Council for the Environment, also known as ICE, whose members included affiliates, predecessors, and/or subsidiaries of Defendants, launched a national climate change science denial campaign with full-page newspaper ads, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. Included

[169] Id.

[170] Benjamin A. Franta, Big Carbon's Strategic Response to Global Warming, 1950-2020, 140 (2022) (Ph. D. Dissertation, Stanford Univ.), https://perma.cc/GCN6-CBN2.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    among the campaign strategies was a plan to "reposition global warming as theory (not fact)." The

2    target audience for its "consumer-based media awareness program" included demographics who

3    were "not typically active information-seekers" and thought to be "predisposed to favor the ICE

4    agenda, and likely to be even more supportive of that agenda following exposure to new

5    information."[171]

6        271.    A goal of ICE's advertising campaign was to change public opinion and consumer

7    perceptions of climate risk. A memo from Richard Lawson, president of the National Coal

8    Association, a predecessor to the National Mining Association, warned, "[p]ublic opinion polls

9    reveal that 60% of the American people already believe global warming is a serious environmental

10   problem. Our industry cannot sit on the sidelines in this debate."[172]

11       272.    The following images are examples of ICE-funded print advertisements

12   challenging the validity of climate science and intended to obscure the scientific consensus on

13   anthropogenic climate change in order to inflate consumer demand for fossil fuels:[173]

14

  

22       273.    In the 1990s, Defendants formed and/or funded the Global Climate Coalition

23   (GCC). GCC's founding members included Defendants Exxon, Shell, and API. Defendants

24

25   ───────────────

26       [171] Union of Concerned Scientists, Deception Dossier #5: Coal's "Information Council on the Environment"
     Sham, 9, 16, 26 (1991), https://perma.cc/BN2P-FKYS.

27       [172] Naomi Oreskes, My Facts Are Better Than Your Facts: Spreading Good News About Global Warming (2010),
     in Peter Howlett et al., How Well Do Facts Travel?: The Dissemination of Reliable Knowledge, 149–50 (Cambridge
     Univ. Press 2011).

28       [173] Union of Concerned Scientists, Deception Dossier #5, supra, at 47–49.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  Chevron and BP also participated as members of the GCC. William O'Keefe, former president of

2  the GCC, was also a former executive of API.[174]

3  274.  GCC's position on climate change contradicted decades of its members' internal

4  scientific reports by asserting that natural trends, not human combustion of fossil fuels, was

5  responsible for rising global temperatures:

> The GCC believes that the preponderance of the evidence indicates
> that most, if not all, of the observed warming is part of a natural
> warming trend which began approximately 400 years ago. If there
> is an anthropogenic component to this observed warming, the GCC
> believes that it must be very small and must be superimposed on a
> much larger natural warming trend.[175]

275.  Defendants funded and orchestrated the GCC's operations both directly through

10  their own membership and through proxy GCC members, including API. Defendant ExxonMobil,

11  among others, was a core member of and substantial financial contributor to the GCC, including

12  holding leadership positions on its board, and received ongoing information about its activities.

13  The GCC spent millions on lobbying and public relations efforts, including distributing a video to

14  hundreds of journalists, the White House, and several Middle Eastern oil-producing countries that

15  misleadingly suggested that higher levels of $CO_2$ would be beneficial for crop production and

16  could be the solution to world hunger.[176]

17  276.  In a 1994 report, the GCC stated that "observations have not yet confirmed

18  evidence of global warming that can be attributed to human activities," that "[t]he claim that

19  serious impacts from climate change have occurred or will occur in the future simply has not been

20  proven," and "[c]onsequently, there is no basis for the design of effective policy action that would

21  eliminate the potential for climate change."[177]

22  277.  The GCC's promotion of overt climate change denialism also contravened its

23  internal assessment, confirming that climate change was real and supported by overwhelming

24

25

26  [174] Jeff Nesmith, Industry Promotes Skeptical View of Global Warming, Cox News Service (May 29, 2003).

[175] Glob. Climate Coal., Global Climate Coalition: An Overview, 2 (Nov. 1996), https://perma.cc/2R82-SXZN.

27  [176] Lieberman & Rust 2015.

28  [177] GCC, Issues and Options: Potential Global Climate Change (1994), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1994-potential-global-climate-change-issues.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   scientific evidence. In 1995, the GCC created an internal climate-change primer that included the

2   statements that "the scientific basis for the greenhouse effect and the potential impact of human

3   emissions of greenhouse gases such as $CO_2$ on the climate is well-established and cannot be

4   denied" and that "contrarian theories" about climate change do not "offer convincing arguments

5   against the conventional model of greenhouse gas emission-induced climate change." But the GCC

6   removed this second statement from a more widely circulated version of its primer in an effort to

7   mislead readers. The excised section also dismissed the claims of contrarian research on the role

8   of solar radiation as an explanation for global warming.[178] The GCC also misleadingly implied

9   that scientists disputed the likelihood of sea-level rise as a result of climate change: "There has

10  been a great deal of speculation about a potential sea level rise, [but] most scientists question the

11  predictions of dangerous melting of Greenland or Antarctic ice caps."[179]

12      278.    Also in 1995, the GCC published a booklet called "Climate Change: Your Passport

13  to the Facts," which stated, "While many warnings have reached the popular press about the

14  consequences of a potential man-made warming of the Earth's atmosphere during the next 100

15  years, there remains no scientific evidence that such a dangerous warming will actually occur."[180]

16  Defendants knew and approved of the dissemination of this document.

17      279.    These GCC advertisements were intentionally misleading. GCC's members,

18  including Defendants, knew that climate change was real and ongoing, and that its impacts were

19  increasingly posing serious risks to the public and the world. Defendants supported, approved, and

20  furthered these misleading advertisements because they were consistent with Defendants' goal of

21  influencing consumer demand for their fossil-fuel products and assisted them in maintaining

22  profits.

23

24

---

25  [178] Union of Concerned Scientists, *Climate Deception Dossier #7: The Global Climate Coalition's 1995 Primer on Climate Change Science*, at 25-28 (July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf [https://perma.cc/JL2V-XYGL] & https://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-7_GCC-Climate-Primer.pdf (hereinafter Dossier #7—GCC Primer).

27  [179] Lieberman & Rust 2015.

28  [180] GCC, *Climate Change: Your Passport to the Facts* (1995), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1995-climate-change-facts-passport.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

280.    In 1997, William O'Keefe, GCC Chairman and API Executive Vice President, falsely stated in an op-ed published in the *Washington Post*, "Climate scientists don't say that burning oil, gas and coal is steadily warming the earth." This false statement contradicted long-established science, as well as Defendants' own knowledge. Yet Defendants nevertheless supported and approved the publication of this op-ed.

281.    At a workshop on or about March 27, 1998, the following persons met to discuss an action plan to defeat the Kyoto agreement and greenhouse gas regulation, namely: A. John Adams, John Adams Associates; Candace Crandall, Science and Environmental Policy Project (Fred Singer); David Rothbard, Committee for A Constructive Tomorrow; Jeffrey Salmon, The Marshall Institute; Lee Garrigan, Environmental Issues Council; Lynn Bouchey and Myron Ebell, Frontiers of Freedom; Peter Cleary, Americans for Tax Reform; Randy Randol, ExxonMobil Corp.; Robert Gehri, The Southern Company; Sharon Kneiss, Chevron Corp; Steve Milloy, The Advancement of Sound Science Coalition; and Joseph Walker, American Petroleum Institute.

282.    Following this in person meeting, a written memorandum of the meeting was distributed via the United States wire by e-mail on April 3, 1998 entitled: the "Global Science Communication Team Action Plan."

283.    The Global Science Communication Team Action Plan was a plan to undermine the science behind climate change which the members knew to be untrue in a coordinated and concerted effort to deceive and profit from the deception and sell their consumer products and maintain their energy monopoly.

284.    The Global Science Communication Team Action Plan developed an organized structure to have false information flooding the United States mail and wire (internet and newspapers), that their products did not contribute to climate change, that the phenomena of climate change or global warming was not true, was a hoax, that there was no scientific consensus, and there was no threat of global warming, though the Defendants knew all this to be false.

285.    The Global Science Communication Team Action Plan developed an organized structure and hierarchy, funders and allocators to undermine scientific consensus and change public opinion on the subject of climate change, in an effort to prolong and maximize the market

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    for their fossil fuel products, prevent non-carbon energy alternatives from entering the

2    marketplace, and maximize Defendants' profits.

3        286.    A GCC 1998 internal strategy document written by a team convened by API

4    describes the plan to defeat the UNFCCC's Kyoto protocol by emphasizing that "it is not known

5    for sure whether (a) climate change actually is occurring, or (b) if it is, whether humans really have

6    any influence on it."[181] The memo states that "victory" would be achieved when average citizens

7    and the media were convinced that uncertainties existed in climate science and were then

8    "stimulat[ed] … to raise questions with policy makers."[182] Ultimately, Defendants sought to "raise

9    such serious questions about the Kyoto treaty's scientific underpinnings that American policy-

10   makers not only will refuse to endorse it, they will seek to prevent progress toward implementation

11   at the Buenos Aires meeting in November or through other ways. Informing teachers/students

12   about uncertainties in climate science will begin to erect a barrier against further efforts to impose

13   Kyoto-like measures in the future." [183] The GCC disbanded in 2002, after then-President Bush

14   rejected the Kyoto Protocol, stating that it had "achieved what [it] wanted to accomplish with the

15   Kyoto Protocol."[184]

16       287.    A similar pattern of activities was undertaken in the 1990s by a group known as the

17   "Greening Earth Society" (GES). GES was headed by Fred Palmer, who now has a position with

18   the Heartland Institute.[185] In 1998, GES produced a video, *The Greening of Planet Earth*

19   *Continues*, which is a sequel to *The Greening of Planet Earth* released by the Western Fuels

20   Association, and that is still being promoted today by the Center for the Study of $CO_2$ and Global

21   Change. The description of the video misleadingly states that $CO_2$ emissions are beneficial: "expert

22   scientists assert that $CO_2$ is not a pollutant, but a nutrient to life on earth." The video is claimed to

23

24       [181] Joe Walker, Global Climate Science Communications Plan (Apr. 3, 1998), http://www.climatefiles.com/trade-

25   group/american-petroleum-institute/1998-global-climate-science-communications-team-action-plan/.

    [182] *Id.*

26       [183] *Id.*

27       [184] Dossier #7—GCC Primer.

    [185] esmog: Clearing the PR Pollution that clouds climate science, *Greening Earth Society*, https://www.

28   desmogblog.com/greening-earth-society [https://perma.cc/J3ES-ADF4].

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   have been distributed to more than 30,000 people worldwide.[186] In 1999, GES published the "State

2   of the Climate Report" with essays from notable climate change deniers, such as Patrick Michaels,

3   who has ties to Koch.[187]

4          288.    Defendants and their foundations have given and continue to give the American

5   Enterprise Institute (AEI) millions of dollars to further their campaign of deception. AEI has made

6   and continues to make misleading statements about climate change. For example, on January 21,

7   2020, AEI published an online article entitled "Six facts about the non-problem of global

8   warming." The six "facts" listed are:

9          (1) The earth's temperature has been rising at a microscopically
10         slow pace …

11         (2) A warmer earth saves lives …

12         (3) While the earth's temperature has risen, the number of natural
           disaster deaths has been sharply declining …

13
           (4) The global air pollution death rate has fallen by almost 50% since
14         1990.

15         (5) Any impact on the economy is likely to be minimal …

16         (6) Restricting carbon emissions to attempt to stop global warming
           is the wrong path—even the most severe restrictions will have
17         almost zero impact on the earth's temperature.[188]

18         289.    ExxonMobil has served or currently serves as corporate leadership of the American

19  Legislative Exchange Council (ALEC) and/or ALEC's Energy, Environmental, and Agriculture

20  Task Force. ALEC's current website misleadingly characterizes climate change as "a historical

21  phenomenon" for which "the debate will continue on the significance of natural and anthropogenic

22  contributions."[189] ALEC continues to question the scientific consensus on climate change, contrary

23  to evidence, and has regularly given climate deniers a speaking platform at its annual meeting.

24  Defendants and their foundations have given and continue to give ALEC millions of dollars to

25  ---

[186] *Id.*

[187] New Hope Environmental Services, *State of the Climate Report: Essays on Global Climate Change* (1999), http://www.climatefiles.com/deniers/patrick-michaels-collection/1999-greening-earth-society-climate-report-2.

[188] Mark Perry, *Six facts about the non-problem of global warming*, American Enterprise Institute (Jan. 21, 2020), https://www.aei.org/carpe-diem/six-facts-about-the-non-problem-of-global-warming/.

[189] ALEC, *Energy Principles*, https://www.alec.org/model-policy/alec-energy-principles/ [https://perma.cc/X7WK-W9W9].

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    further these misleading statements. ExxonMobil gave ALEC $60,000 in 2017 and almost $2

2    million between 1998 and 2017. The Charles G. Koch Charitable Foundation gave ALEC more

3    than $2.4 million between 1997 and 2017. The Charles Koch Institute gave ALEC $137,089

4    between 2014 and 2017, and the Claude R. Lambe Charitable Foundation gave ALEC $720,000

5    between 1993 and 2012. API gave ALEC $88,000 between 2008 and 2010.

6         290.    The Center for the Study of $CO_2$ and Global Change produces a weekly newsletter

7    that has a veneer of scientific credibility but misleadingly states that additional $CO_2$ in the

8    atmosphere will be beneficial.[190] In addition, the Center's website offers a book for sale entitled

9    "The Many Benefits of Atmospheric $CO_2$ Enrichment: How humanity and the rest of the biosphere

10   will prosper from this amazing trace gas that so many have wrongfully characterized as a

11   dangerous pollutant!"[191] The book misleadingly "describes a host of real-world benefits that the

12   controversial atmospheric trace gas [$CO_2$] provides, first to earth's plants and then to the people

13   and animals that depend upon them for their sustenance."[192] Defendants have funded the activities

14   of the Center in order to advance misleading and false ideas. The Center received $85,000 from

15   ExxonMobil between 1998 and 2003. The Center also received $85,000 from the Claude R. Lambe

16   Charitable Foundation between 2004 and 2007.

17        291.    The George C. Marshall Institute (GMI) has been funded by Defendants and

18   affiliated foundations to perpetuate, *inter alia*, the false claim that there is no scientific consensus

19   about the science of climate change. In 1997, for example, GMI orchestrated a sham petition that

20   claimed to have 17,000 signatories arguing against man-made climate change. The "petition"

21   included a cover letter from Fred Seitz, a tobacco scientist and climate denier, and a fake "research

22   paper" entitled: *Environmental Effects of Increased Atmospheric Carbon Dioxide.* The National

23   Academy of Science issued a statement that "[t]he Petition project was a deliberate attempt to

24   mislead scientists and rally them in an attempt to undermine support for the Kyoto Protocol. The

---

25
26   [190] *See, e.g.*, Center for the Study of Carbon Dioxide and Global Change, *Volume 23: February 2020*, http://www.CO2science.org/index.php [https://perma.cc/QJL4-GNTD].

27   [191] Craig D. Idso & Sherwood B. Idso, *The Many Benefits of Atmospheric $CO_2$ Enrichment: How humanity and the rest of the biosphere will prosper from this amazing trace gas that so many have wrongfully characterized as a dangerous pollutant!* (2011).

28   [192] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   petition was not based on a review of the science of global climate change, nor were its signers

2   experts in the field of climate science."[193] Although it was exposed as a sham,[194] for many years

3   thereafter, the petition continued to be relied upon to make false and misleading statements about

4   climate change. For example, the petition was cited in a U.S. Senate press release to counter

5   criticism that was raised at a hearing, claiming that GMI represented the views of only a few

6   scientists.[195] GMI received $570,000 from ExxonMobil Foundation between 1999 and 2005, and

7   $260,000 from ExxonMobil Corporation between 2002 and 2007. GMI received $200,000 from

8   the Charles G. Koch Charitable Foundation between 2013 and 2015 and $420,000 from the Claude

9   R. Lambe Charitable Foundation between 2004 and 2012.

10          292.    GMI's Climate Change program became the "$CO_2$ Coalition" in 2015.[196] The $CO_2$

11  Coalition continues to promote the false assertion that increased atmospheric concentrations of

12  $CO_2$ will be beneficial to our lives and the economy. Its mission:

13              is to demonstrate with science-based facts that: $CO_2$ is a nutrient that
                is essential to life. $CO_2$ at current levels and higher enables plants,
14              trees and crops to grow faster and more efficiently. It is essential for
                life. Just as we require oxygen for life, our economy requires energy,
15              often described as the oxygen or lifeblood of the economy. Energy
                must be abundant, reliable, and reasonably priced for an economy
16              to achieve robust and sustained growth.[197]

17          293.    On December 3, 2019, at a presentation at UNFCCC's 25th Conference of the

18  Parties climate summit in Madrid, at an event titled "Rebutting the United Nation's Climate

19  Delusion," and in collaboration with the Heartland Institute, the Committee for a Constructive

20

21

---

22  [193] Desmog: Clearing the PR Pollution that clouds climate science, *George C. Marshall Institute*,
    https://www.desmogblog.com/george-c-marshall-institute [https://perma.cc/XX3Q-R6FS] (hereinafter Desmog
23  Marshall Institute).

24  [194] Josef Hebert, *Jokers Add Fake Names to Warming Petition*, Seattle Times (May 1, 1998) (noting that the
    petition was signed by fictitious characters and pop stars); Kevin Grandia, *The 30,000 Global Warming Petition Is
    Easily-Debunked Propaganda*, HuffPost (Aug. 22, 2009), https://www.huffpost.com/entry/the-30000-global-
25  warming_b_243092 [https://perma.cc/4EJT-XF86].

    [195] *Inhofe Questions Science Behind Arctic Report*, U.S. Senate Committee on Environment & Public Works
26  (Nov. 16, 2004), https://www.epw.senate.gov/public/index.cfm/2004/11/post-b505f565-f2db-4dab-8c76-
    c6209e5b3d7c [https://perma.cc/KHZ7-TJRW].

27  [196] Desmog Marshall Institute.

    [197] $CO_2$ Coalition, $CO_2$ *Fundamentals*, https://CO2coalition.org/CO2-fundamentals/ [https://perma.cc/4VHB-
28  U739].

---

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Tomorrow, and the European Institute for Climate and Energy, the director of the $CO_2$ Coalition (William Happer) referred to climate change as a phony and bizarre "environmental cult":

> We are here, though, on false pretenses, wasting our time talking about a non- existent climate emergency. And it's hard to understand how much further the shrillness can go, as this started out as global warming, then it was climate change or global weirding, climate crisis, climate emergency … what next? But stick around, it will happen. I hope sooner or later enough people will recognize the phoniness of this bizarre environmental cult and bring it to an end.[198]

Happer's talk also included the following deceptive image:[199]





294.    The $CO_2$ Coalition received $364,985 from GMI in 2015.

295.    The Heartland Institute promotes itself as "[t]he world's most prominent think-tank promoting skepticism about man-made climate change."[200] Heartland has received funding from Defendants in the past, although ExxonMobil has attempted to distance itself from the organization

---

[198] *Trump Adviser William Happer Talks Climate Alarmism During COP25 in Madrid*, The Heartland Institute (Dec. 3, 2019), https://www.youtube.com/watch?v=j8KxVQFoyT0.

[199] *Id.*

[200] *Arthur B. Robinson Center on Climate and Environmental Policy*, The Heartland Institute, https://www.heartland.org/Center-Climate-Environment/index.html [https://perma.cc/R5QY-MNQF].

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1 in recent years.[201] The Heartland Institute advances the false claims that there is no consensus

2 about the causes, effects, or future rate of global warming; that global warming is primarily a

3 natural phenomenon; and that the benefits of warming are likely to outweigh the costs. Heartland

4 also claims responsibility for defeating cap and trade, a regulatory mechanism designed to curb

5 harmful emissions: "You may also know us from our work exposing the shoddy science and

6 missing economics behind the global warming delusion. Our videos, books, studies, and

7 international conferences changed the debate and led to the defeat of 'cap and trade.'"[202]

8      296.    Heartland disseminates this false and misleading information to educators in

9 Washington. For example, Heartland sent Minnesota educators, for free, a book offered for sale

10 on Heartland's website entitled "Why Scientists Disagree About Global Warming: The NIPCC

11 Report on Scientific Consensus."[203] The book was authored by well-known climate deniers,

12 including Craig Idso. The first "Key Finding" of the book is: "The most important fact about

13 climate science, often overlooked, is that scientists disagree about the environmental impacts of

14 the combustion of fossil fuels on the global climate." Most of the "findings" of the book are

15 repeated from other Heartland Institute publications by the so-called "Nongovernmental

16 International Panel on Climate Change," which consists of the same well-worn climate change

17 deniers such as Idso.[204]

18      297.    Other groups that have received funding from Defendants as part of the conspiracy

19 to deceive the public about climate change include, but are not limited to: Americans for

20 Prosperity, Cato Institute, Competitive Enterprise Institute, Center of the American Experiment,

21 Hoover Institute, Institute for Energy Research, Heritage Foundation, Manhattan Institute, Reason

22 Foundation, and U.S. Chamber of Commerce.

---

[201] *See, e.g.*, David Adam, *Exxon to cut funding to climate change denial groups*, The Guardian (May 28, 2008), https://www.theguardian.com/environment/2008/may/28/climatechange.fossilfuels [https://perma.cc/CXH2-WXD6].

[202] Joseph L. Bast, *Message from the President*, https://www.webcitation.org/6dHrecCkT [https://perma.cc/L3NZ-HA2V].

[203] Craig Idso et al., *Why Scientists Disagree About Global Warming: The NIPCC Report on Scientific Consensus*, The Heartland Institute (2d ed. 2016).

[204] *Lead Authors*, Nongovernmental International Panel on Climate Change, http://climatechangereconsidered.org/lead-authors/ [https://perma.cc/XD8Y-9NT6].

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

298.     Defendants paid for, expected, and then used the misleading materials produced by these outside organizations in furtherance of their strategy to exaggerate scientific uncertainty and avoid a clear understanding of the need to address greenhouse-gas emissions and climate change.

299.     The websites of outside organizations funded by Defendants in order to deceive the public about climate science, the role of their products in contributing to climate change, the consequences of climate change, and/or the need to take swift action to mitigate climate change and the harms that it would bring are and were accessible to residents of Washington at times relevant to this Complaint. These websites contain and have contained misleading and deceptive information.

300.     Defendants have also funneled hundreds of millions of dollars to organizations with the intent that these organizations would make misleading statements about climate change, including in Washington, and with the intent that these statements would promote and allow for the continued unfettered sales of their products. For example, between 1998 and 2017, ExxonMobil spent more than $36 million funding organizations that misrepresented the scientific consensus that Defendants' fossil fuel products were causing climate change.[205] These organizations were intended to, and did, target and influence the public and consumers, including in Washington. Although ExxonMobil publicly declared that it would stop funding climate-denial organizations in 2008, more than $13 million of this funding was transmitted to "denial organizations" between 2008 and 2017.[206] In fact, in 2017 alone, ExxonMobil still contributed more than $1.5 million to climate-change denial organizations.[207] Similarly, between 1997 and 2017, Koch-controlled foundations gave more than $127 million to groups that obfuscated climate science.[208]

---

[205] Union of Concerned Scientists, ExxonMobil Foundation & Corporate Giving to Climate Denier & Obstructionist Organizations, https://www.ucsusa.org/sites/default/files/attach/2019/ExxonMobil-Worldwide-Giving-1998-2017.pdf?_ga=2.84739161.1384563456.1548170682-1610477837.1510330963 [https://perma.cc/TG98-G3CJ].

[206] Id.

[207] Id.

[208] Greenpeace, Koch Industries: Secretly Funding the Climate Denial Machine, https://www.greenpeace.org/usa/global-warming/climate-deniers/koch-industries/ [https://perma.cc/J8FJ-88PX].

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

301.    One or more Defendants directed funds to outside organizations engaged in a campaign of deception and conspiracy by funneling money through one or more intermediate organizations such as DonorsTrust and Donors Capital Fund. Between 1998 and 2017, DonorsTrust gave more than $150 million to climate denial groups, and Donors Capital Fund gave nearly $200 million to these groups during the same time frame.

302.    The payments from Defendants to these outside organizations were part of a conspiracy to defraud consumers and the public about climate change and the role of Defendants' products in climate change. Defendants intended for these outside organizations to use the funding provided to them to disseminate misleading statements about climate change, which is what the outside organizations did.

303.    Defendants intended for the misleading statements made by outside organizations to be directed at consumers of their products. Defendants intended that consumers, including those in Washington, would rely on misleading statements by outside organizations to justify decisions not to change their fossil-fuel-consumption habits.

304.    Defendants also intended that the misleading statements made by outside organizations would be relied on by the public in justifying decisions not to, *inter alia*, demand regulation, taxation, or otherwise require abatement of the harmful greenhouse-gas emissions that are the byproducts of burning fossil fuels.

## G.    Defendants Targeted Universities, The Press, And Critics

305.    The oil and gas industry cultivates partnerships with academic institutions as a way to influence climate research toward an energy transition that favors maintaining fossil fuels for as long as possible; bolster its ability to claim expertise on climate science; and gain access to thought leaders.[209] In the words of one BP official, the academics' research was to be "informed by the business challenges we need solved."[210] Although the existence of relationships between industry and academia has long been known, documents released by the House Oversight Committee

---

[209] 2014, Congressional Joint Staff Report: *Denial, Disinformation, and Doublespeak: Big Oil's Evolving Efforts to Avoid Accountability for Climate Change.*

[210] *Id.* at 44.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    (1) reveal for the first time previously unknown funding amounts and (2) shed light on how

2    companies condition grants on cooperation from academics and their perception of the

3    relationship's business value.

4    **H.    Funding and Shaping Academic Research Programs**

5        306.    Six fossil fuel companies, including BP, Chevron, Exxon, and Shell, spent an

6    estimated $700 million on academic research programs between 2010 and 2020, though exact

7    figures are unknown because disclosure requirements for university funding are limited. The

8    funding the companies have provided has filled a research-shaping role that the companies'

9    funding facilitated. As one study found, research centers funded by fossil fuel interests are more

10   "favourable in their reports towards natural gas than towards renewable energy," especially in

11   communications that specifically mention fossil fuel companies. Programs less dependent on fossil

12   fuel industry funding show the reverse, with a more neutral sentiment towards gas, and more

13   favorability towards renewable energy.[211]

14       307.    BP's sponsorship of Princeton University's Carbon Mitigation Initiative (CMI)

15   spans over 20 years and is the longest among the industry-university relationships. CMI seeks "to

16   design safe, effective and affordable carbon mitigation strategies." One spreadsheet reveals that,

17   between 2012 and 2017, BP funded CMI at levels between $2.1 and $2.6 million annually. BP

18   also provides funding to climate policy academic programs at Harvard and Tufts, including the

19   Harvard Kennedy School and the Climate Policy Lab at the Fletcher School at Tufts University.

20   BP gave "$416k to Harvard and $250k to Tufts, per year" between 2019 and 2021, for programs

21   focusing on "policy themes including but not limited to: carbon pricing, land use and carbon

22   offsets, transportation, and technology innovation."[212]

23       308.    One BP email memorialized a conversation with a Princeton University climate

24   systems modeler about research BP requested on the use of carbon capture technologies from

25   Princeton's Net Zero America academic project. That project claims to "quantif[y] five distinct

26   technological pathways, all using technologies known today, by which the United States could

27   ───────────────
     [211] *Id*. at 45.

28   [212] *Id*.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  decarbonize its entire economy." The BP email notes that the researcher "will recommend [an]

2  infrastructure program to advance net zero policies with emphasis on CCUS – building 'backbone'

3  of pipelines to transport carbon from emitters to the Permian and Gulf Coast." The email

4  demonstrates how BP's relationship with Princeton allowed it to advocate directly for energy and

5  emissions policies like carbon capture without accountability for refusing to invest at scale.[213]

6      309.    One spreadsheet rates how strongly Princeton, Harvard University, and Tufts

7  University research plans fit BP's strategic priorities of "advantaged" oil, or oil that has

8  incrementally fewer emissions per barrel than other barrels on the market, supporting a "shift to

9  gas" from coal, and "market-led downstream growth," referring to increasing BP's petroleum

10  refining business—all of which emphasize a continued reliance on fossil fuel.[214]

11      310.    Shell's Global Methane Communications Plan describes an academic-industry

12  partnership at Imperial College London as providing "thought leadership and research into

13  technology that could underpin the role for gas." A 2017 email notes that the program is "focused

14  on supporting fundamental research and develop [sic] innovative technology solutions to support

15  the ongoing energy transition," including on renewables, energy storage, and "new end-uses for

16  natural gas." In the same email, an official described Shell's plan to "'embed' Shell scientists" at

17  the University of California (UC), Berkeley. Shell funds the Energy Biosciences Institute at UC

18  Berkley and spent $25 million over five years on the program.[215]

19      311.    In recent years, Exxon partnered with at least 80 universities, including the

20  Massachusetts Institute of Technology (MIT), the University of Texas, Stanford University,

21  National University of Singapore, and National Technical University of Singapore. From 2016 to

22  2017, Exxon planned to fund dozens of projects at academic institutions, including $600,000 to

23  MIT; $325,000 to George Washington University's Regulatory Studies Center; $175,000 to

---

[213] *Id*. at 45-46.

[214] *Id*. at 46.

[215] *Id.*

1   Indiana University's School of Public and Environmental Affairs; $140,000 to Stanford
2   University; and $50,000 to the University of Massachusetts Amherst.[216]

3       312.    Similarly, Chevron has partnered with major universities for workforce
4   development and facility upgrades, including the Colorado School of Mines; Louisiana State
5   University; MIT; Stanford University; Texas A&M University; UC Berkeley; UC Davis; the
6   University of Texas, Austin; Tuskegee University; North Carolina A&T State University; Prairie
7   View A&M University; and Florida International University. It does not appear that Chevron
8   produced relevant documents on this subject, even though the scope of the House Oversight
9   Committee's subpoena covered these documents.[217]

10  **I.    Conditioning Grants on Cooperation from Researchers**

11      313.    Fossil fuel companies conditioned their funding to academic institutions on the
12  extent of their cooperation and sensitivity to industry business needs. A 2016 internal document
13  marked "confidential" reveals that BP officials recommended cutting the budget for Harvard and
14  Tufts research partnerships because it was finding it difficult to "obtain more value" as compared
15  to the perceived success of BP's partnership with Princeton, explaining that the "CMI discussions
16  are directly relevant to BP, whereas the Harvard/Tufts discussions" were not. Accordingly, the
17  official recommended cutting funding to Harvard in favor of "a tighter focus limited to climate
18  policy and geopolitics," which "should enable a more integrated approach between the policy work
19  at Harvard/Tufts and the scientific work at CMI." The official recommended marginalizing
20  researchers with whom BP worked less well and propping up those who were more favorable to
21  BP. His final recommendation was to renew the Harvard grant at a "[m]aximum of $400k,"
22  preferring "zero for geopolitics but understand[ing] it may need to be $50–$100k if necessary to
23  manage the relationship."[218]

24

25

26
_____

27  [216] *Id.* at 46-47.
    [217] *Id.* at 47-48.
28  [218] *Id.* at 48.


**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    314.    BP reduced funding for the Harvard and Tufts programs by around 40%. Harvard's

2    grant decreased from $700,000 annually to $400,000, and Tufts' grant decreased from $215,000

3    to $200,000.[219]

4    **J.    Using Academic Programs to Bolster Access to Policymakers**

5    315.    Fossil fuel companies sought to gain access to policymakers and influential thought

6    leaders by funding academic research programs. One internal BP email describes the Tufts

7    program as "the policy complement to our longstanding Carbon Mitigation Initiative (CMI)

8    climate science program with Princeton," noting that it benefits BP because "many of their faculty

9    are former senior government officials with deep insight, credibility, and influence with US and

10    global policymakers." Similarly, a "confidential" document from around 2018 describes the

11    benefit of the BP partnership with Harvard and Tufts as "access to unparalleled expertise at the

12    forefront of research in the areas of climate change science, technology and policy," which helps

13    BP "provide a business perspective to help shape international policy."[220]

14    316.    In a 2020 email, BP coordinated with Princeton officials on the Net Zero America

15    study, which maps different pathways by which the United States could decarbonize its economy.

16    BP provided "just under $2 m[illion]" to fund the Net Zero America study, which the company

17    viewed as important because the study had some alignment with the Biden-Harris Administration's

18    climate policy agenda. Specifically, the BP official noted that the study "clearly plays to Biden's

19    green agenda" and that principal researchers were "already advising Biden's transition team." As

20    a result, BP could "leverage the study with the USG [United States government]."[221]

21    317.    As the 2020 presidential elections approached and it appeared that President Biden

22    would win, BP's Vice President of U.S. Policy and Regulatory Affairs pointed out that BP's

23    relationship with Princeton was "becoming increasingly synergistic." BP admitted that, "[i]f the

24

25

26

27    [219] *Id*.

    [220] *Id*.

28    [221] *Id*. at 48-49.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  Presidential elections go the way it looks now, I would not be surprised to see some of our friends

2  in senior government policymaking roles, as well!"[222]

3  **K.    Tracking Critics And Pressuring News Outlets**

4          318.    Documents obtained by the House Oversight Committee reveal that the fossil fuel

5  industry actively tracks individuals, organizations, and news outlets critical of the industry. One

6  particularly disturbing email demonstrates that Exxon's chief security officer was tasked with

7  tracking a specific activist, noting that he "has been very active in his communications of late. We

8  are monitoring his location (now living in Vermont) and his social media." The activist in question,

9  a retired petroleum and industrial engineer who used to work for Exxon, provided testimony to the

10  Vermont state legislature on fossil fuel infrastructure and had written op-eds concerning

11  presidential climate plans, among other advocacy activities. A Shell email similarly demonstrated

12  that climate activist activity is shared internally. The email, from May 2020, acknowledges that

13  the coronavirus pandemic limited the ability of activist groups to protest, but that there was, in

14  turn, a "sharp spike—43% more than average in social media ad spending." This caused concern

15  that the activists "are not sitting on their hands—they are adapting and we expect that they will

16  raise more than $1 billion this year to build their army of boots-on-the-ground supporters with the

17  goal of killing off the fossil fuel industry."[223]

18          319.    Other documents show that fossil fuel companies tracked outside advocacy efforts

19  related to emissions reductions and environmental accountability. A BP official expressed concern

20  about an "uptick in citizen suits" due to the "wide availability of high-tech monitoring devices"

21  that citizens can use to measure pollution from hazardous chemicals in their local environments.

22  He worried that "NGOs will have more info" than what the industry is required to report to the

23  EPA.[224]

24          320.    Documents produced by BP include numerous "Weekly Activist Report[s]" that

25  track global critics and protest activity focused on the fossil fuel industry's role in climate change.

26  _____

27  [222] *Id.* at 49.

     [223] *Id*. at 49.

28  [224] *Id.* at 49-50.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  One Weekly Activist Report identified specific activism, such as "Protests in Washington as part

2  of 'Green New Deal'" and "Sunrise Movement occupies office of US Representative in

3  Washington, DC." API also tracked activities of climate activist groups via an email from an

4  outside consulting group, which promised to contact API "if there is any concerning or threatening

5  content related to API."[225]

6      321.    The fossil fuel industry tracks critical social media content. One email from API to

7  its internal Communications email list, titled "API Media Monitoring," appears to be part of a

8  regular mass email blast that tracks critics of the industry. A 2017 email describes social media

9  conversations on climate change following damaging snowstorms and wildfires throughout the

10 country. Another shows Exxon tracking social media content, including public posts on Facebook

11 and Twitter discussing ExxonMobil and climate change, including "a review of tweets that use the

12 hashtags #ExxonKnew and #EnergyLiesHere."[226]

13     322.    Internal documents show companies pressuring news outlets pursuing stories that

14 the companies believed were instigated by activists. In a 2016 email, an Exxon Media Relations

15 Manager reacted angrily to questions from a Reuters journalist on Exxon's relationship with the

16 American Legislative Exchange Council (ALEC), a nonprofit organization that has frequently

17 undertaken political advocacy activities that appear to violate Internal Revenue Service (IRS) rules

18 governing its tax-exempt status.[227] Providing a statement that could be used "if Reuters is taking

19 this crap seriously," the official responded, "how tone deaf are these guys for asking the IRS to

20 investigate ALEC – an organization made up of more than 2000 conservative state lawmakers –

21 after the IRS scandal last year? Of course, anything passes for news when you slap the 'climate

22 denier' label on it." When the journalist responded, "I hear you," the Exxon media relations

23 manager replied, "Don't hear me. Kill the story."[228]

24

25

---

26  [225] *Id*. at 50.

27  [226] *Id*.

    [227] *Id*.

28  [228] *Id*. at 50-51.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**L.      They Obstructed And Attempted To Undermine A Congressional Investigation**

323.    Exxon, Chevron, Shell, BP, and API "obstructed and attempted to undermine a congressional investigation" into their efforts to avoid accountability for climate change.[229] This conduct included failing to respect well-established judicial interpretations and resulting practices, baseless First Amendment and privilege arguments, disregard for longstanding congressional practice and norms, and significantly redacting or withholding documents.[230]

**M.      Meanwhile, They Schemed About How To Protect Themselves And Profit From Climate Change**

324.    Oil and gas reserves in the Arctic that were not previously reachable due to sea ice are becoming increasingly reachable as sea ice thins and melts due to climate change.[231] In 1973, Exxon obtained a patent for a cargo ship capable of breaking through sea ice[232] and for an oil tanker[233] designed specifically for use in previously unreachable areas of the Arctic.

325.    In 1974, Chevron obtained a patent for a mobile arctic drilling platform designed to withstand significant interference from lateral ice masses[234] allowing for drilling in areas with increased ice floe movement due to elevated temperature.

326.    That same year, Texaco (Chevron) worked toward obtaining a patent for a method and apparatus for reducing ice forces on a marine structure prone to being frozen in ice through natural weather conditions, allowing for drilling in previously unreachable Arctic areas that would become seasonally accessible.[235]

---

[229] *Id*. at 51.

[230] *Id*. at 51-59.

[231] James Henderson & Julia Loe, The Prospects and Challenges for Arctic Oil Development, Oxford Inst. for Energy Stud., 1 (Nov. 2014), https://perma.cc/VDJ3-U5FZ.

[232] Icebreaking Cargo Vessel, ExxonMobil Techn. & Rsch. Eng'g Co., U.S. Patent No. 3727571A (filed July 7, 1971) (issued Apr. 17, 1973), https://perma.cc/YF73-R6AG.

[233] Tanker Vessel, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3745960A (filed May 6, 1971) (issued July 17, 1973), https://perma.cc/WL9C-DQ99.

[234] Arctic Offshore Platform, Chevron Rsch. & Techn. Co., U.S. Patent No. 3831385A (filed June 26, 1972) (issued Aug. 27, 1974), https://perma.cc/MF5D-DSM9.

[235] Mobile, Arctic Drilling and Production Platform, Texaco Inc., U.S. Patent No. 3793840A (filed Oct. 18, 1971) (issued Jan. 24, 1974), https://perma.cc/2TB6-WBY9.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

327.    In 1984, Shell obtained a patent for an Arctic offshore platform adapted for conducting operations in the Beaufort Sea, an area that previously was largely unreachable because of ice but has become increasingly accessible as polar ice has melted.[236]

328.    In 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for a natural gas platform planned for construction in the North Sea to account for anticipated sea level rise. Those design changes were ultimately carried out by Shell's contractors, adding substantial costs to the project.[237]

329.    In 1989, Esso Resources Canada (Exxon) commissioned a report on the impacts of climate change on existing and proposed natural gas facilities in the Mackenzie River Valley and Delta, including extraction facilities on the Beaufort Sea and a pipeline crossing Canada's Northwest Territory.[238] It reported that "large zones of the Mackenzie Valley could be affected dramatically by climatic change" and that "the greatest concern in Norman Wells [oil town in North West Territories, Canada] should be the changes in permafrost that are likely to occur under conditions of climate warming."[239] The report concluded that, in light of climate models showing a "general tendency towards warmer and wetter climate," operation of those facilities would be compromised by increased precipitation, an increase in air temperature, changes in permafrost conditions, and, significantly, sea level rise and erosion damage.[240] The authors recommended factoring those eventualities into future development planning and also warned that "a rise in sea level could cause increased flooding and erosion damage on Richards Island."

330.    In the mid-1990s, Exxon, Shell, and Imperial Oil (Exxon) jointly undertook the Sable Offshore Energy Project in Nova Scotia. The project's Environmental Impact Statement declared, "[t]he impact of a global warming sea level rise may be particularly significant in Nova

---

[236] Arctic Offshore Platform, Shell Oil Co., U.S. Patent No. 4427320A (filed Feb. 19, 1982) (issued Jan. 24, 1984), https://perma.cc/YXH9-CS2B.

[237] Greenhouse Effect: Shell Anticipates a Sea Change, N.Y. Times (Dec. 20, 1989), https://perma.cc/PJV7-6H25.

[238] *See* Stephen Lonergan & Kathy Young, An Assessment of the Effects of Climate Warming on Energy Developments in the Mackenzie River Valley and Delta, Canadian Arctic, 7 Energy Exploration & Exploitation 359–81 (1989).

[239] *Id.* at 369, 376.

[240] *Id.* at 360, 377–78.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  Scotia. The long-term tide gauge records at a number of locations along the N.S. coast have shown

2  sea level has been rising over the past century … For the design of coastal and offshore structures,

3  an estimated rise in water level, due to global warming, of 0.5 m [1.64 feet] may be assumed for

4  the proposed project life (25 years).”[241]

5  **N.    The Lying Continues—The Greenwashing**

6      331.    Even today, Defendants continue to mislead about relevant facts in order to foster

7  continued demand for fossil fuels and dampen demand for clean energy alternatives:

8      • Defendants still cannot bring themselves to disclose the undeniable impact of the sales
9        of their fossil fuels on climate change, and instead continue to work to obscure this
         undisputable connection.

10     • They falsely promote fossil fuel products as “green,” “sustainable,” “carbon-neutral,”
11       and “lowering emissions.”

12     • They falsely promote unrealistic or unproven technologies that would permit continued
         reliance on fossil fuels and fossil-fuel-based cars, heating, and electricity.

13     • And they promote themselves as clean energy companies who are actively working to
14       achieve net-zero emissions.

15     332.    Defendants’ ongoing campaign of deception is pervasive and in violation of the

16  Federal and state law.

17     333.    Defendants reach the public through television, news, podcasts, online ads, Google

18  searches, social media posts, YouTube videos, and through messaging from seemingly

19  independent third parties that are, in reality, closely connected to Defendants. And Defendants

20  employ messaging strategies that amplify and maximize their influence on consumers and the

21  public.

22     334.    All of this in order to achieve a common end: giving consumers the impression that

23  climate change is not a serious concern and, in any event, that Defendants are clean energy

24  companies who will solve climate change with “advanced” fossil fuels, new technologies, and

25  reducing emissions—thereby perpetuating and maximizing the sales of Defendants, fossil fuel

26  products and the massive profits those sales generate.

27

28

---

[241] ExxonMobil, Sable Project: Development Plan, Vol. 3: Environmental Impact Statement, 4–77 (Feb. 1996),
https://web.archive.org/web/20151106083051/http://soep.com/about-the-project/development-plan-application.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

335.    As set forth herein, Defendants' actions, investments and business plans tell a different story. Defendants continue to explore for and produce increasing quantities of fossil fuels, to ensure dependence and to dampen demand for alternative energy sources and technologies. The plan is to maximize, perpetuate, and continue to profit from fossil fuel sales, not to reduce them.

336.    Defendants' investments in clean energy are miniscule parts of their budgets and short-lived, and Defendants' "commitment" to this research demonstrates that Defendant have no intent to facilitate a transition away from fossil fuel dependence as their ads would have the public believe.

337.    In short, Defendants have spent fortunes deceiving the public about climate change and the harms and costs it imposes on the consumers who buy their fossil fuel products all in the name of protecting their "core business" operations: selling more and more fossil fuels. This deception continues.

338.    Defendants have falsely claimed through advertising campaigns in Washington and/or campaigns intended to reach Washington that their businesses are substantially invested in lower-carbon technologies and renewable energy sources. In truth, however, each Defendant has invested minimally in renewable energy while continuing to expand its fossil fuel production. Reasonable consumers exposed to Defendants' advertisements would understand Fossil Fuel Defendants to be far more substantially invested in alternative energy sources than in fact is the case—this is deception. Defendants have also claimed that some of their fossil fuel products are "green" or "clean," and that using these products will sufficiently reduce or mitigate the dangers of climate change. None of the Defendants' fossil fuel products are "green" or "clean" because they all continue to cause climate change and related impacts, and this marketing misleadingly minimizes these products' adverse environmental impacts and induces consumers to purchase these products under false impressions. Collectively, these more recent deceptive promotional statements and practices are referred to as "greenwashing."

339.    Defendants intentionally greenwash their own brands and their fossil fuel products to maximize profit from fossil fuel consumption. Greenwashing is designed to increase consumption by portraying positive but false representations of Defendants and their products.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

While greenwashing occurs in many different forms—e.g., false advertising about "green" or "clean" fossil fuel products, or social media campaigns about Defendants' commitments to the environment or to renewable energy—the common purpose of all greenwashing is to create a positive, but false, narrative about Defendants and their products. That false narrative drives brand loyalty and trust among consumers, alters consumer behavior, and thus increases consumption of fossil fuel products. Greenwashing is especially misleading today because consumers increasingly prioritize environmental sustainability, even when that means paying more, and because consumers report positive associations with brands that portray themselves as "green" or as committed to renewable energy.[242] Because consumers may conflate greenhouse gas emissions and other air pollutants,[243] even advertising that does not explicitly mention greenhouse gases may create a misleading impression that a brand is climate-friendly.

340.    Defendants' misleading greenwashing campaigns are intended to reach, and do reach and influence the public and consumers, including in Washington. These campaigns are intended to capitalize on consumers' concerns about climate change and lead consumers to believe that Defendants are substantially diversified energy companies making meaningful investments in low-carbon energy compatible with minimizing catastrophic climate change. At bottom, these deceptive campaigns are intended "to induce false positive perceptions"[244] of the Defendants' commitment to the environment while downplaying or otherwise concealing the role their fossil fuel products play in bringing about catastrophic climate harms.

341.    Defendants' greenwashing extends to their professed support for the Paris Agreement. Publicly, Defendants pledged to help meet the goals of the agreement. Privately, they viewed participation and support for the agreement as politically convenient, risk-free, and

---

[242] Ronald S. Friedman & Dylan S. Campbell, *An Experimental Study of the Impact of Greenwashing on Attitudes toward Fossil Fuel Corporations' Sustainability Initiatives*, 17 Env't Commc'n 486 (2023), https://perma.cc/4JNF-UTKZ; *see also* Ravi Dutta-Powell et al., *Two Interventions for Mitigating the Harms of Greenwashing on Consumer Perceptions*, BIT Working Paper No. 001 (2023), https://perma.cc/S59N-ECV2.

[243] E.g., Charlotte Noel et al., *The Public's Perceptions of Air Pollution. What's in a Name? Environ Health Insights* (wp. 21, 2022), doi: 10:1177/11786302221123563; Ann Bostrom et al., *Causal Thinking and Support for Climate Change Policies: International Survey Findings*, 22 Global Environmental Change 210 (Feb. 2012), https://doi.org/10.1016/j-gloenvch.2011.09.012.

[244] Noemi Nemes et al., *An Integrated Framework to Assess Greenwashing*, 14 Sustainability 4431 (2022), https://perma.cc/H4Af-9VA3.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  unburdened by the necessity of any meaningful corresponding action on their part.[245] The Paris

2  Agreement proved to be an opportunity for Defendants to tout their environmental bona fides by

3  overemphasizing their minimal investments in clean or renewable forms of energy while they

4  knowingly pursued business strategies undermining the agreement's goal of limiting global

5  warming to 2 degrees Celsius.[246] For example, Exxon publicly announced its support for the Paris

6  Agreement in 2015 and reiterated its support in 2021. However, in a 2019 memo circulated to

7  high-level executives at the Oil and Gas Climate Initiative ("OGCI"), an Exxon official

8  recommended that the group remove all references to its support for the agreement in any public-

9  facing document so as to avoid "commit[ting] [OGCI] members to enhanced climate-related

10  governance, strategy, risk management, and performance metrics and targets."[247] Meanwhile, in

11  2024, Exxon announced that it would increase oil and gas production by about 10% over the next

12  four years.[248]

13      342.    Defendants also engaged in doublespeak regarding their commitments to emission

14  reduction measures, professing their support for such things as federal methane emissions

15  regulations on one hand while lobbying against them on the other.[249] In a bid to "stave off future

16  regulation," Defendants, through a program convened by API, voluntarily pledged to limit their

17  methane emissions.[250] Beyond methane emissions, Defendants have pledged to meet certain

18  emission reduction targets.[251] These pledges, however, elide continued long-term commitments to

19  oil and gas production and internal doubts about the ability of the Fossil Fuel Defendants to

20  actually meet their emissions targets.[252]

21  _____

22  [245] *Denial, Disinformation, and Doublespeak*, *supra*, at 17-21.

    [246] *Id*. at 18.

23  [247] *Id*. at 18 (quoting Doc. No. EM-HCOR3-00064980).

24  [248] *Id*.

    [249] *Id*. at 25.

25  [250] *Id*. at 24, 26 (quoting Doc. No. BPA_HCOR_00039279 ("You begin by doing things voluntarily and then that (and not much more) becomes the regulation:)).

26  [251] *Id*. at 11.

27  [252] *See e.g., id*. at 14 (citing Doc No. SOC-HCOR-045422 (email thread in which Shell employee writes that "any credible route to net-zero emission requires significate electrification of end use as well as biofuels, hydrogen and some degree of carbon capture and storage)), (citing Doc. No. SOC-HCOR-391063 (New York Magazine article

28  quoting Shell's Chief Economist as saying "We're going to get as much out of [oil and gas] for as long as we can")).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

343.    Likewise, Defendants widely promoted their token investments in carbon capture and other emissions-reducing technologies like algae-based biofuels despite concerns about their scalability and cost. For example, in an advertisement, Exxon described its investment and utilization of carbon capture technology as "one way ExxonMobil is helping industrial plants … be more like plants."[253] The goal of such advertising was to convince people that "ExxonMobil is actively working on effective ways to reduce the world's $CO_2$ levels."[254] However, Exxon itself admitted that to reach net zero by 2050, carbon capture technology would need to be deployed at 185 times its current rate of deployment.[255] Indeed, Defendants viewed one of the key benefits of carbon capture technology as "sustain[ing] gas demand growth for longer[.]"[256] Similarly, beginning in 2008, Defendants heavily promoted their funding and development of algae-based biofuels as viable clean energy alternatives, only for all such efforts to be terminated by 2023 amid internal doubts about the technology's practicability.[257]

344.    Contrary to their messaging about commitments to low-carbon energy and energy diversification, however, Defendants' spending on low-carbon energy is substantially and materially less than Fossil Fuel Defendants indicate to consumers. For example, according to a recent analysis, between 2010 and 2018, BP spent 2.3% of total capital spending on low-carbon energy sources, Shell spent 1.33%, Chevron spent 0.23%, Exxon spent 0.22%, and ConocoPhillips spent 0.03%, despite an array of greenwashing advertisements and promotion conveying these companies as committed to green, clean, or sustainable energy.[258]

345.    Ultimately, although Fossil Fuel Defendants currently claim to support reducing GHG emissions, their conduct belies these statements. Fossil Fuel Defendants have continued to ramp up fossil fuel production globally; to invest in new fossil fuel development, including in shale

---

[253] *Id*. at 31 (citing Doc. Nos. EM-HCOR3-00524824, EM-HCOR3-00519383, EM-HCOR3-00519355).

[254] *Id*. (quoting Doc. No. EM-HCOR3-00298426).

[255] *Id*. at 32 citing ExxonMobil, Emissions (online at https://corporate.exxonmobil.com/what-we-do/energy-supply/globaloutlook/emissions) (accessed Apr. 29, 2024)).

[256] *Id*. at 34 (quoting Doc. No. BPS_HCOR_0037840; BPS_HCOR_00049634).

[257] *Id*. at 34-35 ("Exxon spent nearly half as much on *advertising* algae as a climate solution as it did on actually researching it.").

[258] Fletcher *et al*., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    oil production and shale gas fracking—some of the most carbon-intensive extraction projects; and

2    to plan for unabated oil and gas exploitation indefinitely into the future.

3        346.    For example, Exxon's 2023 Corporate Plan update states that the company expects

4    its oil and gas production to rise from 3.8 million oil-equivalent barrels per day in 2024 to about

5    4.2 million oil-equivalent barrels per day by 2027.[259] Exxon anticipates capital expenditures of

6    between $23 billion and $27 billion annually through 2027, and says that it will "pursu[e]" $20

7    billion of vaguely-defined "lower-emissions opportunities" through 2027.[260] In 2023 alone, Exxon

8    spent almost three times as much money acquiring fossil fuel producer Pioneer Natural Resources

9    ($59.5 billion) than it has stated it will invest in "lower carbon initiatives" (largely carbon capture

10   technology) through 2027.[261]

11       347.    Similarly, Chevron announced in late 2023 that it would spend between $18.5

12   billion and $19.5 billion on new oil and gas projects in 2024, representing an 11% increase from

13   the year before.[262] By contrast, Chevron expected to spend only $2 billion in 2024 to "lower the

14   carbon intensity of traditional operations and grow new energy business lines."[263] In late 2024,

15   Chevron announced that it would spend only $1.5 billion in 2025 on emissions-reduction efforts

16   and alternative energy initiatives, a 25% drop from 2024.[264] In 2023 alone, Chevron spent more

17   than five times as much money acquiring fossil fuel producer Hess as it has stated it will spend on

18   lower-carbon energy projects through 2028.[265]

19

20

21

---

22   [259] Press Release, ExxonMobil, *Corporate Plan Update* (Dec. 6, 2023), https://perma.cc/XAM4-F3WR.

     [260] *Id.*

23   [261] Aryn Baker, *How Chevron and Exxon's Latest Fossil Fuel Deals Compare to Their Green Spending*, Time

24   Magazine (oct. 25, 2023, 2:31 PM EDT), https://perma.cc/8ZF6-JL5D.

     [262] Sabrina Valle, *Chevron Increases Project Spending Budget by 11% for 2024*, Reuters (Dec. 6, 2023, 8:56 PM

25   EST), https://perma.cc/JB7J-6UXN.

     [263] Sam Ramon, *Chevron Announces $16 Billion 2024 Capex Budget*, Chevron (Dec. 6, 2023), https://perma

26   .cc/H4X5-FH2M.

     [264] Kevin Crowly, *Chevron Is Cutting Low-Carbon Spending by 25% Amid Belt Tightening*, Bloomberg (Dec. 6,

27   2024), https://perma.cc/N9QX-V6MT.

     [265] Baker, *How Chevron and Exxon's Latest Fossil Fuel Deals Compare to Their Green Spending*, supra note

28   EDT), https://perma.cc/3MYK-T6TV.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

348.     Likewise, Shell spent almost six times more money on oil and gas development than on renewable technology in 2022.[266] In June 2023, Shell withdrew its 2021 pledge to cut oil production each year for the rest of the decade, announcing instead that it would maintain its current level of oil production until 2030 and would invest $40 billion in oil and gas production between 2023 and 2035.[267] And while Shell states that approximately 12% of its 2021 capital spending went to its "Renewables and Energy Solutions" division, its own financial reporting indicates it dedicated only approximately 1.5% of its capital expenditures to developing renewable energy sources such as wind and solar power production, with the large majority of other spending directed to projects related to natural gas.[268] Shell also announced that, notwithstanding its record profits in 2022, it would not increase spending on Renewables and Energy Solutions and would instead focus new spending on fossil fuel production.[269]

349.     BP has also scaled back its recently stated decarbonization goals. In 2020, BP stated its intention to reduce the company's total upstream emissions by 20% by the year 2025, and 35–40% by the year 2030. In February 2023, however, BP reduced those projections to a 10–15% reduction by 2025, and a 20–30% reduction by 2030.[270] [271] BP had also pledged in 2020 to reduce its total oil and gas production 40% from 2019 levels by 2030.[272] Again in 2023, however, BP lowered its goal to a 25% reduction.[273] In 2025, BP essentially rolled back its entire 2020 pledge

---

[266] Ron Bousso, Exclusive: *Shell Pivots Back to Oil to Win Over Investors*, Reuters (June 9, 2023, 1:06 PM EDT), https://oerma.cc/3MYK-T6TV.

[267] Lottie Limb, *Shell Joins BP and Total In U-Turning on Climate Pledges 'to Reward Shareholders'*, euronews (June 15, 2023, 16:10 GMT), https://perma.cc/9QR8-JQlB.

[268] Oliver Milman, *Shell's Actual Spending on Renewables is Fraction of What It Claims, Group Alleges*, The Guardian (Feb. 1, 2023, 8:00 EST), https://perma.cc/3QRS-FZYL.

[269] Will Mathis, *Shell Hits the Brakes on Growing Renewables Unit After Record 2022 Profit*, Bloomberg (Feb. 2, 2023 7:49 AM EST), https://perma.cc/VEX5/KCJD.

[270] Evan Halper and Aaron Gregg, *BP Dials Back Climate Pledge Amed Soaring Oil Profits*, The Wash. Post (Feb. 7, 2023, 11:41 Am EST), https://perma.cc/HL7J-YZCV.

[271] BP, *Getting to Net Zero*, https://perma.cc/3SGK-8JGU; BP, BP Integrated Energy Company Strategy Update (Feb. 7, 2023), https://perma.cc/PA3U-2EZa.

[272] Shadia Nasralla and Ron Bousso, BP to *Cut Fossil Fuels Output by 40% By 2030*, Reuters, (Aug. 4, 2020, 3:34 AM EDT), https://perma.cc/5PNG-ENJT.

[273] Stanley Reed, *BP, in a Reversal, Says It Will Produce More Oil and Gas*, N.Y. Times (Feb. 7, 2023), https://perma.cc/TV4V-QK2X.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

when it announced that it is aiming to boost its oil and gas production back up to 2.5 million barrels per day by 2030, roughly 1% below its 2019 production average of 2.6 million barrels per day.[274]

350.    The following pages depict a few examples of the many images employed by Defendants in their deceptive greenwashing campaign:



**(BP Advert (Revised) Beyond Petroleum Ad. Youtube. (May 10, 2007)**

---

[274] Joe Wallace, *BP to Slash Green Spending, Pivot Back to Oil*, The Wall Street Journal (Feb. 26, 2025), https://perma.cc/K3EX-RCCL.

CLASS ACTION COMPLAINT - 86
011350-11/3355774 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15






16
17
18
19
20
21
22




23
24

**(Sponsored Advertisement by Shell. By working together, we can achieve a net-zero emissions world. Click to learn more. #MakeTheFuture. Facebook.
(May 10, 2021 to June 27, 2021)**

25
26
27
28

CLASS ACTION COMPLAINT - 87
011350-11/3355774 V1

1
2
3
4
5
6
7
8
9
10



11    **(Phillips 66 October 1, 2021 Social Media Advertisement (Facebook))**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



27    **(API "Lower emissions … industry is helping lead the way" image and text posted on its**
**website, social media post, and in other advertisements)**

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

351.    Defendants' greenwashing campaigns deceptively minimize their own role in causing climate change, including by suggesting that small changes in consumer choice and behavior can adequately address climate change. These campaigns misleadingly portray Fossil Fuel Defendants as part of the solution to climate change and deceptively distract from the fact that their fossil fuel products are the primary driver of global warming and climate change.

352.    Finally, all of these greenwashing claims are clear violations of the FTC Green Guides. Developed by the Federal Trade Commission (FTC), the Green Guides are designed to help marketers avoid making environmental marketing claims that are unfair or deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45. The Green Guides also play a large role in state consumer protection law. At least twelve states[275] have laws that directly incorporate the standards set forth in the Green Guides as the legal standard for lawfully making certain marketing claims[276] and twenty-seven states and territories[277] have laws designating the FTC's interpretation in the Green Guides as persuasive authority for courts.

**O.    Causation And Damages**

**1.    Atmospheric CO2 levels sufficient to cause the severe weather events driving the Plaintiffs' increased home-owners premiums were not inevitable.**

353.    Defendants have long been aware of alternative clean energy sources and technologies that were available to facilitate a transition away from fossil fuels.

354.    As early as 1980, Exxon knew that non-fossil fuel energy sources, if pursued, could penetrate half of a competitive energy market in approximately 50 years.[278] This internal estimate was based on extensive modeling within the academic community, including research conducted by the Massachusetts Institute of Technology's David Rose, which concluded that a transition to

---

[275] These states are Alabama, California, Florida, Indiana, Maine, Maryland, Michigan, Minnesota, New Mexico, New York, Pennsylvania, Rhode Island, and Washington.

[276] April 24, 2023 Comments to FTC re Green Guides from the states of California, Connecticut, Delaware, Illinois, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Wisconsin, available at https://oag.ca.gov/system/files/attachments/press-docs/Comments%20to%20FTC%20re%20Green%20Guides%204.24.23.pdf.

[277] These are Alabama, Alaska, Arizona, Connecticut, District of Columbia, District of Guam, Florida, Idaho, Georgia, Illinois, Maine, Maryland, Massachusetts, Michigan, Montana, New Hampshire, New Mexico, Ohio, South Carolina, Rhode Island, Tennessee, Texas, Utah, Vermont, Washington, and West Virginia.

[278] Memorandum from Henry Shaw to T.K. Kett, Exxon Research and Engineering Company's Technological Forecast: CO2 Greenhouse Effect, 3 (Dec. 18, 1980), https://perma.cc/22P8-W4V3.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1   non-fossil energy could be achieved in around 50 years. Exxon circulated an internal memo

2   approving of Rose's conclusions, stating they were "based on reasonable assumptions."[279]

3       355.   In 1980, Imperial Oil (Exxon) wrote in its "Review of Environmental Protection

4   Activities for 1978–79": "There is no doubt that increases in fossil fuel usage and decreases in

5   forest cover are aggravating the potential problem of increased $CO_2$ in the atmosphere. Technology

6   exists to remove $CO_2$ from stack gases but removal of only 50% of the $CO_2$ would double the cost

7   of power generation."

8       356.   A 1987 company briefing Shell produced on "Synthetic Fuels and Renewable

9   Energy" noted that "Initially, [clean energy sources] will supplement and eventually replace

10  valuable oil products … New energy sources take decades to make a major global contribution.

11  Sustained commitment is therefore needed during the remainder of this century to ensure that new

12  technologies and those currently at a relatively early stage of development are available to meet

13  energy needs in the next century."

14      357.   A 1989 article in a publication from Exxon Corporate Research, for company use

15  only, stated: "Since energy generation from fossil fuels dominates modern $CO_2$ emissions,

16  strategies to limit $CO_2$ growth focus near term on energy efficiency and long term on developing

17  alternative energy sources. Practiced at a level to significantly reduce the growth of greenhouse

18  gases, these actions would have substantial impact on society and our industry—near-term from

19  reduced demand for current products, long term from transition to entirely new energy systems."[280]

20      358.   In a 1997 speech by John Browne, Group Chief Executive for BP America, at

21  Stanford University, Browne described Defendants' and the entire fossil fuel industry's

22  responsibility and opportunity to reduce the use of fossil fuel products, reduce global $CO_2$

23  emissions, and mitigate the harms associated with the use and consumption of such products:

24          [W]e need to go beyond analysis and to take action. It is a moment
        for change and for a rethinking of corporate responsibility… .

25

26  [279] Exxon Research and Engineering Company, Coordination and Planning Division, $CO_2$ Greenhouse Effect: A Technical Review, at 17–18 (Apr. 1, 1982), https://perma.cc/83JJ-27CW.

27  [280] Flannery, Brian. Greenhouse Science, Connections: Corporate Research, Exxon Research and Engineering Company (Fall 1989), http://www.climatefiles.com/exxonmobil/1989-exxonmobil-article-technologys-place-

28  marketing-mix.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

[T]here is now an effective consensus among the world's leading scientists and serious and well informed people outside the scientific community that there is a discernible human influence on the climate, and a link between the concentration of carbon dioxide and the increase in temperature… . We [the fossil fuel industry] have a responsibility to act, and I hope that through our actions we can contribute to the much wider process which is desirable and necessary. BP accepts that responsibility and we're therefore taking some specific steps. To control our own emissions. To fund continuing scientific research. To take initiatives for joint implementation. To develop alternative fuels for the long term. And to contribute to the public policy debate in search of the wider global answers to the problem.[281]

359.    Indeed, Defendants themselves had developed, patented, and controlled some of these clean energy technologies.

360.    For example, in 1963, Esso (Exxon) obtained multiple patents on technologies for fuel cells,[282] including the design of a fuel cell and the necessary electrodes,[283] and on a process for increasing the oxidation of a fuel, specifically methanol, to produce electricity in a fuel cell.[284]

361.    Phillips Petroleum Company (ConocoPhillips) obtained a patent in 1966 for a "Method for recovering a purified component from a gas" outlining a process to remove carbon from natural gas and gasoline streams.[285]

362.    In 1970, Esso (Exxon) obtained a patent for a "low-polluting engine and drive system" that used an interburner and air compressor to reduce pollutant emissions, including $CO_2$ emissions, from gasoline combustion engines. The system also increased the efficiency of the fossil fuel products used in such engines, thereby lowering the amount of fossil fuel product necessary to operate engines equipped with this technology.[286]

---

[281] John Browne, Group Executive for BP America, BP Climate Change Speech to Stanford (May 19, 1997), available at https://www.climatefiles.com/wp-content/uploads/1997/05/bp-john-browne-stanford-1997-climate-change-speech-1.pdf.

[282] Fuel cells use to chemical energy of hydrogen or other fuels to produce electricity. See U.S. Dep't of Energy, *Fuel Cells*, https://perma.cc/6W5L-EZGV.

[283] Fuel Cell and Fuel Cell Electrodes, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3116169A (filed Mar. 14, 191960) (issues Dec. 31, 1963), https://perma.cc/8NKJ-DEUL.

[284] Direct Production of Electrical Energy from Liquid Fuels, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3113049A(filed Jan. 3, 1961) (issued Dec. 3, 1963), https://perma.cc/CWW4-W4MF.

[285] Phillips Petroleum Co., Patent US3228874A: Method for recovering a purified component from a gas (granted Jan. 11, 1966), https://patents.google.com/patent/US3228874.

[286] Low-polluting Engine and Drive System, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3513929A (filed Aug. 25, 1967) (issued May 26, 1970), https://perma.cc/N4AF-2M67.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

**2.    Defendants obstructed and delayed the transition to clean energy sources they knew could be achieved by deceiving consumers.**

363.    Despite Defendants' knowledge of the foreseeable, measurable, and significant harms associated with the unrestrained consumption and use of fossil fuel products, in Washington, as elsewhere, and despite Defendants' knowledge of technologies and practices that could have helped to reduce the foreseeable dangers associated with their fossil fuel products, Defendants continued to promote heavy fossil fuel use, and mounted a campaign to obscure the connection between fossil fuel products and the climate crisis.

364.    As discussed *supra*, Defendants knew since 1980 that a transition to clean energy sources reducing fossil fuel energy sources by 50% could be achieved by 2030.

365.    Defendants could have chosen to make that transition happen. Instead they embarked on a campaign to do everything they could to make sure it did not.

366.    They could have acknowledged what they knew to be the validity of scientific evidence on anthropogenic climate change and the catastrophic impacts it posed for the consumers it was selling its products to.

367.    They could have disseminated evidence supporting a public policy agenda focused not on determining whether to combat climate change but on the critical need to do so.

368.    They could have chosen not to participate in efforts, whether directly, through coalitions, or through front groups, to distort public debate, manipulate public perception and the public policy agenda, and cause many consumers, business, and political leaders to think the relevant science is far less certain than it actually is and entirely eliminated the public confusion that has ensued since at least 1988.

369.    Forthrightly communicating with consumers, the public, regulators, and warning stake-holders about the global warming hazards of fossil fuel products that were known to Defendants would have enabled informed decisions about whether to curb the use of these products—including whether and to what extent to invest in alternative clean energy sources instead of in fossil fuels.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

370.    Defendants chose a different path. As described above, rather than inform and warn the public of the risks associated with their fossil fuel sales, Defendants chose instead to perpetrate a massive, deliberate, decades-long and ongoing misinformation campaign intended to perpetuate, inflate, and maximize their fossil fuel sales and massive profits by deceiving the public and consumers as to the conclusions they themselves had reached regarding the substantial consequences that the sale of their products would have.

371.    Defendants' successful big-tobacco inspired playbook was founded on the common-sense principle that when people are made aware of the harmful effects or qualities of products they purchase, they will choose not to purchase them or to reduce their purchases.

372.    History shows that this holds especially true when products have been shown to harm public health or the environment. For example, increased consumer awareness of the role of pesticides in harming human health, worker health, and the environment has spurred a growing market for food grown organically and without the use of harmful pesticides. With access to information about how their food is grown, consumers have demanded healthier choices, and the market has responded.

373.    Consumers responded swiftly to findings that the use of products like hairsprays and deodorants with chlorofluorocarbon ("CFC") containing aerosols were depleting the earth's protective ozone layer by purchasing substitutes for CFC-containing products.

374.    Increased consumer awareness of the role of pesticides in harming human health, worker health, and the environment spurred a burgeoning market for food grown organically— with access to information about how their food was grown, consumers demanded healthier choices, and the market responded.

375.    This phenomenon can be described as the Gateway Belief Model. "The Gateway Belief Model describes a process of attitudinal change where a shift in people's perception of the scientific consensus on an issue leads to subsequent changes in their attitudes which in turn predict changes in support for public action."[287]

---

[287] https://environment.yale.edu/bibcite/reference/1949.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

376.    Recent studies and surveys have demonstrated that consumers with substantial awareness of climate change are largely willing "to change their consumption habits … to help reduce the impacts of climate change."[288]

377.    It has also been shown that informed consumers attempt to contribute toward solving environmental problems by supporting companies that they perceive to be developing "green" or more environmentally friendly products.[289]

378.    Defendants were and are well aware that consumer purchasing habits regarding fossil fuels, like tobacco sales, would be driven by the consumer's understanding of the associated risks. They knew that knowledge of the full extent of the risks associated with the routine use of fossil fuel products is material to consumers' decisions to purchase and use those products. As a BP executive put it in an internal memo from 2016:[290]

## 1.1.1 Risks to BP from climate change

The climate problem has the potential to disrupt BP's business in at least three ways:
  i. Effective climate policies can emerge that discourage fossil fuel consumption, that impose environmental performance standards on production processes, and that subsidize or promote efficiency and low carbon energy.
  ii. Climate-motivated research can create disruptive new energy technology.
  iii. Climate impacts can directly disrupt BP's investments in energy production infrastructure and supply chains.

379.    Creating a false perception of disagreement in the scientific community (despite the consensus that its own scientists, experts, and managers had previously acknowledged) has been a successful strategy for the Defendants. It disrupted vital channels of communication between

---

[288] Changes in Consumers' Habits Related to Climate Change May Require New Marketing and Business Models, The Conf. Bd. (Oct. 26, 2022), https://perma.cc/2FFC-WYAY.

[289] See, e.g., Anthony Leiserwitz et al., Consumer Activism on Global Warming, Yale Program on Climate Change Commc'n & George Mason Univ. Ctr. for Climate Change Commc'n, George Mason University, eds (Sept. 2021), https://perma.cc/5VXC-BN2H.

[290] BP. Issues Management Working Group Meeting Notes; Caspian 4.53. (Sept. 25, 2017) https://oversight democrats.house.gov/sites/democrats.oversight.house.gov/files/2022/BP_Redacted-Final-1.pdf p.104.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    scientists and the public and deprived consumers of the knowledge to make informed choices about

2    their consumption of Defendants' fossil fuel products.

3        380.    In 2007, a Yale University-Gallup poll found that only 48% of Americans believed

4    that there was a consensus among the scientific community that global warming was happening,

5    and 40% believed there was a lot of disagreement among scientists over whether global warming

6    was occurring.[291] Eight years later, a 2015 YaleGeorge Mason University poll found that "[o]nly

7    about one in ten Americans understands that nearly all climate scientists (over 90%) are convinced

8    that human-caused global warming is happening, and just half … believe a majority do."[292]

9    Further, it found that 33% of Americans believe that climate change is mostly due to natural causes,

10   compared to 97% of peer-reviewed papers that acknowledge that global warming is real and at

11   least partly human-caused.[293]

12       381.    Following an advertising campaign linking Shell to a polar expedition using

13   renewable fuels, on of Shell's public relations firms articulated the "Business Outcome" of the

14   campaign:

15   
16       • Audience members are 31% more likely to believe Shell is
             committed to cleaner fuels.

17       • Positive attitudes towards the brand increased by 12%

18       382.    Deliberately undermining the science of climate change, purposefully downplaying

19   the role that the purchase and consumption of their products played in causing climate change,

20   concealing failing to inform consumers and the public of their understanding that without swift

21   action, climate change would result in "catastrophic" consequences has been a tremendous success

22   for the Defendants' collective bottom-line.

23       383.    Defendants' campaign has ensured that the transition away from fossil fuels to

24   clean energy and low-carbon technologies that the Defendants' determined would penetrate half

25   

26       [291] *American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll*, Yale Program on Climate Change
         Commc'n (July 31, 2007), https://perma.cc/JU76-XV82.

27       [292] Anthony Leiserowitz et al., *Climate Change in the American Mind*, Yale Program on Climate Change
         Commc'n & George Mason Univ., Ctr. For Climate Change Commc'n 9 (Oct. 2015), https://perma.cc/4M77-25RM.

28       [293] *Id.* at 7.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

of the competitive energy market by 2030 if pursued has been entirely derailed. And it has successfully prolonged and maximized Defendants' massive profits. During the period when Defendants and their proxies were deliberately misleading consumers about the consequences of using their products, Defendants realized massive profits through the unduly inflated and expanded extraction, production, promotion, marketing, and sale of their fossil fuel products. ExxonMobil alone earned approximately $775 billion in profits during this period,[294] and the six largest oil and gas companies have generated $2.4 trillion in profits since 1990.[295]

3.    **The massive fossil fuel sales driven by the Defendants' deceptive and unlawful conduct have now resulted in the very same extreme weather events defendants foresaw they would and, in turn, have precipitated a home-owners insurance crisis.**

384.    The scientific community has unequivocally concluded—just like the research conducted by the fossil fuel industry itself did decades ago—that the unabated and growing sale of Defendants' fossil fuel products during their campaign of deception has more than substantially contributed to atmospheric $CO_2$ reaching levels that are causing escalating extreme weather occurrences.

385.    Had it not been for Defendants' deception, non-fossil fuel energy sources would have penetrated half of a competitive energy market by 2030, just as Defendant Exxon forecasted in 1980. This would have prevented the unabated accumulation of GHG, an accumulation the Defendants have more than substantially contributed to, from causing the catastrophic results Defendants predicted, including the extreme weather events that are driving the Plaintiffs' increased insurance premiums. Atmospheric $CO_2$ levels would not be anywhere near the levels necessary to cause the extreme weather events now being experienced if Defendants had not derailed the path to a 50% reduction in fossil fuel sales by the year 2030 that they knew would occur if they did not do something to prevent it.

---

[294] Matthew Tyler & Jillian Ambrose, Revealed: big oil's profits since 1990 total nearly $2tn: BP, Shell, Chevron and Exxon accused of making huge profits while "passing the buck" on climate change, The Guardian (Feb. 12, 2020), https://www.theguardian.com/business/2020/feb/12/revealed-big-oil-profits-since-1990-total-nearly-2tn-bp-shell-chevron-exxon [https://perma.cc/ GML4-AME4].

[295] Padding Big Oil's Profits: Companies bank trillions, taxpayers get the bill, Taxpayers for Common Sense (Feb. 2019), https://www.taxpayer.net/energy-natural-resources/padding-bigoils-profits/ [https://perma.cc/2UTW-JH4B].

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

386.    Defendants' failure to warn consumers and deception about the dangers of their products in causing climate change has resulted in the very same "dramatic environmental effects" that the Defendants knew would come to pass from the continued expansion of the use of their products.

387.    There is also no debate that these escalating extreme weather occurrences brought about by Defendants' misconduct have, in turn, caused insurance companies to increase homeowner's insurance premiums.

388.    On May 25, 2021, then President Biden issued Executive Order (EO) 14030, calling for "a comprehensive, [g]overnment-wide strategy" on climate-related financial risk. Among other things, EO 14030 directed the Federal Insurance Office (FIO) of the Department of the Treasury to "assess, in consultation with States, the potential for major disruptions of private insurance coverage in regions of the country particularly vulnerable to climate change impacts."[296]

389.    On November 2, 2023, in accordance with EO 14030, the Department of Treasury published notice of FIO's intent to "obtain consistent, granular, and comparable homeowners insurance data that is not otherwise publicly available on a national level," describing this data as "critical to understanding how climate-related financial risks impact families and individuals across state markets and the United States."[297]

390.    In June of 2024, Benjamin J. Keys of the Wharton School at the University of Pennsylvania and Philip Mulder of the University of Wisconsin School of Business published a National Bureau of Economic Research working paper: Property Insurance and Disaster Risk: New Evidence from Mortgage Escrow Data.[298] The authors began by noting that "[w]ith widespread rate increases since 2020 and forecasts of heightened climate risk, the impact of rising insurance premiums has become a pivotal issue for households, financial institutions, researchers, and policymakers," but "[u]nfortunately, existing data on premiums is coarse and inadequate,

---

[296] https://www.federalregister.gov/documents/2021/05/25/2021-11168/climate-related-financial-risk.

[297] https://www.federalregister.gov/documents/2023/11/02/2023-24248/agency-information-collection-activities-submission-for-omb-review-comment-request-federal-insurance#:~:text=The%20primary%20goal%20of%20this%20data%20collection,since%202017%20at%20a%20ZIP%20Code%20leve.

[298] https://www.nber.org/papers/w32579.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  preventing a clear understanding of the extent and underlying causes of these increases."[299] Using

2  "information on mortgage escrow payments to develop a new approach to measuring homeowners

3  insurance premiums,"[300] they determined that "those in the top 5% of expected disaster risk

4  increase" face "annual premium increases of over $700 by 2053 due to higher disaster risk.

5  Extrapolating our full-sample estimates to the approximately 80 million single-family homes in

6  the U.S. implies additional annual premiums of $5.1 billion by 2053." Keys and Mudler noted that

7  "We anticipate that this data effort is only an initial foray into measuring homeowners insurance

8  markets, and that additional data availability on policy coverage, deductibles, and claims will be

9  valuable for researchers, policymakers, and households that must navigate an increasingly

10  challenging property insurance landscape."[301]

11  391.    On January 16, 2025, in response to CO (EO) 14030, the Department of the

12  Treasury issued its *U.S. Department of the Treasury Report: Homeowners Insurance Costs Rising,*

13  *Availability Declining as Climate-Related Events Take Their Toll.*[302] The Report was based on a

14  dataset "created through a first-of-its-kind collaboration among the National Association of

15  Insurance Commissioners (NAIC), state insurance regulators, and FIO."[303] "Data and analysis,

16  like those in this report, are critical for helping policymakers understand how substantial climate-

17  related property losses are being spread across homeowners, insurers, and governments," said

18  Under Secretary for Domestic Finance Nellie Liang.[304] Among the report's key findings:

19  • Climate change is making it more costly for insurers to operate.[305]

20  • Homeowners in communities affected by substantial weather events are paying far
   more than those elsewhere; and

21

22  • Homeowners insurance costs are rising fast across the nation.

---

[299] *Id.* at 2.

[300] *Id.*

[301] *Id.* at 31.

[302] *See* FIO, "Analyses of U.S. Homeowners Insurance Markets, 2018-2022: Climate-Related Risks and Other Factors" (Jan. 16, 2025), available at https://home.treasury.gov/system/ files/311/Analyses_of_US_Homeowners_Insurance_Markets_2018-2022_ClimateRelated_Risks_and_Other_Factors_0.pdf.

[303] *Id.* at 1.

[304] https://home.treasury.gov/news/press-releases/jy2791.

[305] *Id.*



392.    Insurance generally operates by pooling risks.[306] Thus, when climate change increases the frequency and intensity of disasters, insurance companies will spread the costs across the customer pool in the form of higher rates.[307] "So even if you haven't been directly harmed by extreme weather, you're paying for some of the costs of those climate-worsened disasters."[308]

393.    Plaintiffs did not, and could not have, understood that the intentional and deceptive nature of Defendants' statements about climate change had resulted in increased home-owners insurance premiums until June of 2024, at the very earliest.

394.    Plaintiffs and the putative class do not seek to impose liability on Defendants for their direct emissions of GHGs and do not seek to restrain Defendants from engaging in their lawful business operations. The complaint does not ask the Court to limit, cap, or enjoin the production and sale of fossil fuels by Defendants, or anyone else. This case does not incentivize—much less compel—Defendants to curb their fossil fuel production or greenhouse gas emissions; it merely presents the proposition that those activities will be slightly less profitable. Nothing in this lawsuit stands as an obstacle to any Congressional purposes or objectives. Defendants' successful effort to deceive the public was undertaken for the express purpose of preserving and maximizing their profits. This case seeks only to ensure that the parties who have profited from this deception cannot offload costs resulting from that deception onto the backs of ordinary homeowners.

395.    A report by Climate Analytics (2023) calculated the amount of damages caused by the 25 largest emitting oil and gas companies compared to their fiscal gains and concluded the "dirty dozen", which includes the defendants, accounted for 15 trillion in environmental damages with 21 trillion in gains. Defendant here could have and can pay for the damages they have caused and remain profitable.

---

[306] https://yaleclimateconnections.org/2025/01/nobodys-insurance-rates-are-safe-from-climate-change/.

[307] *Id.*

[308] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

## V.     CLASS ACTION ALLEGATIONS

396.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

397.     Plaintiffs seek to represent the following class and subclasses (collectively, the "Classes") defined as follows:

> **The Nationwide Class:** All persons who have or will purchase homeowner's insurance for property in the United States at any time after the year 2017 asserted for the RICO claims; and

> **The Washington Subclass:** All persons who have or will purchase homeowner's insurance for property in the State of Washington at any time after the year 2017 asserted for all claims.

398.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded or otherwise modified.

399.     Plaintiffs reserve the right to establish subclasses as appropriate.

400.     This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1-4) and 23(b)(1), (b)(2), or (b)(3), and satisfies the requirements thereof. As used herein, the term "Class Members" shall mean and refer to the members of the Classes.

401.     <u>Numerosity</u>: While the exact number of members of the Classes is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Classes is ascertainable based upon the records maintained by Defendants. At this time, Plaintiffs are informed and believe that the Classes include hundreds of thousands of members. Therefore, the Classes are sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

402.     <u>Ascertainability</u>: Some names and addresses of members of the Classes are available from Defendants' records, and others can be ascertained through appropriate notice. Notice can be provided to the members of the Classes through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under Washington state law and federal law.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

403. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the other members of the Class, which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Classes have been subjected to the same deceptive and improper practices and have been damaged in the same manner thereby.

404. <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Classes, because they have no interests that are adverse to the interests of the members of the Classes. Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

405. <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

    a.    The expense and burden of individual litigation make it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action.

    b.    If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

    c.    Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

406. Common questions of law and fact exist as to the members of the Classes, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Classes within the meaning of Federal Rule of Civil Procedure 23(b)(3).

407. The common questions of fact include, but are not limited to, the following:

    a.    Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

    b.    Whether Defendants were members of, or participants in the conspiracy alleged herein;

    c.    Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of the laws of the state of Washington.

d.    Whether Plaintiffs and members of the Classes sustained damages, and if so, the appropriate measure of damages; and

e.    Whether Plaintiffs and members of the Classes are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of this suit.

408.    In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

a.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants;

b.    The prosecution of separate actions by individual members of the Classes would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole and necessitating that any such relief be extended to members of the Classes on a mandatory, class-wide basis.

409.    Plaintiffs are not aware of any difficulty that will be encountered in the management of this litigation that should preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §1962(c))

410.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein for this and all of their causes of action.

411.    The Racketeer Influenced and Corrupt Organizations Act (RICO) forbids "any person ... associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

### A.    The RICO Enterprise

412.    Defendants collectively are an "enterprise," as that term is defined in 18 U.S.C. §1961(4), i.e., a group of business entities and individuals associated in fact, which was engaged

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  in, and the activities of which affected, interstate commerce and foreign commerce (the RICO

2  Enterprise).

3      413.    The Fossil Fuel RICO Enterprise functioned as a continuing unit for decades to

4  achieve, through unlawful means, the shared goal and common purpose of enhancing and

5  prolonging the market for fossil fuel products and thereby increasing and maximizing the

6  Defendants' profits, regardless of the truth, the law, or the consequences to the American people.

7      414.    Each individual Defendant itself had, at all times material hereto, an extensive

8  nexus to interstate or foreign commerce, and the affairs of the RICO Enterprise affected interstate

9  commerce through a pattern of racketeering activity.

10      415.    Each Defendant knowingly joined the Fossil Fuel RICO Enterprise. Each

11  Defendant knew the general nature and purpose of the RICO Enterprise, and that it extended

12  beyond any one Defendant's individual role, but each Defendant also knew that all the other

13  Defendants were participating in the RICO Enterprise to achieve their shared objective.

14      416.    From at least as early as 1959, and continuing until the time of filing of this

15  complaint, in Washington and in the United States, Defendants perpetrated a scheme to defraud

16  and obtain money and property from members of the public by means of material false and

17  fraudulent pretenses, misrepresentations, false promises, omissions of material facts, and other

18  means, knowing that the pretenses, representations, and promises, were false when made.

19      417.    The scheme involved the Defendants selling products for purchase by consumers

20  under the pretext that such products were not proven to be dangerous when in fact, Defendant

21  knew that continued sales of fossil fuels were directly causing and would exacerbate climate

22  change and associated extreme weather events. Defendants were well aware that if they told the

23  truth about the link between consumers purchase of fossil fuels and catastrophic climate change

24  events such disclosure would threaten and/or substantially impact the profitability of Defendants'

25  fossil fuel business model.

26      418.    Each Defendant participated, directly or indirectly, in the conduct of the RICO

27  Enterprise's affairs, and had some part in directing its affairs via intentional and deliberate

28  performance of acts, functions, or duties which are related to the operation or management of the

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    RICO Enterprise by coordinating and/or causing the public dissemination of false, misleading or

2    deceptive statements denying the link between fossil fuels and climate change, all in furtherance

3    of the primary, shared objective of the RICO Enterprise.

4    **B.    The Pattern Of Racketeering Activity**

5    419.    Through their relationships with each other and as members of API, GCC, and

6    others, the RICO Enterprise coordinated and conspired to achieve their shared objective by

7    concealing and misrepresenting the known dangers of burning fossil fuels, knowingly withholding

8    material information regarding the consequences of using fossil fuel products, spreading

9    knowingly false and misleading information to the public regarding the weight of climate science

10   research, and deceptively promoting consumer demand for fossil fuel products which they knew

11   were harmful and were associated with catastrophic consequences.

12   420.    For example, API and its members, including Defendants, knew, since at least

13   1965, that unabated GHG emissions would result in "catastrophic" consequences.

14   421.    Despite their knowledge, Defendants chose to perpetrate a massive misinformation

15   campaign intended to protect their profits by engaging in a deliberate decades-long misinformation

16   campaign intended to sow doubt about the conclusions they themselves had reached about the

17   substantial consequences that the sale of their products would have. This was all done while failing

18   to inform consumers and the general public of their superior knowledge to the contrary, and with

19   the goal of protecting their massive profits by perpetuating and maximizing dependence on fossil

20   fuel products by stymying consumer and public understanding of climate change and the role of

21   fossil fuel consumption in causing it.

22   422.    Another strategy in Defendants' efforts to discredit scientific consensus on climate

23   change and the IPCC was to bankroll unqualified or unscrupulous scientists to advance fringe

24   conclusions about climate change. These scientists obtained part or all of their research budget

25   from Fossil Fuel Defendants directly or through Fossil Fuel Defendant-funded organizations like

26   Defendant API.

27   423.    Defendants also conspired with, financed, and worked hand-in-hand with industry

28   trade associations, front groups, and other organizations to lie about it. This included using a web

1    of trade associations, think tanks, and other nonprofits, including, but not necessarily limited to,

2    API, GCC, the Chamber, OGCI, NGSA, WSPA, NPC, IPIECA, ICE, GES, AEI, ALEC, GMI, the

3    $CO_2$ Coalition, and the Heartland Institute, to spread misleading narratives to the public, without

4    having to put their names directly on advertisements, lobbying, or PR campaigns.

5        424.    Defendants also cultivated partnerships with academic institutions as a way to

6    influence climate research toward an energy transition that favors maintaining fossil fuels for as

7    long as possible, bolster their ability to claim expertise on climate science, and gain access to

8    thought leaders. They funded and shaped academic research programs, conditioned grants on

9    cooperation from researchers, used academic programs to bolster access to policymakers, and they

10   tracked critics and pressured news outlets.

11       425.    For purposes of executing and attempting to execute and in furtherance of their

12   scheme, Defendants and their co-conspirators would and did knowingly transmit and cause to be

13   transmitted in interstate and foreign commerce by means of mail, telephone, wire, radio, television,

14   and internet communication writings, signs, signals, pictures, and sounds.

15       426.    As a direct and proximate result of the Defendants' racketeering activities and

16   violations of 18 U.S.C. §1962(a), and by reason thereof, Plaintiffs have been damaged. As set forth

17   herein, Defendants have long understood the central role their fossil fuel products play in causing

18   climate change and the associated potential for catastrophic consequences. Defendants'

19   misconduct and campaign of deception were intended to, and did, perpetuate, inflate, and

20   maximize the market for fossil fuels. Defendants' deception campaign successfully swayed

21   opinion. It staved off and delayed the transition to alternative energy sources, derailing

22   Defendants' forecast that clean energy could penetrate half of a competitive energy market by

23   2030. It prolonged and maximized Defendants' massive profit, but it also resulted in atmospheric

24   GHG levels that are now altering the climate and supercharging deadly wildfires, floods, and

25   storms. This, in turn, has resulted in increased costs to insurance companies and increased

26   homeowners' insurance premiums.

27

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

## SECOND CAUSE OF ACTION

2

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT (18 U.S.C. §1962(a))

3

4       427.    Defendants used and invested income that was derived from a pattern of

5   racketeering activity to operate through enterprises which affected interstate commerce.

6   Specifically, the Defendants, all interdependent on each other for the operation of their industry

7   monopoly, all used and invested income derived from the pattern of racketeering activity to fund

8   and support the API, GCC and the RICO Enterprise to deceive the public, investors, regulators,

9   and the Plaintiffs and their citizens, persons of ordinary prudence and comprehension, that their

10  products and business model did not cause climate change, and/or that climate change was not a

11  real or a threat to the public, including to the Plaintiffs. As a direct and proximate result of the

12  Defendants' racketeering activities and violations of 18 U.S.C. §1962(a), and by reason thereof,

    Plaintiffs have been damaged as described herein.

13

## THIRD CAUSE OF ACTION

14

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT (18 U.S.C. §1962(b))

15

16      428.    Each Defendant participated at some point and/or maintained control of the

17  operation and control of API and the RICO Enterprise. Defendants also participated in or directed

18  the activities of the API and RICO Enterprise's activities, which furthered the scheme to deceive

19  the public about fossil fuels accelerating climate change in order to maintain their profits from the

20  fossil fuel industry and prevent or, at least, delay the transition from fossil fuels to more sustainable

21  energy sources. For example, and as described *supra*:

22          a.    Senior Executives from several of the Oil and Gas Defendants have been members
                of API and have served on the API Board of Directors throughout the last several
23              decades.

24          b.    The API Board of Directors has been Chaired by Executives of Defendants every
                year for the past five years: Chevron (2022-present), ConocoPhillips (2020-2022),
25              ExxonMobil (2018-2020), and Phillips 66, a subsidiary of Defendant
                ConocoPhillips (2016-2018).
26
27          c.    The Oil and Gas Defendants have exercised further control through their financial
                contributions to API, making up a large portion of API's yearly income. Oil and
28              Gas Defendants have together contributed tens of millions of dollars annually as
                members.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

d.    The Oil and Gas Defendants have organized, controlled, and participated in API initiatives, Committees, Task Forces, Communications Teams, marketing efforts, and lobbying for the past 50 years to deceive the public about the recognized risks of climate change.

429.    Each Defendant participated at some point and/or maintained control of the operation and control of API and the RICO Enterprise. Defendants also participated in or directed the activities of the API and RICO Enterprise's activities, which furthered the scheme to deceive the public about fossil fuels accelerating climate change in order to maintain their profits from the fossil fuel industry and prevent or, at least, delay the transition from fossil fuels to more sustainable energy sources. For example, and as described *supra*:

a.    Defendants ExxonMobil, Shell, ConocoPhillips, and API were all founding members of the GCC. All Defendants were members of the GCC throughout its existence.

b.    GCC's first Chairman was a previous ConocoPhillips Director of Government Relations, Thomas Lambrix.

c.    Executives from Defendants ExxonMobil, Chevron, and ConocoPhillips served on the GCC's Board of Directors.

d.    The GCC's Science and Technology Committee, which created false studies disputing the possibility of manmade climate change, was co-chaired by an ExxonMobil Executive. Further, Chevron executives also served as members of the Science and Technology Committee.

430.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. §1962(b), and by reason thereof, Plaintiffs have been damaged as described herein.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §1962(d))

431.    Defendants agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c). Defendants formulated, funded and supported the API, GCC, and the RICO Enterprise to deceive the public, investors, regulators, Plaintiffs and their citizens, persons of ordinary prudence and comprehension, that their products and business model did not substantially contribute to climate change, and/or that climate change was not real or a threat to the public; all in an effort to (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    (§ 1962(a)); (2) acquire or maintain interests in the enterprise through a pattern of racketeering

2    activity (§ 1962(b)); and (3) conduct and participate in the conduct of the affairs of the enterprise

3    through a pattern of racketeering activity (§ 1962(c)).

4        432.    As a direct and proximate result of the Defendants' racketeering activities and

5    violations of 18 U.S.C. § 1962(d), and by reason thereof, Plaintiffs have been damaged as

6    described herein.

7    **FIFTH CAUSE OF ACTION**

8    **FRAUDULENT MISREPRESENTATION**
     **(The Washington Sub-class Only)**

9

10        433.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

herein.

11

12        434.    Defendants' material misrepresentations and omissions about the certainty and

13    consensus about the science of climate change, the role their products played in causing climate

change, the consequences of climate change, the need to act quickly to mitigate climate change,

14    and the harms that it would bring.

15

16        435.    These material misrepresentations and omissions caused economic harm to

17    Plaintiffs and the Class. Plaintiffs and the Classes thereby have suffered an injury in fact.

18        436.    Defendants knew or should have known that the science of climate change was

19    certain and that there was a scientific consensus about the science and the role of fossil fuels as

20    early as 1982, that the consequences of climate change could be catastrophic, and that we needed

to act quickly to mitigate the worst injuries from climate change.

21

22        437.    Accordingly, Defendants' acts were intentional, oppressive, deliberate, and/or

23    reckless with the intent to defraud Plaintiffs and the Classes.

24        438.    Consumers, regulators, policy makers, and the public relied on these

25    misrepresentations, allowing for the purchase of more fossil fuel products than otherwise would

have occurred.

26

27        439.    Consumers', regulators', policy makers', and the public's reliance on Defendants'

28    misrepresentations in continuing to purchase and use Defendants' fossil fuel products was

CLASS ACTION COMPLAINT - 108
011350-11/3355774 V1

1    reasonable because Defendants held themselves out as experts and failed to disclose financial

2    relationships with seemingly independent experts.

3        440.    Plaintiffs did not, and could not have, understood the intentional and deceptive

4    nature of Defendants' statements about climate change would result in increased homeowners

5    insurance premiums.

6        441.    Defendants' conduct warrants an assessment of punitive damages in an amount

7    sufficient to deter such conduct in the future, which amount is to be determined according to proof.

8                        **SIXTH CAUSE OF ACTION**

9                            **CIVIL CONSPIRACY**
                        **(The Washington Sub-class Only)**
10

11        442.    Defendants engaged in a civil conspiracy with each other, with organizations not

     directly engaged in the sale of fossil fuel products, and with individuals to mislead the public and
12
     decision makers about the consequences of using their products. Defendants are jointly and
13
     severally liable, along with other co-conspirators, for this conspiratorial conduct and the resulting
14
     harm suffered by the State as a result of their conspiracy.
15

16                    **SEVENTH CAUSE OF ACTION**

                        **UNJUST ENRICHMENT**
17                    **(The Washington Sub-class Only)**

18        443.    Plaintiffs have conferred a benefit upon Defendants by paying for the costs of the

19    harms caused by Defendants' improper and unlawful practices. Because of the conduct, practices,

20    actions, and material omissions described in this Complaint, Defendants obtained enrichment they

21    would not otherwise have obtained, and without justification.

22                        **EIGHTH CAUSE OF ACTION**

23    **VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**
               **(WASH. REV. CODE ANN. § 19.86.010, *ET SEQ.*)**
24                    **(The Washington Sub-class Only)**

25        444.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

26    herein.

27

28



445.    The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE ANN. §19.96.010.

446.    Defendants' acts complained of herein are deceptive and unfair within the meaning of the Washington CPA. WASH. REV. CODE ANN. §19.96.010.

447.    Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of the Washington CPA. WASH. REV. CODE ANN. §19.96.010.

448.    Defendants' deceptive and unfair practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons.

449.    Defendants' deceptive and unfair practices, as alleged herein, injured Plaintiffs and the Class in their business or property.

450.    If not for Defendants' deceptive and unfair conduct, Plaintiffs and the Class would not be forced to pay the increased home-owners insurance premiums they are now paying as described herein.

451.    Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE ANN. §19.86.090.

## NINTH CAUSE OF ACTION

### NUISANCE
### (The Washington Sub-class Only)

452.    Under RCW 7.48.120, "[n]uisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property."

453.    An actionable nuisance subject to damages and other relief includes "whatever is injurious to health or indecent or offensive to the senses … so as to essentially interfere with the

CLASS ACTION COMPLAINT - 110
011350-11/3355774 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    comfortable enjoyment of the life and property." *Id.* 7.48.010. "A public nuisance is one which

2    affects equally the rights of an entire community or neighborhood, although the extent of the

3    damage may be unequal." *Id.* 7.48.130.

4        454.    Defendants, individually and in concert with each other, have engaged, and

5    continue to engage in, unlawful, negligent, reckless, knowing, and/or intentional tortious conduct.

6    Such conduct, described *supra*, includes: promoting doubt in the public's mind about the existence,

7    causes, and effects of climate change; promoting the sale and use of fossil fuels without warning

8    consumers that using fossil fuels would cause dangerous climate change; promoting the sale and

9    use of fossil fuels that Defendants knew to be hazardous and knew would cause catastrophic

10   consequences, including, but not limited to, extreme weather occurrences, deadly wildfires, floods,

11   and storms; concealing the hazards that Defendants knew would result from the normal use of their

12   fossil fuels by misrepresenting, and casting doubt on, the integrity of scientific information related

13   to climate change; disseminating and funding the dissemination of information that misleads

14   consumers and the public regarding the known and foreseeable risk of climate change and its

15   consequences, which follow from the normal, intended use of fossil fuels; misleadingly promoting

16   fossil fuel products as sustainable, clean energy products; misleadingly presenting themselves as

17   clean energy companies who are committed to reducing emissions; and misleadingly promoting

18   their investments in alternative technologies as capable of reducing emissions on a large-scale in

19   the near-term.

20       455.    Defendants' campaign of deception has been pervasive and long-lasting. Their

21   willful campaign has influenced the public's purchasing and investment decisions for decades,

22   unduly driving ever increasing demand for fossil fuels. It has also reduced demand for, and

23   investment in, clean energy, thereby delaying the clean energy transition. This increased demand

24   directly led to increased greenhouse gas emissions and is a substantial factor causing injury to

25   Plaintiffs.

26       456.    Defendants' conduct is the proximate cause of the injuries to Plaintiffs. Defendants

27   knew that continued fossil fuel sales would lead to a climate crisis. They nonetheless chose to

28   engage in a sophisticated deception campaign that had the purpose and effect of sustaining, and

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  inflating, fossil fuel consumption. Plaintiffs' injuries if increased insurance premiums are the direct

2  and foreseeable result of Defendants' tortious conduct.

3      457.   Defendants' ongoing interference with public rights is substantial and

4  unreasonable. The harm to the Plaintiffs is severe and should be born without compensation.

5  Defendants' deceptive acts and omissions also lack any social utility because there is no utility in

6  deceiving and misleading the public.

7  **REQUEST FOR RELIEF**

8      458.   Plaintiffs, on behalf of themselves and all others similarly situated, request the

9  Court to enter judgment against Defendants, as follows:

10      A.   Certifying the Classes, as requested herein, certifying Plaintiffs as the

11  representative of the Classes, and appointing Plaintiffs' counsel as counsel for the Classes;

12      B.   Ordering that Defendants are financially responsible for notifying all members of

13  the Class of the alleged conduct discussed herein;

14      C.   Awarding Plaintiffs and the members of the Classes compensatory damages in

15      D.   an amount according to proof at trial;

16      E.   Awarding restitution and disgorgement of Defendants' revenues and/or profits to

17  Plaintiffs and members of the Classes;

18      F.   Awarding Plaintiffs and the members of the Classes treble damages in an amount

19  according to proof at trial;

20      G.   Awarding declaratory and injunctive relief as permitted by law or equity, including:

21  enjoining Defendants from continuing the unlawful practices as set forth herein, and directing

22  Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and

23  disgorgement of all monies acquired by Defendants by means of any act or practice declared by

24  this Court to be wrongful;

25      H.   Awarding interest on the monies wrongfully obtained from the date of collection

26  through the date of entry of judgment in this action; and

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1        I.    Adjudicating Defendants jointly and severally liable for any damages sustained by

2    the Plaintiffs and members of the class and awarding such other relief as the court deems just and

3    equitable.

**DEMAND FOR JURY TRIAL**

4

5        Plaintiffs hereby demand a jury trial for all claims so triable.

6    DATED: November 25, 2025        Respectfully submitted,

7                        **HAGENS BERMAN SOBOL SHAPIRO LLP**

8

9                        By: */s/ Steve W. Berman*
                    Steve W. Berman, WSBA #61063

10                       By: */s/ Sydney K. Thomas*
                    Sydney K. Thomas, WSBA #64571

11                       1301 Second Avenue, Suite 2000
                    Seattle, WA 98101

12                       Telephone: (206) 623-7292
                    steve@hbsslaw.com

13                       sydney.thomas@hbsslaw.com

14                       Jason Gustafson (*pro hac vice* forthcoming)

15                       Pat Michenfelder (*pro hac vice* forthcoming)
                    Chad Throndset (*pro hac vice* forthcoming)

16                       **THRONDSET MICHENFELDER, LLC**
                    80 S. 8th Street, Suite 900

17                       Minneapolis, MN 55402
                    Telephone: (763) 515-6110

18                       jason@throndsetlaw.com

19                       pat@throndsetlaw.com
                    chad@throndsetlaw.com

20

21                       Daniel E. Gustafson (*pro hac vice* forthcoming)
                    Tony Stauber (*pro hac vice* forthcoming)

22                       Josh Rissman (*pro hac vice* forthcoming)
                    Michael Warkel (*pro hac vice* forthcoming)

23                       **GUSTAFSON GLUEK PLLC**
                    Canadian Pacific Plaza

24                       120 South Sixth Street, Suite 2600
                    Minneapolis, MN 55402

25                       Telephone: (612) 333-8844
                    dgustafson@gustafsongluek.com

26                       tstauber@gustafsongluek.com

27                       jrissman@gustafsongluek.com
                    mwarkel@gustafsongluek.com

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rebecca A. Peterson (*pro hac vice* forthcoming)
**GEORGE FELDMAN MCDONALD PLLC**
1650 W. 82nd Street, Suite 880
Bloomington, MN 55431
Telephone: (612)0778-9595
rpeterson@4-Justice.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT - 114
011350-11/3355774 V1

HAGENS BERMAN